# EXHIBIT 2

**FIRST AMENDMENT**
**[OH0329 – NEW BRAUNFELS, TX]**

THIS AMENDMENT is made as of **March 13, 2012.** by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C. a Florida limited liability company ("One Hour"), and **ZUBIE AIR INC,** a Texas corporation ("Franchisee") with respect to the following facts:

A. One Hour and Franchisee made a Franchise Agreement of even date (the "Franchise Agreement") granting Franchisee the right to use the ONE HOUR AIR CONDITIONING & HEATING® System and Licensed Marks to operate the Franchised Business at a specific location. All words and phrases have the meaning attributed to them in the Franchise Agreement.

B. One Hour and Franchisee desire to amend the Franchise Agreement, as herein provided.

In consideration of the premises, the Franchise Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, One Hour and Franchisee hereby agree that:

1. Section 8.2 of the Franchise Agreement entitled "**Continuing Franchise Fee**" is hereby deleted in its entirety and replaced with the following:

8.2     *Continuing Franchise Fee.* Commencing on the first of the month following 90 days after the Effective Date, as stated on **Exhibit A**, Franchisee will pay One Hour a semi-monthly continuing franchise fee (the "**Continuing Franchise Fee**") equal to a percentage of Net Sales (as defined in Section 8.5), determined as follows: three percent (3%) of Net Sales from July 1, 2012 through June 31, 2013,  four  percent (4%) of Net Sales from July 1, 2013 through June 31, 2014; and five percent (5%) of Net Sales thereafter for the remainder of the Term of the Franchise Agreement. Franchisee will calculate and pay the Continuing Franchise Fee twice a month: (A) the first payment is due by the 19th day of each month for Net Sales from sales from the 1st day through the 15th day of the month, and (B) the second payment is due by the 6th day of the next month for Net Sales from sales from the 16th day through the last day of the immediately preceding month.

**[Space intentionally left blank]**

1

2.     In all other respects the Franchise Agreement shall remain unchanged and is hereby ratified and confirmed.

One Hour:                                          Franchisee:

ONE HOUR AIR CONDITIONING            **ZUBIE AIR INC**
FRANCHISING, L.L.C.

By:                                                     By:
Scott F. Boose                                      **Evel L. Zubiate**
President                                              **President**

2



**FRANCHISE AGREEMENT**
**for operation of a**
**ONE HOUR AIR CONDITIONING & HEATING**
**FRANCHISED BUSINESS**
**or a**
**ONE HOUR HEATING & AIR CONDITIONING**
**FRANCHISED BUSINESS**

Franchisee: **ZUBIE AIR INC**

Territory Name: **New Braunfels, TX**

Franchise: **#2**

Date: **March 13, 2012**

## Table of Contents

Article 1.    Nature and Scope of Agreement ............................................................................ 2

Article 2.    Representations and Owner's Guaranty ................................................................. 3

Article 3.    Scope of License .................................................................................................. 3

Article 4.    Term and Renewal ............................................................................................... 5

Article 5.    Location and Business Site .................................................................................. 6

Article 6.    One Hour's Responsibilities ................................................................................ 6

Article 7.    Franchisee's Responsibilities ............................................................................. 10

Article 8.    Fees ................................................................................................................... 14

Article 9.    Records, Reports, Inspections and Inquiries ....................................................... 16

Article 10.   Advertising/Marketing Fund ............................................................................. 18

Article 11.   Licensed Marks ................................................................................................. 23

Article 12.   Rights to the System ......................................................................................... 23

Article 13.   Operations Manual and Confidentiality ............................................................ 25

Article 14.   Non-Competition .............................................................................................. 27

Article 15.   Transfer ............................................................................................................ 28

Article 16.   Termination and Expiration .............................................................................. 31

Article 17.   Relationship and Indemnification ..................................................................... 35

Article 18.   Dispute Resolution ........................................................................................... 36

Article 19.   General ............................................................................................................. 39

Owner's Acknowledgment ..................................................................................................... 41

Exhibit A     Business Terms
Exhibit B     Owner's Guaranty
Exhibit C     Owners of Franchisee

# FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT, dated **March 13, 2012** (the "**Agreement**"), is made by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company ("**One Hour**"), located at Plaza Five Points, 50 Central Avenue, Suite 920, Sarasota, Florida 34236, and **ZUBIE AIR INC**, a Texas corporation ("**Franchisee**"), located at **13111 Look Out Ridge, San Antonio, Texas 78233**, who in consideration of the promises stated below agree as follows:

### Article 1.  Nature and Scope of Agreement

1.1  ***The Franchisor***.  One Hour has developed a distinctive business format and system and related standards, specifications and procedures that One Hour has for operating a One Hour HVAC Business (defined below), including, but not limited to, the Operations Manual and System Standards (the "**System**") that is designed to provide residential air conditioning and heating services, including indoor air quality services, maintenance, repairs and equipment replacement, and other related services designated by One Hour under the service marks ONE HOUR AIR CONDITIONING & HEATING® and ONE HOUR HEATING & AIR CONDITIONING® and associated marks, logos and designs that One Hour now uses or may use as a component of the System (the "**Licensed Marks**"), and offers franchises to operate either a ONE HOUR AIR CONDITIONING & HEATING or a ONE HOUR HEATING & AIR CONDITIONING residential air conditioning and heating services businesses (each, a "**One Hour HVAC Business**").

1.2  ***The Franchisee***.  Franchisee acknowledges that it has independently investigated the business risks involved and other matters as Franchisee deems important, including current and potential market conditions and competitive factors and risks, has had the opportunity to read One Hour's Franchise Disclosure Document (the "**Franchise Disclosure Document**"), provided to Franchisee in connection with the offer to Franchisee of the franchise represented by this Agreement (the "**Franchised Business**"), and has not relied on any representations not stated in this Agreement or in the Franchise Disclosure Document. Aware of the relevant facts, Franchisee desires to enter into this Agreement to obtain a license to use the System and the Licensed Marks to operate a One Hour HVAC Business within the geographic area stated on **Exhibit A** to this Agreement (the "**Territory**").

1.3  ***The System***.  The System is used by residential air conditioning and heating service and repair businesses that operate under the Licensed Marks.  The System presently includes, but is not limited to: the Licensed Marks; installation of a talking thermostat invention; advertising, publicity and other marketing programs; training programs and training materials; and other requirements that are stated or referred to in this Agreement and occasionally in One Hour's OpX Operations Manual (the "**Operations Manual**"), or that One Hour, periodically, may otherwise state in writing and designate as part of standards for the system, and which may be included in a document known as the "Standards" ("**System Standards**").  System Standards will be applied to all franchised One Hour HVAC Businesses, although One Hour in its business judgment may make exceptions based on local conditions, special circumstances or different

-2-

contractual provisions. One Hour, in its sole discretion, may change or modify the System, including System Standards, occasionally, and Franchisee agrees to comply with the System and System Standards as they may exist periodically (including all operational policies, procedures, programs and plans stated in the Operations Manual or otherwise stated in writing), all of which will constitute provisions of this Agreement as if fully written here.

### Article 2.  Representations and Owner's Guaranty

2.1  ***Representations and Warranties.***  Franchisee hereby represents and warrants to One Hour as follows:

> A. Franchisee is acquiring this franchise for Franchisee's own account for the purpose of operating a Franchised Business, and not for the purpose of resale or redistribution or other speculative matter;

> B. All information provided to One Hour in Franchisee's application and other documents to induce One Hour to grant this franchise was true, correct, complete and accurate as of the date made, and, as of the date of this Agreement, no material change has occurred in this information;

> C. Franchisee's execution, delivery and performance of this Agreement does not violate or constitute a breach under any agreement or commitment made by Franchisee;

> D. If Franchisee is a business entity, Franchisee is duly organized and validly existing, is qualified to do business in each state where Franchisee is or will conduct business, and is duly authorized to sign and deliver this Agreement and perform Franchisee's obligations under this Agreement; and

> E. This Agreement represents a valid, binding obligation of Franchisee and each of Franchisee's owners (each, an "**Owner**").

2.2  ***Owner's Guaranty/Owner's Acknowledgement.***  If Franchisee is a business entity, each Owner is required to sign an owner's guaranty, the form of which is attached to this Agreement as **Exhibit B** (the "**Owner's Guaranty**") in favor of One Hour and deliver the signed Owner's Guaranty to One Hour concurrently with execution of this Agreement, or if this ownership interest is acquired later, within 10 days after obtaining this ownership interest. All Owners are required to sign the Owner's Acknowledgement that follows the signature block of this Agreement.

### Article 3.  Scope of License

3.1  ***Grant of License.***  Subject to the terms and conditions of this Agreement, One Hour hereby grants to Franchisee a license to operate one Franchised Business using the System and the Licensed Marks within the Territory from and only from the location stated on **Exhibit A** to this Agreement (the "**Approved Location**"). Franchisee hereby accepts this grant and agrees to operate a Franchised Business in accordance with the System under the Licensed Marks from and only from the Approved Location and to continuously exert its best efforts to

promote and enhance the operation of the Franchised Business and the goodwill associated with the Licensed Marks.

3.2 ***Exclusive Rights.*** This franchise will be exclusive in the Territory during the Term (defined below) while Franchisee is in full compliance with the terms and conditions of this Agreement, including **Section 7.6** relating to Minimum Sales Performance Standards, and any other agreement between One Hour (or its affiliates) and Franchisee (or its affiliates), and this Agreement has not been terminated or expired. "**Exclusive**" for purposes of this **Section 3.2** means that during the Term, except as provided in **Section 3.3** and **except if One Hour (or its affiliate) is operating a One Hour HVAC Business in the Territory at the date of this Agreement or has told Franchisee, in writing, before Franchisee has signed this Agreement that One Hour (or its affiliate) intends to operate a One Hour HVAC Business in the Territory,** One Hour will not operate, or grant to another person or business entity a franchise to operate, another One Hour HVAC Business in the Territory and will not permit another person or business entity to service HVAC customers located within the Territory as a One Hour HVAC Business. One Hour will provide Franchisee with a list of any One Hour HVAC Businesses or other franchisees' Existing Customers (defined below) located within the Territory who would affect Franchisee's exclusivity, if applicable.

3.3 ***Customers.*** Franchisee will primarily service customers located within the Territory. Franchisee may service customers who are outside the Territory, if Franchisee made a service call upon those customers within the 2 years immediately preceding the date of this Agreement and Franchisee notifies One Hour of these existing customers (referred to as "**Existing Customers**"). If an Existing Customer is in an existing franchisee's territory, you will be able to continue to service the Existing Customer for 2 years before turning the Existing Customer over to the existing franchisee. Otherwise, Franchisee may accept orders from customers located outside the Territory only if no other franchisee using the Licensed Marks has been given that other territory. If Franchisee acquires another HVAC business outside the Territory during the Term, Franchisee may service those other HVAC business' customers as a One Hour franchisee from its Approved Location, only until the time that other territory is sold to another franchisee, and Franchisee is required to pay Continuing Franchise Fees on all HVAC sales and services provided to these other business' customers. Franchisee must refer service calls it cannot service itself to another franchisee, if one is available, who can. Franchisee acknowledges and agrees that other One Hour franchisees using the Licensed Marks may continue to service their Existing Customers located in the Territory if they have continuing rights to service those customers under their Franchise Agreements (e.g., the other franchisees had made a service call upon these Existing Customers within the 2 years immediately preceding the date of their respective franchise agreements). Other than as provided here (and in Article 10), Franchisee is restricted from soliciting or accepting orders from customers outside of its Territory by use of alternate channels of distribution, such as the Internet, telemarketing and other direct marketing.

3.4 ***Reserved Rights.*** One Hour reserves all rights not specifically granted to Franchisee. This Agreement does not limit the right of One Hour or its affiliates to use or license the System or to engage in or license any business activity, including, without limitation, the operation or franchising of residential HVAC businesses under the Licensed Marks at any location outside the Territory, and/or under any other trade name, trademark or service mark now

-4-

or at any time owned by or licensed to One Hour or its affiliates at any location inside or outside the Territory. Franchisee acknowledges that One Hour's rights to use and/or license the System pre-date this Agreement and are not limited or changed by the terms of this Agreement. Franchisee agrees that by acknowledging those rights, the parties do not intend to make One Hour's exercise of these rights subject to rules applicable to contractual performance or the exercise of contractual discretion under this Agreement.

### Article 4.  Term and Renewal

4.1  ***Term.***  Unless terminated earlier under **Article 16**, the initial term of this Agreement will be 10 years ("**Term**") commencing on the effective date stated on **Exhibit A** to this Agreement (the "**Effective Date**") and terminating on the expiration date stated on **Exhibit A** to this Agreement (the "**Expiration Date**").

4.2  ***Renewal.***  This Agreement may be renewed by Franchisee for one additional term of 10 years ("**Renewal Term**"), provided that all of the following conditions are met before commencement of the Renewal Term:

    A.  Franchisee has substantially complied with all the provisions of this Agreement (including, without limitation, making all payments in full when due) and all other agreements between Franchisee (or its affiliates) and One Hour (or its affiliates) during the Term, and is in full compliance with this Agreement and all other agreements at the end of the Term;

    B.  Franchisee has signed One Hour's then-current form of franchise agreement and all other agreements then customarily used by One Hour in granting franchises for One Hour HVAC Businesses, with a renewal term as provided above, which agreements may contain different terms and conditions (including, without limitation, different or increased fees and other financial terms, Continuing Franchise Fees and/or Marketing Fund Contributions, and a requirement that Franchisee remodel, refurbish, renovate or re-equip the Franchised Business to bring it into full compliance with all System Standards for new franchised One Hour HVAC Businesses) and may not contain any further renewal terms;

    C.  Franchisee and its Owners have signed a general release, in form satisfactory to One Hour, of all claims Franchisee may have against One Hour and its officers, directors, owners, employees, affiliates, successors and assigns;

    D.  Franchisee has given One Hour Notice of its intention to renew this Agreement at least 3 months but not more than 6 months prior to the expiration of the Term; and

    E.  Franchisee has paid One Hour a renewal fee in an amount equal to $10,000.00, payable in a lump sum.

### Article 5. Location and Business Site

5.1 **Location.** Franchisee will operate its Franchised Business from, and only from, the Approved Location. Franchisee may not change the location of the Franchised Business without One Hour's prior written approval. If Franchisee has other franchise agreements with One Hour for contiguous territories, Franchisee may operate its Franchised Business from an approved location within a contiguous territory. In this event, if Franchisee opens an Approved Location within the Territory, Franchisee may continue to direct all order processing and head office functions (including maintenance of books, records and accounts) through one central location of its choosing within one of its contiguous territories while all other operations of the Franchised Business are conducted from the Approved Location within the Territory.

5.2 **Site Criteria.** The layout of the business site must comply with the criteria described in the Operations Manual. The business site for the Franchised Business is required to include a dispatching area, reception/talking area, tech/training/break area, restroom and warehouse space. In addition, the business site is required to comply with local zoning and business requirements, and have parking to accommodate trucks and employees.

5.3 **One Hour's Approval.** One Hour's approval of the Franchisee's business site only indicates that One Hour believes that the business site falls within One Hour's then-current criteria, and is not a warranty of success for the Franchised Business. Franchisee acknowledges that its acceptance of a business site is based on its own independent investigation of the suitability of the business site.

5.4 **Conversion and Construction/Opening.** Franchisee is responsible for converting, constructing and opening the business site as a Franchised Business in accordance with the layout and other criteria described in the Operations Manual or in other written communications by One Hour. Franchisee must complete the conversion and construction of the business site and open the Franchised Business within 3 months after the Effective Date.

5.5 **Maintenance, Appearance and Remodeling.** Franchisee is required to maintain the business site of the Franchised Business and its appearance in accordance with One Hour's standards communicated periodically to Franchisee in the Operations Manual, in System Standards, or by other written or electronic communications. Not more often than once every 5 years, Franchisee must remodel the business site to comply with One Hour's then-current System Standards or Operations Manual if One Hour, in the exercise of its business judgment, believes that this remodeling is necessary.

### Article 6. One Hour's Responsibilities

6.1 **One Hour Obligations.** In addition to One Hour's other obligations under this Agreement, One Hour will also have the following obligations:

A. One Hour will endeavor in the exercise of its business judgment to maintain a high standard of quality for the System, and to promote, protect and enhance the public image and reputation of the System;

(03/26/11)                                                                                                          Multistate

B.     One Hour will provide Franchisee and its manager and key employees with these required training courses, programs and materials, as One Hour deems appropriate, this training to be conducted at the locations and times as One Hour may designate. One Hour (or its affiliate) will provide an initial training course without cost to Franchisee, except that Franchisee will be responsible for paying the travel, living and meal expenses and salaries for Franchisee and its manager or employees who attend the training classes;

C.     Before the opening of the Franchised Business, One Hour will give Franchisee, or provide Franchisee, via One Hour's interactive electronic website, a copy of the Operations Manual and System Standards; One Hour will provide Franchisee with copies of any amendments to the Operations Manual and System Standards throughout the Term;

D.     Before the opening of the Franchised Business, One Hour will tell Franchisee how to obtain, at no cost to Franchisee, the SuccessWare®21 (ASP Option) software package (or other software package specified by One Hour) which Franchisee is required to use in its Franchised Business; Franchisee will be responsible for all ongoing license fees, training fees, and the costs of any upgrades or replacements to the software package;

E.     One Hour will develop and maintain a list of standards for trucks, inventory, equipment, tools, uniforms, and other items that Franchisee may use in the Franchised Business;

F.     One Hour, as it may deem appropriate, will make available to Franchisee additional and optional or mandatory training courses, programs and materials through its affiliate, Success Academy (the "**Success Academy Services Program**"), and SuccessWare; this training will be conducted at locations and times designated by One Hour and SuccessWare and at fees established by One Hour;

G.     One Hour will make available to Franchisee throughout the Term the sales, marketing and technical assistance, and consultation and advice on operating procedures that One Hour may deem necessary or desirable in the exercise of its business judgment;

H.     One Hour will provide Franchisee with a list of approved suppliers and marketing campaign materials through use of an Internet catalog and/or the Operations Manual and/or other written or electronic communications;

I.     One Hour will make available to Franchisee improvements and changes in One Hour's services or operating procedures relating to residential HVAC services;

J.     One Hour will work with its affiliate, BuyMax, LLC, or with other vendors to further develop and maintain a vendor purchase program to negotiate purchase arrangements with suppliers for the benefit of franchisees;

-7-

K. One Hour will make available for purchase by Franchisee from approved suppliers ready-to-go forms, letterheads, business cards and other daily use marketing items;

L. One Hour will provide Franchisee with materials that will enable Franchisee to establish a service club, called "The Comfort Club"™ or some other name selected by One Hour, which will allow Franchisee to offer its customers discounts, scheduling preferences and maintenance and service programs (the "**Comfort Club**");

M. One Hour, at its discretion, will provide mystery shopping services;

N. One Hour will provide a website that will be available 24 hours a day, 7 days a week to Franchisee's residential customers;

O. One Hour will provide a web and DVD-based training resource, currently called "**Clockwork University**", that can be used by Franchisee on an on-going basis to train on and review the concepts found in the Operations Manual; and

P. If the annual gross sales volume of the business that Franchisee is converting to the Franchised Business is $4,000,000 or more (as evidenced by the records and reports Franchisee has provided to One Hour prior to signing this Agreement), One Hour will spend 40% of the Continuing Franchise Fees that Franchisee pays One Hour during the first year of the Term to market and advertise the Franchised Business in the Territory. After the first year of the Term, One Hour's obligation in this regard will cease and terminate.

One Hour may have a franchise who has signed a Model Center Agreement (a "**Model Center Franchisee**") provide Franchisee with some or all of the services described in the foregoing sub- **Sections 6.1(B)**, **(C)**, **(F)** and **(G)**.

6.2 *Approved Suppliers.* One Hour reserves the right to designate or approve, periodically, one or more third parties (a "**Supplier**" or "**Suppliers**"), or One Hour itself or one of its affiliates, to supply Franchisee with certain categories of products and services using the Licensed Marks. If One Hour does so designate or approve, Franchisee will purchase the categories of products or services using the Licensed Marks only from Suppliers that One Hour has so designated or approved or from One Hour.

One Hour may approve a Supplier for any products or services using the Licensed Marks and may approve a Supplier only as to certain products or services, including supplies to be used in the Franchised Business. One Hour may concentrate purchases with one or more Suppliers to obtain lower prices, better advertising support and/or better services for any group of Franchised Businesses. Franchisee will not purchase products or services using the Licensed Marks from any Supplier unless and until One Hour has approved the Supplier. One Hour may approve a single supplier for any item, and may approve a supplier only as to certain items. In approving suppliers, One Hour takes into consideration the price and quality of the products or services,

-8-

and the reliability of the supplier in getting the products or services to Franchisee in a timely manner. One Hour may concentrate purchases with one or more suppliers to obtain the lowest price, or any other benefit One Hour deems, in its sole discretion, may benefit the Licensed Marks. If One Hour later disapproves a supplier, One Hour will notify Franchisee in writing of One Hour's disapproval. Franchisee must cease purchasing from that supplier within a reasonable time after Franchisee's receipt of One Hour's notice of disapproval.

If Franchisee proposes to purchase products or services using the Licensed Marks from any Supplier that One Hour has not previously approved for these products or services, Franchisee is required to first notify One Hour in writing and submit to One Hour all information, specifications and samples that One Hour requests. One Hour will have the right to require that its representatives, at Franchisee's expense, be permitted to inspect the proposed Supplier's facilities and that samples from the proposed Supplier be delivered to One Hour or its designated testing facility for evaluation and testing. One Hour will have sole discretion as to whether or not to approve any Supplier. Approval of a Supplier as to any products or services using the Licensed Marks, if given, will be in writing and may be conditioned on requirements relating to the frequency of delivery, standards of service, including prompt attention to complaints, concentration of purchases and other criteria, and may be conditioned on the Supplier providing One Hour with adequate insurance protection, the Supplier's execution of reasonable indemnity and confidentiality agreements, payment of reasonable continuing inspection fees and administrative costs, and the Supplier's payment of reasonable license fees to One Hour, and may be temporary or conditional, pending One Hour's further evaluation of the Supplier.

One Hour reserves the right to re-inspect, at any time, the facilities, products and/or services of any approved Supplier and to revoke its approval upon the Supplier's failure to continue to meet any of One Hour's then-current criteria.

### Article 7. Franchisee's Responsibilities

7.1   *Franchisee's Obligations*.   In addition to Franchisee's other obligations under this Agreement, Franchisee will also have the following obligations:

A.   Franchisee is required to open its Franchised Business for business within the time period provided in **Section 5.4**;

B.   Franchisee is required to operate its Franchised Business from, and only from, the Approved Location (unless otherwise permitted under **Section 5.1**) according to the System and System Standards and under the Licensed Marks, and not deviate from the System and System Standards without One Hour's prior written consent;

C.   Franchisee will use its best efforts in the Territory to promote, develop and expand the market for the services of its Franchised Business;

D.   Franchisee is required to devote sufficient time and effort to its Franchised Business as required by **Section 7.2** to ensure the proper, efficient and effective operation of the Franchised Business;

-9-

E.      Franchisee is required to comply with all of One Hour's mandatory standards, methods, policies, products, procedures, techniques and specifications that One Hour may prescribe periodically, whether in the Operations Manual, System Standards or in other written or electronic communications, including the wearing of uniforms while performing services, and using only trucks, inventory, equipment, tools, uniforms, computers, software and telephones that meet or exceed One Hour's standards;

F.      Franchisee will offer all and only such products and services as have been expressly approved by One Hour from time to time (in the Operations Manual or otherwise in writing) and shall refrain from or discontinue offering any products or services which One Hour may, in its discretion, disapprove in writing at any time;

G.      Franchisee must service all customer accounts to the satisfaction of One Hour and in accordance with the System and System Standards, and will hire the employees as are necessary or appropriate to staff the Franchised Business. Franchisee must ensure that all employees have all licenses required by law;

H.      Franchisee will offer a 100% satisfaction guarantee to all customers as required by the Operations Manual, and Franchisee will execute the mediation and guarantee of services agreement with UWIN, LLC, One Hour's affiliate ("**UWIN**"), and will participate, and timely and faithfully perform all of its obligations thereunder;

I.      Franchisee will purchase the opening inventory and supplies package designated by One Hour in the Operations Manual ("**Opening Inventory and Supplies Package**") from an approved supplier;

J.      Franchisee will obtain and utilize a new telephone number for the Franchised Business (if so instructed by One Hour, as part of a coordinated telephone system for One Hour HVAC Businesses organized by One Hour or one of its affiliates) and will cease using or redirect to Phone Facts any telephone numbers used in connection with its Prior Business as soon as commercially reasonable, but no later than 30 days after the Effective Date;

K.      Franchisee and its manager, if any, and key employees will attend and successfully complete the two-phase initial training program to be conducted by One Hour (or its affiliate) and is required to successfully complete the SuccessWare®21 (ASP Option) software system training, or such other software system training that One Hour may designate, to be able to maintain all the daily financial records of the Franchised Business. Franchisee will be responsible for all the travel, living and meal expenses, and salaries, of Franchisee and its managers and key employees who attend the initial training class (One Hour retains the right to waive opening training requirements for qualifying, experienced franchisees, at its sole discretion);

-10-

L.    Franchisee is required to present and use the Licensed Marks exactly and only as permitted;

M.    Franchisee will honor the Territory's boundary in accordance with **Section 3.3** of this Agreement;

N.    Franchisee will maintain a drug free workplace and formal drug testing procedures for its employees as provided in the Operations Manual;

O.    Franchisee will pay all fees and other payments due to One Hour hereunder promptly when due;

P.    Franchisee must comply at all times with all federal, state and municipal laws, orders, regulations, ordinances and the like pertaining to the operation of the Franchised Business, including, without limitation, all governmental regulations relating to OSHA, workers' compensation, unemployment insurance, and withholding and payment of federal, state and local income taxes and sales taxes;

Q.    Franchisee is required to promptly pay when due all taxes, expenses and surcharges of any kind levied or assessed by any governmental body, whether federal, state or local, by reason of or in connection with Franchisee's operation of its Franchised Business;

R.    Franchisee is required to submit the information and reports required by **Section 9.3** and permit One Hour to access its data as provided in **Sections 9.1, 9.2**, and **9.4**;

S.    Franchisee will conduct its Franchised Business in a manner that does not reflect adversely on One Hour, the System or the Licensed Marks, or which might depreciate or otherwise adversely affect the goodwill associated with any of them;

T.    Each of Franchisee's Owners, officers, directors, members, partners, managers and employees who obtain Confidential Information is required to sign a confidentiality agreement that One Hour will prescribe periodically (the "**All Hands Confidentiality Agreement**");

U.    Franchisee or one of its Owners or managers will attend two annual franchise system meetings that are currently called "Congress" and "Operation: Brand Dominance." Franchisee is responsible for all the expenses Franchisee or its representative incurs in attending the Congress and the Operation Brand Dominance meetings;

V.    Franchisee, in the manner and with the frequency prescribed by One Hour, is required to use a system that is designed to track Franchisee's progress and assist Franchisee to prioritize its time, train employees, and plan its

-11-

Franchised Business (the "GEARS") which may be operated by an independent third party or by an affiliate of One Hour; and

W.      Franchisee agrees not to use or permit to be used any part of the System in connection with any commercial business in which Franchisee has an interest, direct or otherwise, other than the Franchised Business.

### 7.2    *Operation of Franchised Business*.

A.      Franchisee (or its principal Owner if Franchisee is a business entity) **will diligently** and fully exploit the rights granted in this Agreement by providing direct supervision in the operation of the Franchised Business. Franchisee will not engage in conflicting enterprises or other activities that could be detrimental to or interfere with the operation of the Franchised Business.

B.      Franchisee will not display or use in connection with the Franchised Business any tradename, trademark, logo, or other intellectual property that is not part of the Licensed Marks; provided, however, that Franchisee may continue to use any tradename, trademark, logo, or other intellectual property previously used to identify its Prior Business ("**Prior Marks**") for up to 3 years after the Effective Date to the extent necessary to convert and consolidate its Prior Business into the Franchised Business, as approved by One Hour.

C.      Franchisee may appoint a manager to handle the day-to-day operations of its Franchised Business. This manager will be required to attend and pass One Hour's initial training program. One Hour has the right to approve or reject any manager appointed by Franchisee. A manager who has been rejected by One Hour may not handle the day-to-day operations of the Franchised Business.

7.3    *Insurance*. Franchisee will purchase, and at all times during the Term maintain in full force and effect, the policies of insurance in the amounts as are reasonably required by One Hour as stated in the Operations Manual or the System Standards including, without limitation, property damage, business interruption, employee honesty and liability, product liability, comprehensive general liability, automobile liability, fire and property insurance for and in respect of the Franchised Business. In all these policies of insurance, One Hour will be named as an additional insured and these policies will provide that the insurer will send One Hour duplicate copies of all documentation and correspondence. At least 14 days before the opening of the Franchised Business, Franchisee will provide One Hour with a certificate of coverage issued by the insurer indicating that all required insurance is in full force and effect and that it will not be terminated, permitted to lapse, expire or be changed without at least 30 days' prior written notice to One Hour. In the event that Franchisee does not maintain this insurance as required, One Hour may obtain this insurance from an insurer selected by One Hour and keep the same in full force and effect at the sole expense of Franchisee. In this event, Franchisee is required to promptly reimburse One Hour for the cost of this insurance upon

Multistate

receipt of an invoice. Franchisee, at its option and sole cost, may participate in any group or blanket insurance program, which One Hour may establish from time to time for its franchisees.

7.4 ***Computer System/Office Equipment.*** Franchisee is required to acquire and use in the Franchised Business a computer system, including software, of a type that One Hour may designate from time to time that is compatible with the software or other required system designated for use by franchisees from time to time. Franchisee will also acquire and use the office equipment that One Hour may designate for use by franchisees from time to time. Franchisee is required to implement, and have fully operational within 3 months from the Effective Date, the SuccessWare®21 (ASP Option) software program, the SonicWALL firewall protection system, and all other software programs that One Hour may designate, from time to time, during the Term for use in the Franchised Business. At its sole expense, Franchisee will maintain and upgrade its computer system, including software, to meet One Hour's requirements from time to time.

7.5 ***Franchise Advisory Council.*** One Hour reserves the right to establish an advisory council of franchisees and One Hour's representatives to provide non-binding advice to One Hour ("**Franchise Advisory Council**"). In the event that One Hour establishes a Franchise Advisory Council, Franchisee will automatically become a member of the Franchise Advisory Council, with the right to elect a regional representative to advise One Hour on franchisee relations and other matters related to the System. Franchisee will pay any dues that may be associated with its membership in the Franchise Advisory Council.

7.6 ***Minimum Sales Performance Standards.*** Franchisee must achieve a revenue level of at least $5,000 per 1,000 of population in the Territory (*e.g.,* $500,000 per 100,000 of population) per annum ("**Minimum Sales Performance Standards**") within 3 years after the Effective Date. After the 3rd anniversary of the Effective Date, Franchisee must maintain at least the Minimum Sales Performance Standards each year throughout the Term. If Franchisee fails to meet the Minimum Sales Performance Standards by the 3rd anniversary of the Effective Date, or fails to maintain the Minimum Sales Performance Standards for the remainder of the Term, One Hour has the right, by giving Notice to Franchisee, to declare that Franchisee's Territory is no longer Exclusive; that is, henceforth One Hour will have the right to (A) serve, or authorize others to serve, residential HVAC customers within the Territory; and/or (B) operate, or to grant a franchise to another person or business entity to operate, a One Hour HVAC Business in Franchisee's Territory. The Minimum Sales Performance Standards are not purchase commitments, but notice to Franchisee of the minimum sales goals that One Hour expects Franchisee to achieve in the Territory. One Hour may, in its sole discretion temporarily waive compliance with this **Section 7.6** based on Franchisee's business circumstances; provided, however, any delay by One Hour in declaring Franchisee's Territory non-Exclusive does not constitute a waiver of its right to, at any time, require strict compliance with the Minimum Sales Performance Standards or its right to notify Franchisee that its Territory has become non-Exclusive. In addition, as further described in **Section 19.9** below, any such waiver regarding one failure by Franchisee to comply with the Minimum Sales Performance Standards does not constitute a waiver with respect to any other failure by Franchisee to meet its Minimum Sales Performance Standards.

7.7 *Owners of Franchisee*. **Exhibit C** to this Agreement will at all times completely and accurately describe all the Owners of Franchisee and their beneficial ownership interests in Franchisee. Franchisee and its Owners will sign and deliver to One Hour the revised **Exhibit C** as may be necessary to reflect any permitted changes in the information contained therein within 5 days following the occurrence thereof and to furnish other information about Franchisee's organization or formation as One Hour may request.

### Article 8. Fees

8.1 *Initial Fees*. Franchisee will pay One Hour the initial fees stated on **Exhibit A** to this Agreement (the "**Initial Fees**"), which amount Franchisee acknowledges is fully earned by One Hour and is not refundable.

8.2 *Continuing Franchise Fee*. Commencing on the first of the month following 90 days after the Effective Date, as stated on **Exhibit A**, Franchisee will pay One Hour a semi-monthly continuing franchise fee (the "**Continuing Franchise Fee**") of 5% of Net Sales (as defined in **Section 8.5**). Franchisee will calculate and pay the Continuing Franchise Fee twice a month: (A) the first payment is due by the 19th day of each month for Net Sales from sales from the 1st day through the 15th day of the month, and (B) the second payment is due by the 6th day of the next month for Net Sales from sales from the 16th day through the last day of the immediately preceding month. The minimum Continuing Franchise Fee is $1,500 per month.

8.3 *Small Market Model Continuing Franchise Fee*. Commencing on the first of the month following 90 days after the Effective Date, as stated on **Exhibit A**, Franchisee shall pay to One Hour semi-monthly the continuing franchise fee (the "**Continuing Franchise Fee**") of 5% of Net Sales. Franchisee shall calculate and pay the Continuing Franchise Fee twice a month: (i) the first payment shall be due by the 19th day of each month for Net Sales from sales from the 1st day through the 15th day of the month, and (ii) the second payment shall be due by the 6th day of the next month for Net Sales from sales from the 16th day through the last day of the immediately preceding month. The minimum Continuing Franchise Fee is $15 per 1,000 of serviceable population.

8.4 *Marketing Fund Payments*. If One Hour implements a Marketing Fund under **Section 10.4**, Franchisee will pay One Hour a semi-monthly Marketing **Fund contribution** in the amount designated by One Hour, but not to exceed 4% of Net Sales for **the preceding period** ("**Marketing Fund Contribution**"). Payments of the Marketing Fund Contribution will commence at the later of the date that One Hour implements a Marketing Fund or 90 days after the Effective Date. The Marketing Fund Contribution will be calculated and paid twice a month: (A) the first payment is due by the 30th day of each month for Net Sales from sales from the 1st day through the 15th day of the month, and (B) the second payment is due by the 15th day of the next month for Net Sales from sales *from the 16th day through* the last day of the immediately preceding month.

8.5 *Net Sales*. "**Net Sales**" is defined as: (A) all sales and revenue (and all other income of every kind and nature) related to, derived from, or originating from the Franchised Business) **(whether within or outside** the Territory), including proceeds of any business interruption insurance policies; (B) all sales and revenues from the sale of commercial HVAC

-14-

products and services by Franchisee (whether or not authorized by **Section 14.**1 of this Agreement); and (C) all sales and revenues deemed ᵗo be Net Sales as provided in **Section 9.1**, less (i) thᵉ amount of sales tax ºr similar receipts which, by law, are chargeable to customers, ᶦf such taxes are separately stated when the customer is cha'ᵍed and if such taxes are paid to the appropriate taxing authority; (ii) any *bona* fide refunds, rebates or discounts granted to customers in the ordinary course of business; (iii) any *bona* fide and reasonable payments made in the ordinary course of business to unaffiliated subcontractors who perform services unrelated to Franchisee's core business and at Franchisee's customer's premises; and (iv) any reasonable and customary job service permit fees paid to governmental entities if such permit fees are properly documented and if such permit fees are paid to the appropriate governmental entity . Franchisee acknowledges and agrees that "Net Sales" under **Section 8.5(A)** include, but are not limited to, all sales and revenues related to the Franchisee's sale and delivery of any products and services of any kind or nature whatsoever (whether or not such products or services are approved by One Hour) that were procured or delivered in any manner using any portion of the Franchised Business, including the Licensed Marks (such as trucks, vehicles, invoices, and uniforms bearing the Licensed marks), the System, Confidential Information, any of the employees of the Franchised Business, or the telephone number of the Franchised Business.

 8.6 *Past Due Service Charge.* If any amount owed by Franchisee to One Hour under this Agreement is past due, One Hour has the right to assess and collect a past due service charge equal to the lesser of 1.5% per month or the maximum permissible rate on any past due amounts.

 8.7 *Service Deficiency Reimbursements.* If a customer of Franchisee complains to One Hour that Franchisee's services were deficient and One Hour determines after discussion with Franchisee that there is merit to the customer's complaint, One Hour reserves the right to perform or cause to be performed these services to the customer's reasonable satisfaction or to reimburse the customer for any money the customer may have paid for these services upon written notice to Franchisee if Franchisee does not do so itself. In this event, Franchisee will promptly reimburse One Hour for any costs incurred by One Hour to perform or have performed these services or for the payment made by One Hour to the customer upon receipt of an invoice from One Hour.

 8.8 *Payments.* Franchisee will make all payments to One Hour by electronic funds transfer to an account designated by One Hour, or by the other methods that One Hour may designate from time to time. The Franchisee will be required to complete an Automatic Clearing House (ACH) agreement authorizing automatic withdrawals.

### Article 9. Records, Reports, Inspections and Inquiries

 9.1 *Records.* During the Term, Franchisee will maintain and preserve full, complete and accurate books, records and accounts relating to the conduct and operation of the Franchised Business. The books, records, and accounts will be kept at the Approved Location unless otherwise permitted under **Section 5.1**. Franchisee will establish and maintain, at its own expense, a bookkeeping, accounting and record keeping system in accordance with generally accepted accounting principles (**"GAAP"**) consistently applied and conforming to the requirements that One Hour may prescribe from time to time. If Franchisee operates any

-15-

business other than the Franchised Business, Franchisee will keep books, records and accounts of this other business (the "**Other Business Records**") separate and distinct from the books, records and accounts of the Franchised Business (the "**Franchised Business Records**"), failing which the revenues received by Franchisee from this other business will be deemed for all purposes, including the calculation and payment of Continuing Franchise Fees, to be revenues attributable to the Franchised Business.  One Hour has the right to access and obtain any information required to be delivered to it by Franchisee for the Franchised Business under the terms of this Agreement directly from the systems established by Franchisee, and if One Hour cannot or does not do so, Franchisee will transmit to One Hour all information requested by One Hour in the manner and at the time One Hour specifies.

9.2  *Access to Data*.  One Hour will use the SuccessWare®21 (ASP Option) software program (or other software program specified by One Hour) to gather information on the entire One Hour AIR CONDITIONING & HEATING and One Hour HEATING & AIR CONDITIONING system.  Among other uses, One Hour (a) will use this information to monitor progress by its franchisees so it can provide assistance if a franchisee's key numbers drop below One Hour's suggested levels, (b) may use this information if One Hour elects to prepare a financial performance representation for its Franchise Disclosure Document, and (c) may use (or authorize others to use) this information to provide services to Franchisee's former customers after the Expiration Date or after a termination described in **Article 16**.  Franchisee hereby grants to One Hour access to the information in Franchisee's SuccessWare®21 (ASP Option) software program database, or other software program specified by One Hour, including its financial reports, to be used by One Hour for those purposes and other purposes permitted by this Agreement.

9.3  *Reports*.  Franchisee will give One Hour, in the form prescribed by One Hour from time to time:  (A) its current customer lists; (B) concurrently with each payment of the Continuing Franchise Fee, a report of Net Sales for the preceding period; (C) by the 3rd business day following the end of each month-end, a Profit and Loss Statement for the immediately preceding month along with a completed balance sheet as of the last day of that same month;: (D) upon One Hour's request, the other data, inventory reports, information and supporting records for these periods as One Hour may require; and (E) within 120 days after the end of Franchisee's fiscal year, a Profit and Loss Statement, a fiscal year-end balance sheet, and statement of cash flows for the Franchised Business for the fiscal year, reflecting all year-end adjustments.  Franchisee also will maintain and furnish, upon One Hour's request, complete copies of all federal, state and local income tax returns and any amendments that Franchisee files with the Internal Revenue Service and state tax departments reflecting sales and income of the Franchised Business.  These records will be maintained at the Approved Location except as otherwise permitted under **Section 5.1**.  Franchisee's chief financial officer (if Franchisee is a business entity) or Franchisee's principal Owner will certify all reports that Franchisee provides to One Hour.  If Franchisee fails to send One Hour the Net Sales reports along with the month-end Profit and Loss Statement described above when due, One Hour may estimate Franchisee's Net Sales for the prior month based on Franchisee's previous Net Sales plus 15%.  Franchisee authorizes One Hour to withdraw Continuing Franchise Fee payments as described in **Section 8.8** above based on this estimate of Net Sales.  One Hour will refund any difference between estimated Continuing Franchise Fees and actual Continuing Franchise Fees after Franchisee submits the delinquent Net Sales reports.

-16-

9.4 *Inspection and Audits*.   One Hour, or its authorized agents and representatives, has the right during business hours, but without prior notice to Franchisee, to inspect the following operations and material to ascertain that Franchisee is operating the Franchised Business in accordance with the System and the terms of this Agreement: (A) all aspects of the operation of the Franchised Business at the Approved Location; (B) all Franchised Business Records; (C) Other Business Records (if any); and (D) all accounting and other records, books of account, tax returns and other documents and materials in the possession of or under the control of Franchisee relating to the Franchised Business, Franchisee, and/or the subject matter and terms of this Agreement, including, without limitation, all records of Franchisee required to be maintained under applicable law. If any of the materials described in this **Section 9.4** are kept at another location under **Section 5.1**, Franchisee will permit One Hour to inspect these materials at the other location. One Hour and its authorized agents and representatives will be allowed to make extracts from or copies of all the materials described in this **Section 9.4**. In the event that One Hour's inspection reveals a discrepancy which has resulted in the underpayment of any fee, including the Marketing Fund Contribution, Franchisee will promptly pay the underpayment, and if the underpayment of any fee shows a discrepancy of more than 3%, Franchisee will promptly pay the underpayment and reimburse One Hour upon receipt of an invoice for all expenses associated with the inspection.

9.5 *Inquiry by One Hour*.   Franchisee, by its execution of this Agreement, authorizes One Hour and its agents and representatives to make credit and background checks, including, without limitation, reasonable inquiries of Franchisee's bankers, suppliers and other trade creditors regarding their dealings with Franchisee in relation to the Franchised Business and the subject matter and terms of this Agreement, to discuss the affairs, finances and accounts of the Franchised Business and the subject matter and terms of this Agreement with Franchisee's bankers; and Franchisee, by its execution of this Agreement, authorizes and directs these bankers, suppliers and trade creditors to discuss with One Hour and its authorized agents and representatives the affairs, finances and accounts of the Franchised Business and to obtain information and copies of invoices relating to sales or other dealings between all these parties and Franchisee in any way relating to the Franchised Business and the subject matter and terms of this Agreement. If requested, Franchisee agrees to sign and deliver these directions and other documents as One Hour may require to authorize the bankers, suppliers and trade creditors to release or disclose this information and documents to One Hour.

### Article 10.   Advertising/Marketing Fund

10.1 *Advertising and Marketing*.   Franchisee agrees that all advertising and marketing by Franchisee with respect to the Franchised Business in any medium will be conducted in a dignified manner and will conform to the System and System Standards. Franchisee agrees to use only the current Licensed Marks in its advertising and marketing, except to the extent One Hour authorizes the Franchisee to gradually phase out use of the Prior Marks during the conversion term described in **Section 7.2(B)**. One Hour reserves the right, upon Notice to Franchisee, to require that all advertising that Franchisee proposes to use be approved by One Hour before Franchisee's use of the materials. One Hour may disapprove any advertising or marketing materials used or proposed to be used by Franchisee, without liability to Franchisee for any costs incurred by Franchisee in connection with the same.

-17-

10.2 ***Yellow Pages or Comparable Telephone Directory Listing***.  Franchisee will list its Franchised Business in the Yellow Pages or comparable telephone directory for the Territory as soon as possible after signing this Agreement; provided, however, Franchisee will not market the Franchised Business in any Yellow Pages (or any similar telephone directory), if the purpose, intent or effect of such marketing is to reach customers who reside outside the Territory.  If Franchisee operates its Franchised Business in a marketing area that is shared by One Hour's other franchisees, Franchisee and all the other franchisees will use a common toll-free telephone number in their advertising or marketing materials.

10.3 ***Local Marketing***.  One Hour recommends that Franchisee spend annually at least 4% to 9% of Net Sales on local marketing.  Franchisee may reduce this recommended amount by the amount of any Marketing Fund Contribution that Franchisee pays under **Sections 8.3** and **10.4**.  Franchisee's Yellow Pages or comparable telephone directory expenses as required by **Section 10.2** will be counted towards the recommended local marketing expenditure.

10.4 ***Establishment of Marketing Fund***.  One Hour may establish, maintain and administer a national and one or more regional marketing funds (each a "**Marketing Fund**") by giving Franchisee not less than 30 days' Notice of the effective date of the Marketing Fund and the amount of the Marketing Fund Contribution.  One Hour may modify the amount of the Marketing Fund Contribution on not less than 30 days' Notice to Franchisee.  If a Marketing Fund is established, Franchisee will pay the Marketing Fund Contribution required by **Section 8.3**, and One Hour will direct all marketing programs financed by the Marketing Fund and have sole discretion over the creative concepts, materials and endorsements used and the geographic, market and media placement and allocation of the marketing programs. Among other things and without limitation, One Hour may use the Marketing Fund to pay the costs of preparing and producing video, audio and written advertising materials; administering local, regional, multi-regional and national advertising programs including, without limitation, purchasing direct mail and other media advertising; employing advertising, public relations and media buying agencies to assist in these activities; supporting public relations, market research and other advertising and marketing activities; and constructing and maintaining a website used to promote the One Hour marketing programs. One Hour may elect to use the Marketing Fund to provide Franchisee with marketing, advertising and promotional formats and sample materials without additional charge, or to provide Franchisee with multiple copies of marketing, advertising and promotional materials at a reasonable price.

10.5 ***Use of Marketing Fund Contributions***.  The Marketing Fund is not a trust. However, One Hour will account for the Marketing Fund Contributions separately from One Hour's other funds and will not use the Marketing Fund Contributions to defray any of One Hour's general operating expenses, except for costs, salaries, travel expenses, administrative costs, overhead and other similar expenses that One Hour may incur in activities reasonably related to the administration of the Marketing Fund and its marketing programs (including, without limitation, conducting market research, preparing advertising and marketing materials, general production costs and collecting and accounting for contributions to the Marketing Fund). One Hour may spend in any fiscal year an amount greater or less than the total contributions of all Franchised Businesses to the Marketing Fund in the year and One Hour may cause the Marketing Fund to invest any surplus for future use by the Marketing Fund.  Franchisee authorizes One Hour to collect for remittance to the Marketing Fund any advertising or

-18-

promotional monies or credits offered by any supplier to the Marketing Fund based upon Franchisee's purchases. All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs of the Marketing Fund before other assets of the Marketing Fund are expended. One Hour will prepare an annual statement of monies collected and costs incurred by the Marketing Fund and will furnish it to Franchisee upon Franchisee's written request. One Hour will have no obligation to have the Marketing Fund audited.

10.6 ***Benefit of Marketing Fund***. Franchisee agrees that the Marketing Fund, once established, will be intended to maximize recognition of the Licensed Marks and patronage of all Franchised Businesses in the United States. Although One Hour will endeavor to utilize the Marketing Fund to develop advertising and marketing materials and programs, and to place advertising that will benefit all Franchised Businesses in the United States, One Hour undertakes no obligation to ensure that expenditures by the Marketing Fund in or affecting any geographic area will be proportionate or equivalent to the contributions to the Marketing Fund by franchisees operating in that geographic area or that any Franchised Businesses will benefit directly or in proportion to its contribution to the Marketing Fund from the development of advertising and marketing materials or the placement of advertising. Although One Hour intends the Marketing Fund, once established, to be of unlimited duration, One Hour will have the right to terminate and, if terminated, to reinstate, the Marketing Fund at any time after all money in the Marketing Fund has been expended.

10.7 ***One Hour Obligations***. Except as expressly provided in this **Article 10**, One Hour assumes no direct or indirect liability or obligation to Franchisee with respect to the maintenance, direction or administration of the Marketing Fund.

10.8 ***No Representation and Warranty***. One Hour makes no representation and warranty that any marketing, advertising or promotional materials or programs that it provides to Franchisee, or that is prepared by Franchisee and approved by One Hour, comply with federal, state or local laws, rules, and regulations, or the conditions of any agreements or orders to which Franchisee may be subject. Franchisee will be solely responsible for the use of all these materials and programs and One Hour assumes no direct or indirect liability or obligation to Franchisee with respect to the use of any such materials and programs by Franchisee. Franchisee will, at its own expense and risk, obtain all governmental approvals of all these materials and programs and defend any claim that these advertising or promotional materials are not in compliance with law, and Franchisee will indemnify One Hour (as provided pursuant to **Section 17.4(D)**) in connection with Franchisee's use of any marketing, advertising or promotional materials or programs in Franchisee's operation of the Franchised Business.

10.9 ***One Hour's Website***. One Hour has established a website (the "**One Hour Website**") that is designed to assist Franchisee with respect to the promotion and operation of its Franchised Business. Franchisee will have the right to use the One Hour Website, subject to the condition that Franchisee hereby agrees that by the use thereof it will be bound by all of the following terms:

        A.    As soon as commercially reasonable after the Effective Date but no later than 60 days after the Effective Date, Franchisee will cease using any separate website for the Franchised Business and any other residential HVAC

business and will use only the space provided to Franchisee on the One Hour Website, in the manner described in **Section 11.7.** Franchisee will transfer any domain name(s) related to any preexisting residential HVAC business to One Hour (which domain name(s) One Hour may, in its sole discretion, link or redirect to the One Hour Website) (Franchisee will not receive any compensation for such transfer. Franchisee will use the One Hour Website solely to promote and operate its Franchised Business and that it will not use the One Hour Website in any way that is unlawful or harms One Hour, its affiliates or franchisees or any customer of One Hour or its franchisees, as determined in One Hour's sole discretion. Franchisee will not use the One Hour Website in any manner that breaches the terms of this Franchise Agreement, or any code of conduct, policy, the Operations Manual or other notice that is applicable to One Hour's franchisees. Without limiting the generality of this sub-section A., Franchisee will not use the One Hour Website in any manner that could damage, disable, overburden or impair the One Hour Website or interfere with any other party's use and enjoyment of the One Hour Website.

B.      Without limiting the generality of sub-Section A., Franchisee will not use the One Hour Website to transmit, either directly or indirectly, any unsolicited bulk e-mail or unsolicited commercial e-mail. Franchisee understands and accepts that One Hour may use filtering technology or other measures in its efforts to stop unsolicited commercial e-mail, and that if Franchisee's use of the One Hour Website includes e-mail related services, then the filtering technology or other measures may block, either temporarily or permanently, some e-mail sent to Franchisee through the One Hour Website.

C.      For materials that Franchisee posts or otherwise provides to One Hour related to the One Hour Website, Franchisee hereby permits One Hour to (i) use, copy, distribute, transmit, publicly display, publicly perform, reproduce, edit, modify, translate and reformat these materials, each in connection with the One Hour Website, and (ii) sublicense the material to the maximum extent permitted by applicable law. One Hour will not pay Franchisee for these materials, and One Hour may remove these materials at any time. For each of the materials that Franchisee provides to One Hour, Franchisee represents that it has all rights necessary for One Hour to make the grants made in this sub-Section C. If permitted by applicable law, One Hour may monitor Franchisee's e-mail, or other electronic communications and may disclose this information in the event One Hour has a good faith reason to believe it is necessary for the purposes of ensuring Franchisee's compliance with this Franchise Agreement, and protecting the rights, property and interests of One Hour, its affiliates and franchisees and any customer of One Hour or its franchisees.

D.      One Hour does not warrant or guarantee the accuracy or timeliness of any information that is available from the One Hour Website. **One Hour PROVIDES THE ONE HOUR WEBSITE "AS IS," "WITH ALL FAULTS" AND "AS AVAILABLE," AND THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND**

EFFORT IS WITH FRANCHISEE. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ONE HOUR MAKES NO REPRESENTATIONS, WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED. ONE HOUR DISCLAIMS ANY AND ALL WARRANTIES OR CONDITIONS, EXPRESS, STATUTORY OR IMPLIED, INCLUDING, WITHOUT LIMITATION, (i) WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, WORKMANLIKE EFFORT, ACCURACY, TITLE QUIET ENJOYMENT, NO ENCUMBRANCES OR LIENS AND NON-INFRINGEMENT, (ii) WARRANTIES OR CONDITIONS ARISING THROUGH COURSE OF DEALING OR USAGE OF TRADE, OR (iii) WARRANTIES OR CONDITIONS THAT ACCESS TO OR USE OF THE ONE HOUR WEBSITE WILL BE UNINTERRUPTED OR ERROR-FREE. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE FACE OF THIS FRANCHISE AGREEMENT.

E. WITHOUT LIMITING THE GENERALITY OF SECTION 18.7, IN NO EVENT WILL ONE HOUR BE LIABLE FOR ANY DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES ARISING OUT OF, BASED ON, OR RESULTING FROM FRANCHISEE'S USE OF THE ONE HOUR WEBSITE, EVEN IF ONE HOUR HAS BEEN ADVISED OF THE POSSIBILITY OF THESE DAMAGES. THE EXCLUSION OF DAMAGES UNDER THIS SUB-SECTION E IS INDEPENDENT OF FRANCHISEE'S EXCLUSIVE REMEDY AND SURVIVES IN THE EVENT THE REMEDY FAILS OF ITS ESSENTIAL PURPOSE OR IS OTHERWISE DEEMED UNENFORCEABLE. THESE LIMITATIONS AND EXCLUSIONS APPLY WITHOUT REGARD TO WHETHER THE DAMAGES ARISE FROM (i) BREACH OF CONTRACT, (ii) BREACH OF WARRANTY, (iii) NEGLIGENCE, OR (iv) ANY OTHER CAUSE OF ACTION, IF THE EXCLUSION AND LIMITATIONS ARE NOT PROHIBITED BY APPLICABLE LAW. IF FRANCHISEE IS DISSATISFIED WITH THE ONE HOUR WEBSITE, DOES NOT AGREE WITH ANY PART OF THIS SECTION 10.9, OR HAS ANY OTHER DISPUTE OR CLAIM WITH OR AGAINST ONE HOUR WITH RESPECT TO THE ONE HOUR WEBSITE, FRANCHISEE'S SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE ONE HOUR WEBSITE.

F. One Hour may change the One Hour Website or delete features in any way, at any time and for any reason. As Franchisee uses the One Hour Website, Franchisee may receive, access or use information, materials, graphics, software, data and content originated by One Hour or other parties. WITHOUT LIMITING THE GENERALITY OF SUB-SECTIONS D AND E, FRANCHISEE ACKNOWLEDGES THAT ONE HOUR IS NOT RESPONSIBLE OR LIABLE FOR (i) ANY CONTENT, INCLUDING, WITHOUT LIMITATION, ANY INFRINGING, INACCURATE,

-21-

OBSCENE, INDECENT, THREATENING, OFFENSIVE DEFAMATORY, TORTIOUS, OR ILLEGAL CONTENT, OR (ii) ANY THIRD PARTY CONDUCT, TRANSMISSIONS OR DATA. IN ADDITION, WITHOUT LIMITING THE GENERALITY OF SUB-SECTIONS D AND E, FRANCHISEE ACKNOWLEDGES AND AGREES THAT ONE HOUR IS NOT RESPONSIBLE OR LIABLE FOR (iii) ANY VIRUSES OR OTHER DISABLING FEATURES THAT AFFECT ACCESS TO OR USE OF THE ONE HOUR WEBSITE, (iv) ANY INCOMPATIBILITY BETWEEN THE ONE HOUR WEBSITE AND OTHER WEBSITES, SERVICES, SOFTWARE AND HARDWARE, (v) ANY DELAYS OR FAILURES FRANCHISEE MAY EXPERIENCE IN INITIATING, CONDUCTING OR COMPLETING ANY TRANSMISSION OR TRANSACTIONS IN CONNECTION WITH THE ONE HOUR WEBSITE IN AN ACCURATE OR TIMELY MANNER, OR (vi) ANY DAMAGES OR COSTS OF ANY TYPE ARISING OUT OF OR IN ANY WAY CONNECTED WITH FRANCHISEE'S USE OF ANY SERVICES AVAILABLE FROM THIRD PARTIES THROUGH LINKS CONTAINED ON THE ONE HOUR WEBSITE. THE LIMITATIONS, EXCLUSIONS AND DISCLAIMERS IN SUB-SECTIONS D, E AND F APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND ARE NOT INTENDED TO DEPRIVE FRANCHISEE OF ANY MANDATORY PROTECTIONS PROVIDED TO FRANCHISEE UNDER APPLICABLE LAW.

G.       One Hour may terminate or suspend Franchisee's access to the One Hour Website at any time, with or without cause, with or without notice. Upon a termination or suspension, Franchisee's right to use the One Hour Website will immediately cease. **UPON A TERMINATION OR SUSPENSION, ANY INFORMATION FRANCHISEE MAY HAVE STORED ON THE ONE HOUR WEBSITE MAY NOT BE RETRIEVED LATER.**

### Article 11.    Licensed Marks

11.1 *Use of Licensed Marks*. Franchisee will have the non-exclusive right and license for the Term to use the Licensed Marks solely for purposes of operating the Franchised Business under the System and the Operations Manual in compliance with this Agreement. Franchisee may use the Licensed Marks only in the manner and format specified in the Operations Manual or otherwise with the prior written consent of One Hour. One Hour reserves the right to specify the use of the Licensed Marks and to pre-approve in writing any non-specified use of the Licensed Marks. Franchisee will not use or permit to be used any of the Licensed Marks in connection with any other business owned or operated by Franchisee or its affiliates. Franchisee will not use any marks to identify the Franchised Business other than the Licensed Marks specified by One Hour.

11.2 *Goodwill*. Franchisee acknowledges and agrees that it will not acquire any proprietary rights in the Licensed Marks by virtue of the license granted to Franchisee in this Agreement or otherwise. All goodwill established by Franchisee's use of the Licensed Marks

-22-

will inure to the sole and exclusive benefit of One Hour. Franchisee agrees not to contest at any time either the validity, or One Hour's ownership, of any of the Licensed Marks. Any unauthorized use of the Licensed Marks by Franchisee will constitute an infringement of One Hour's rights in and to the Licensed Marks.

11.3 *No Use in Business Name*. Except as provided in **Section 11.4**, Franchisee may not use the Licensed Marks in connection with Franchisee's corporate, business organization or trade name, or in connection with any prefix, suffix or other modifying words, terms, designs or symbols or in any modified form. Franchisee may not use the Licensed Marks when selling any unauthorized product or service or in any other manner that One Hour has not expressly authorized in writing in advance.

11.4 *Identification*. Franchisee will identify itself as the independent owner of the Franchised Business, give notices of trademark and service mark registrations in the manner One Hour specifies, and make the fictitious or assumed name registrations as may be required under applicable law or as may be required by One Hour to distinguish itself from One Hour.

11.5 *Infringements*. Franchisee will give Notice to One Hour immediately upon learning of any alleged infringement or a challenge to Franchisee's use of the Licensed Marks, or any claim by any third party of any rights in the Licensed Marks or any similar mark, and will not communicate with any person other than One Hour or One Hour's attorneys and Franchisee's attorneys in connection with the alleged infringement, challenge or claim. One Hour has the sole discretion to take the action, if any, it deems appropriate and the right to exclusively control any litigation, trademark office proceeding or other administrative proceeding arising out of any infringement, challenge or claim or otherwise concerning any of the Licensed Marks. Franchisee will sign all instruments and documents, provide assistance and take any action that, in the opinion of One Hour's attorneys, may be necessary or advisable to protect and maintain One Hour's interests in any litigation, trademark office proceeding or other administrative proceeding or to otherwise protect and maintain One Hour's interest in the Licensed Marks.

One Hour will bear all legal expenses incident to Franchisee's participation, at One Hour's request, in any action to prevent the infringement or illegal use of the Licensed Marks, except for the cost of any legal counsel separately retained by Franchisee. Except as expressly provided in this Section, One Hour will not be liable to Franchisee for any damages, costs, expenses, loss of profits or business opportunities, or indirect, incidental or consequential damages of any kind or nature whatsoever relating to any action involving the Licensed Marks.

11.6 *Modification or Discontinuance*. One Hour has the right to modify or discontinue its or Franchisee's use of the Licensed Marks or the specifications for use of the Licensed Marks, or to require Franchisee to commence use of new or substitute Licensed Marks. Franchisee agrees that One Hour may change the mark under which Franchisee operates the Franchised Business to another mark, and, if such change is made, within the time specified by One Hour, Franchisee will cease using the old mark and use the new Licensed Mark as directed by One Hour at Franchisee's expense. If such change is made, reference in this Agreement to the Licensed Marks will be deemed to refer to such new mark.

11.7 *Electronic Commerce*. Franchisee will comply with the requirements stated in the Operations Manual regarding its use of the Licensed Marks in electronic commerce, which includes all forms of electronic or computer communication, including the One Hour Website. One Hour may require that various types of marketing or advertising utilize a specific template or format. Franchisee will give One Hour copies of all proposed applications for registrations of any of the Licensed Marks or any variation thereof for use in and for electronic commerce. Franchisee will obtain One Hour's prior written approval before filing any application, which approval One Hour may withhold in its sole discretion. Franchisee may not use the Licensed Marks, any portion thereof, or any words confusingly similar to any e-mail address, domain name, or other identification of Franchisee or the Franchised Business in any electronic medium, unless agree to in advance, in writing, by One Hour.

### Article 12.    Rights to the System

12.1 *Ownership of System*. Franchisee will not contest One Hour's unrestricted and exclusive ownership of the System or One Hour's right to grant licenses to use the System. All Improvements and additions to or associated with the System, whenever and by whomever made, and all service mark and trademark registrations and goodwill at any time associated with the System, including the Licensed Marks, are the property of One Hour. Franchisee acknowledges that it does not have any right to license others to use any part of the System, and that all materials relating to the System will at all times remain the sole property of One Hour. Upon expiration or termination of this Agreement, no monetary amount will be assigned or attributed to any goodwill associated with Franchisee's use of the System.

12.2 *Disputes Concerning System*.    One Hour has the sole right and responsibility to handle and resolve litigation and other disputes with third parties (including imitators and infringers) concerning the use of all or any part of the System. One Hour will not have any obligation to initiate suit against imitators or infringers, and may settle any dispute by grant of a license or otherwise. Franchisee will, at its reasonable expense, extend its full cooperation to One Hour in all such matters.

12.3 *System and Business Improvements*. During the Term, any addition, modification, adaptation, improvement, refinement, discovery, invention or innovation of the System or any Licensed Mark (collectively, an "**Improvement**") made by Franchisee, its Owners, managers, or employees while employed by or owning the Franchised Business, will be the sole and exclusive property of One Hour, regardless of Franchisee's, its Owners' or employees' participation or sole participation in its development, and will be deemed assigned to One Hour. Upon One Hour's request, Franchisee and its Owners will, and will cause their managers and employees to, sign any instruments and documents that One Hour requests and assist One Hour to perfect or protect all intellectual property rights in such Improvement. Franchisee, its Owners and employees will not be entitled to any compensation for the use or licensing of any Improvement. All of the Improvements and information remain One Hour's sole property.

12.4 *Complaints*. Franchisee will immediately provide One Hour with copies of any complaints relating to the operation or activities of the Franchised Business that Franchisee

-24-

receives from any of its customers, any Better Business Bureau or any federal, state or local regulatory or governmental agency.

### Article 13.    Operations Manual and Confidentiality

13.1 *Operations Manual.*   One Hour will entrust to Franchisee a copy of the Operations Manual and Franchisee will comply with all provisions of the Operations Manual. One Hour may make the Operations Manual available solely through a secure Internet link from time to time during the Term.   One Hour may communicate to Franchisee mandatory and suggested standards, methods, procedures and specifications applicable to the System and System Standards and information relative to other obligations of Franchisee under this Agreement and to the operation of the Franchised Business. One Hour may make such communications through the Operations Manual, System Standards or written or electronic media.  For the purposes of the following provisions of this **Section 13.1** (and where otherwise referred to in this Agreement), the Operations Manual and all One Hour communications will be collectively referred to as the "**Operations Manual.**"  The Operations Manual at all times will remain the exclusive property of One Hour, and Franchisee is required to return the Operations Manual (and all copies thereof which Franchisee has made) to One Hour promptly upon request by One Hour and, in any event, upon termination of expiration of this Agreement for any reason whatsoever.  Franchisee will not at any time copy, duplicate, record or otherwise reproduce or transcribe the Operations Manual or any of the forms supplied by One Hour hereunder without One Hour's prior written consent.   If the Operations Manual is supplied electronically, Franchisee may print one copy solely to use in its operation of the Franchised Business.  One Hour reserves the right from time to time revise the Operations Manual, and Franchisee expressly agrees to make corresponding revisions to its copy of the Operations Manual and to comply with each new or changed standard immediately upon receipt of such revision.  In the event of any discrepancy between the Operations Manual held by Franchisee and the Operations Manual maintained by One Hour, Franchisee agrees that the terms of the Operations Manual maintained by One Hour will control.

13.2 *Confidential Information.*    Franchisee acknowledges that certain information relating to the operation of the Franchised Business including, without limitation, the standards, methods, procedures and specifications of the System, including System Standards and the contents of the Operations Manual, is derived from information that One Hour has disclosed to Franchisee and that all such information is of a proprietary and confidential nature and a trade secret of One Hour ("**Confidential Information**").  Franchisee and each of its Owners, officers, directors, members or partners will maintain the absolute confidentiality of all Confidential Information both during the Term and after the termination or expiration of this Agreement and will use Confidential Information only if necessary to operate the Franchised Business, and will not disclose any Confidential Information for any reason whatsoever, except as provided here.  Franchisee may disclose Confidential Information to its Owners, officers, directors, members, partners, manager and employees only if necessary to operate the Franchised Business in accordance with this Agreement.  Franchisee will cause those persons receiving the Confidential Information to sign an All Hands Confidentiality Agreement.  Franchisee will not use any Confidential Information, directly or indirectly, in any other business or in any other manner or obtain any benefit therefrom not specifically approved in writing by One Hour during the Term or afterwards.

(03/26/11)                                                                                                              Multistate

13.3 *Use of Confidential Information*. Franchisee will not acquire any interest in the Confidential Information other than the right to use the Confidential Information in connection with its ownership and operation of the Franchised Business during the Term and any Renewal Term, and acknowledges that its use or duplication of the Confidential Information in any other business or capacity will constitute an unfair method of competition with One Hour, its affiliates and One Hour's other franchisees.

Franchisee acknowledges that One Hour is disclosing the Confidential Information to Franchisee solely on the condition that Franchisee agrees, and Franchisee hereby agrees, that any Confidential Information received from One Hour (a) will only be used by Franchisee for purposes of performing its obligations under this Agreement, (b) will not be used by Franchisee in any other business, manner or capacity, (c) will have its absolute confidentiality maintained by Franchisee both during and after the Term and any Renewal Term, (d) will not be copied by Franchisee without One Hour's written authorization, and (e) will not be disclosed by Franchisee to any third party without the prior written consent of One Hour. Franchisee must use reasonable care to prevent the disclosure of the Confidential Information to any third party, and further must limit the dissemination of the Confidential Information within its own organization to individuals whose duties justify the need to know the Confidential Information, and then only provided that there is a clear understanding by such individuals of their obligation to maintain the confidential status of the Confidential Information and to restrict its use solely to the purposes specified here. Franchisee will cause each person receiving the Confidential Information to sign the form of confidentiality agreement provided by One Hour.

Franchisee acknowledges that no other right or license to use the Confidential Information is granted by this Agreement, and agrees that the amount of the Confidential Information to be disclosed to Franchisee is completely within the discretion of One Hour.

Franchisee further acknowledges and agrees that the identity, background and/or work capabilities of One Hour's employees constitutes, by way of example and not limitation, Confidential Information and, accordingly, that Franchisee will not directly or indirectly solicit, retain or hire for employment or for any other type of working relationship any employee of One Hour or any of its affiliates without the prior express written consent of the One Hour.

### Article 14.    Non-Competition

14.1 *Non-Competition During the Term*. Commencing on the Effective Date and for balance of the Term and any Renewal Term, Franchisee (and its Owners if Franchisee is a business entity) will not own or be involved with a Competitive Business. A "**Competitive Business**" means a business that offers residential air conditioning and heating products and services competitive with or similar to those offered by One Hour, its affiliates, its franchisees or its licensees or its affiliates' franchisees, licensee and members (including, but not limited to, the members of the Clockwork affinity groups). For purposes of this **Article 14**, "Competitive Business" does not include the continued, temporary operation of a Prior Business during a reasonable conversion time period after the Effective Date. Franchisee agrees to terminate any day-to-day operations of a Prior Business within the six-month anniversary of the Effective Date. Franchisee (and its Owners if Franchisee is a business entity) may own and/or operate other commercial air conditioning and heating services businesses so long as such other commercial

-26-

air conditioning and heating services businesses:; (i) do not provide residential air conditioning and heating products and services and repair services in the Territory or an adjacent territory; (ii) do not use any portion of the Franchised Business, including the System, Confidential Information or the Licensed Marks (such as the use of vehicles, invoices, and uniforms bearing the Licensed Marks); and (iii) do not interfere with Franchisee's operation of the Franchised Business (or diminish the Franchisee's ability to fully comply with Franchisee's obligations under this Agreement, including **Section 7.1(C), (D) and (E)** hereof; and further provided that any such commercial air conditioning and heating services business is a legal entity separate and distinct from the Franchised Business and that its books and records are maintained completely separate from the Franchised Business. To verify compliance with this **Section 14.1**, Franchisee will make the books and records of any such authorized commercial air conditioning and heating services business available to One Hour upon reasonable prior notice.

14.2 *Post-Term Non-Competition*. For a period of 24 months after termination, expiration, or Transfer of this Agreement, Franchisee (and its Owners if Franchisee is a business entity) agrees that it (or they) will not own or be involved with a Competitive Business that is located in or serves customers within the Territory or any zip code where Franchisee had Franchised Business customers during the Term and any Renewal Term; provided, however, that the foregoing obligation shall not apply to Franchisee if this Agreement is terminated by Franchisee (i) within 24 months of the initial term of this Agreement and (ii) in accordance with Section 16.1 of this Agreement.

14.3 *Severability of Restrictive Covenants*. Franchisee acknowledges that the invalidity or unenforceability of any portion of **Section 14.1** or **Section 14.2** will not affect the validity or enforceability of any other portion of **Section 14.1** or **Section 14.2** or any other section of this Agreement and any invalid or unenforceable portion of **Section 14.1** or **Section 14.2** will be deemed to be severable and subject to **Section 19.1**.

14.4 *Amendment of Restrictive Covenants*. Franchisee acknowledges that the provisions of this **Article 14** have been inserted for the sole benefit of One Hour and that One Hour has the right, from time to time during the Term, in its sole discretion, to waive in whole or in part or otherwise reduce the scope of any covenant written in this **Article 14** or any portion of this Agreement without Franchisee's consent effective upon One Hour giving Notice to Franchisee.

### Article 15.    Transfer

15.1 *Transfer by One Hour*. One Hour has the right, directly or indirectly, to sell, assign, transfer or otherwise dispose of or deal with this Agreement, or any or all of its rights and obligations under this Agreement, to any individual, firm, partnership, association, bank, lending institution, corporation, limited liability company or other third party as One Hour may in its sole discretion deem appropriate. In the event of this transfer, One Hour will be released from any liability under this Agreement for the obligations transferred.

15.2 *Transfer by Franchisee*. Franchisee acknowledges that the granting of the rights hereunder is based upon One Hour's investigation of Franchisee's qualifications and that

such rights are personal to Franchisee. Except as provided here, Franchisee will not sell, divide, encumber, assign, hypothecate, mortgage, sub-license, transfer through bequest, inheritance, transfer in trust, divorce or operation of law or by any other means, or otherwise dispose of the rights granted here or any part of this Agreement, or any rights or privileges incidental to this Agreement, or the Franchised Business or any of its interest, or Franchisee's rights or interest in this Agreement, and if Franchisee is a business entity, Franchisee's Owners will not transfer the shares of the corporation or of the ownership or membership interests (collectively referred to as a "**Transfer**"), to any individual, firm, partnership, association, bank, lending institution, corporation, limited liability company or other third party without the prior written consent of One Hour. One Hour will not unreasonably withhold its consent to such Transfer having regard to factors which may include, without limitation, the viability of the investment by the transferee based on the price for the Franchised Business payable by the transferee. Any actual, attempted or purported Transfer occurring without One Hour's prior written consent will constitute a default of this Agreement and will be null and void. One Hour reserves the right to require any or all of the following as a condition to its consent to any Transfer:

A.     the proposed transferee is acceptable to One Hour based upon standards for new franchisees used by One Hour at such time;

B.     Franchisee is not in default in the performance or observance of any of Franchisee's obligations under this Agreement (including, without limitation, making all payments in full when due), and any other agreement between Franchisee (or its affiliates) and One Hour (or its affiliates) relating to the Franchised Business or any other agreement between Franchisee (or its affiliates) and One Hour (or its affiliates);

C.     Franchisee has settled and paid, or made satisfactory arrangements to pay, all outstanding accounts with and amounts owed to One Hour and all trade creditors of the Franchised Business;

D.     Franchisee has delivered to One Hour a general release, in a form satisfactory to One Hour, of all claims Franchisee may have against One Hour, its members, officers, directors, owners, employees, affiliates, successors and assigns;

E.     except in the case of a Transfer under **Section 15.3** or a Transfer to One Hour under **Section 15.4**, Franchisee has paid One Hour's then-current transfer fee;

F.     the proposed transferee has agreed, in writing, to complete One Hour's initial training program and to pay One Hour's reasonable costs of administering such program and all transportation and accommodation costs and living expenses of the transferee and its manager and key employees for such initial training program;

G.    the proposed transferee assumes all rights and the obligations of Franchisee hereunder and, if required by One Hour, signs One Hour's then-current form of franchise agreement (and all other agreements, instruments and documents then customarily used by One Hour in the granting of Franchised Businesses) on the then prevailing terms, conditions and fees (but without obligation to pay initial fees) for a period equal to the then unexpired portion of the Term;

H.    Franchisee has paid One Hour a transfer fee of $2,000.00 to reimburse One Hour for its expenses in connection with the Transfer, but a transfer fee will not be charged for mortgages or other encumbrances; and

I.    this Transfer is completed in accordance with any applicable bulk sales legislation.

It is understood and agreed that upon satisfaction of all the foregoing conditions and upon payment of all amounts that are owed by Franchisee, Franchisee will be released from any further liability under this Agreement with respect to matters or periods subsequent to the date of the Transfer; provided, however, Franchisee's obligations under **Section 14.2** will survive the transfer of this Agreement.

15.3  ***Transfer to a Corporation or Limited Liability Company.***  If Franchisee is an individual, Franchisee may, coincident with or at any time after execution of this Agreement, after obtaining the written consent of One Hour and provided all obligations of Franchisee to One Hour have been satisfied, transfer and assign all of Franchisee's rights and obligations hereunder to a corporation or limited liability company, provided Franchisee is and throughout the Term remains a principal executive officer of such corporation or limited liability company and the beneficial and registered owner of greater than 50% of the issued and outstanding voting and equity rights and interests in such corporation or limited liability company (and any rights or options convertible into such voting or equity rights or interests), and provided that Franchisee forthwith:

A.    causes the corporation and its directors and shareholders or, if a limited liability company, its owners or members, to acknowledge this Agreement and to agree in writing to be bound by the provisions of this Agreement; signs and causes the corporation and its directors and shareholders or, if a limited liability company, its owners or members, to sign any agreement as may be specified by One Hour relating to the assumption by the corporation or limited liability company of any rights and obligations under this Agreement; and causes the corporation or limited liability company to inform One Hour and to keep it informed as to the names and addresses of the then current directors and shareholders or members of, and those persons who have a financial interest in, the corporation or limited liability company from time to time;

B.    signs such documents in respect of the transfer and assignment as One Hour may direct, including the attached Owner's Guaranty; **and**

-29-

C.    pays to One Hour all of One Hour's reasonable costs (including, without limitation, legal costs and fees) for the administration of the Transfer and the preparation, execution and filing of all documentation required by One Hour in connection with the Transfer.

15.4 ***Death or Incapacity.***  If Franchisee dies or becomes incapacitated (or if Franchisee is a corporation, limited liability company, partnership or other entity, the death or incapacity of a principal Owner) so that Franchisee, a principal Owner, or a qualified manager appointed or employed by Franchisee, is not able to devote full time and attention to the operation of the Franchised Business, then the heirs or personal representatives of Franchisee will Transfer the rights granted hereunder to a third party acceptable to One Hour within a reasonable time, not to exceed 6 months from the date of death or Incapacity.  One Hour reserves the right to require any or all of the conditions set out in **Section 15.2** to be satisfied prior to providing its consent to such Transfer.  In the event that any of the required conditions stated in **Section 15.2** are not satisfied (except in **Section 15.2(E)**), One Hour will have the right in its sole discretion to terminate this Agreement by Notice, in the case of death, sent to the estate of Franchisee and, in the case of Incapacity of Franchisee, to Franchisee.  For purposes of this **Section 15.4**, "**Incapacity**" means that, in the reasonable opinion of One Hour, Franchisee or its principal owner, by reason of physical or mental illness or disability, is unable to operate the Franchised Business in the ordinary course for a period of 30 days or more in any consecutive 90-day period.  In the event of Franchisee's or the principal Owner's death or Incapacity, One Hour may elect to service Franchisee's customers itself or through the use of another franchisee if those customers cannot otherwise be adequately serviced during the period of Franchisee's Incapacity or after Franchisee's death.  One Hour or such other franchisee will be entitled to be paid for such services in accordance with One Hour's or such other franchisee's then current fees for such services.

15.5 ***Right of First Refusal.***  If Franchisee or one or more of its Owners proposes to make a Transfer to any individual or entity other than a corporation, partnership or other entity wholly owned by Franchisee or its Owners, One Hour has the right for a period of 30 days after Franchisee or such Owners have submitted all information requested by One Hour to exercise a right of first refusal and substitute itself for the proposed transferee in the transaction.  If One Hour declines to do so and there is any change in the terms and conditions of the proposed transaction or the proposed transferee, Franchisee will promptly notify One Hour, and One Hour has the further right to exercise its right of first refusal regarding the revised transaction for a period of 15 days.  If One Hour exercises its right of first refusal, One Hour will have not less than 90 days to close the transaction, and One Hour has the right to substitute cash for any alternative form of consideration contemplated by the proposed transaction.  If One Hour does not exercise its right of first refusal, Franchisee or the transferring Owners may make a Transfer on the terms and conditions of the offer considered by One Hour if Franchisee and its Owners have complied with all of the provisions of **Section 15.2**.

### Article 16.    Termination and Expiration

16.1 ***Termination by Franchisee.***    If Franchisee has fully complied with this Agreement and One Hour materially fails to comply with this Agreement and does not correct such failure within 30 days after receipt of Notice thereof, Franchisee may terminate this

-30-

Agreement effective 30 days after giving Notice of such termination to One Hour.  Franchisee's termination of this Agreement for any other reason or without such notice will be deemed a termination without cause.

16.2 ***Termination by One Hour Without Opportunity to Cure***.  Franchisee will be deemed to be in default under this Agreement, and One Hour may, at its option, terminate this Agreement and all rights granted here, effective immediately, without giving Franchisee Notice of, or the opportunity to cure, the default, if Franchisee either:

A.      (i) makes or is deemed to have made a general assignment for the benefit of creditors; or (ii) if a petition is filed against Franchisee under the Bankruptcy Code and not dismissed within 60 days of filing; or (iii) if a petition is filed by Franchisee under the Bankruptcy Code; or (iv) if Franchisee is declared or adjudicated bankrupt; or (v) if a liquidator, trustee in bankruptcy, custodian, receiver, receiver and manager, moderator, or any other officer with similar powers is appointed of or for Franchisee; or (vi) if Franchisee commits any act of bankruptcy or institutes proceedings to be adjudged bankrupt or insolvent or consents to the institution of such appointment or proceedings; or (vii) if Franchisee admits in writing an inability to pay debts generally as they become due;

B.      (i) has any of the products or chattels of the Franchised Business at any time seized or taken in execution or in attachment by a creditor of Franchisee; or (ii) a writ of execution is issued against such products or chattels; or (iii) if Franchisee, without the prior written consent of One Hour, gives any security interest in any of such products or chattels or sells any of such products or chattels, except in the normal course of business, and, as a consequence of these acts, in the judgment of One Hour, the operation of the Franchised Business or any security interest which One Hour may have in respect of this Agreement is materially impaired;

C.      willfully or fraudulently misrepresents any fact, condition or report made in any application given to One Hour or required to be made by this Agreement;

D.      dies or becomes incapacitated and a Transfer is not consummated as described in **Section 15.4**;

E.      by its actions, or its failure to take an action that it is required to take, adversely affects the goodwill associated with One Hour, the Licensed Marks or the Franchised Business;

F.      (or any of its affiliates) defaults under any other agreement with One Hour (or its affiliates) and One Hour (or its affiliates) has the right to terminate such other agreement without giving Franchisee (or its affiliate) an opportunity to cure the default; or

-31-

G.    fails to pay 2 or more times in Franchisee's fiscal year the full amount of any Continuing Franchise Fee that One Hour's audit or inspection reveals was underpaid.

16.3 *Termination by One Hour After Opportunity to Cure*.  Franchisee will be deemed to be in default of this Agreement, and One Hour, at its option, may terminate this Agreement and all rights granted here effective as of the time noted, if Franchisee either:

A.    fails to pay when due any monies owed to One Hour or any affiliate of One Hour, including, without limitation, the Initial Fees, any Continuing Franchise Fees or any Marketing Fund Contributions, or fails to pay any monies owed One Hour under **Section 8.6** and such default is not cured within 10 days after receiving Notice thereof from One Hour;

B.    is in default in paying any monies owed to any Supplier under the normal payment terms and conditions of such Supplier and fails to cure such default and satisfy One Hour that such default has been cured within 30 days after receiving Notice from One Hour to cure the same;

C.    fails to service satisfactorily all of Franchisee's customer accounts to the satisfaction of One Hour and in accordance with the System and System Standards and fails to cure such default and satisfy One Hour that such default has been cured within 30 days after receiving Notice from One Hour to cure the same;

D.    is in default of any of Franchisee's other obligations contained in this Agreement or in any other agreement or instrument entered into or made between Franchisee (or its affiliates) and One Hour (or its affiliates) relating to the Franchised Business including, without limitation, any promissory note or security agreement, and fails to cure such default and satisfy One Hour that such default has been cured within 30 days after receiving Notice from One Hour to cure the same;

E.    has received from One Hour during any consecutive 12-month period 3 or more Notices relating to a default under this **Section 16.3** (whether such Notices relate to the same or different defaults and whether or not such defaults have been   cured by Franchisee), such termination to be effective immediately upon the giving of Notice by One Hour; or

F.    (or any of its affiliates) is in default under any other franchise agreement or other agreement with One Hour (or its affiliates) and, has not cured such default within the applicable cure period.

16.4 *Optional Cure Period Training*.  During any cure period which begins to run under **Section 16.3(C)** or **16.3(D)**, Franchisee will have the right to request that the One Hour provide training services for Franchisee and its manager and employees.  Subject to availability, One Hour (or its affiliate) will provide the services of trainers at the then-current per diem fees for such services.  Franchisee will pay such fees promptly upon receipt of an invoice

-32-

from One Hour. In addition to the per diem fees, Franchisee is obligated to pay for the personal and living expenses of the One Hour employees offering the training.

16.5 ***Other Relief.*** Any termination under **Sections 16.2** and **16.3** will be without prejudice to any other rights (including any right of indemnity), remedy or relief vested in or to which One Hour may otherwise be entitled against Franchisee. One Hour will retain all moneys paid to it by Franchisee under this Agreement or otherwise as consideration for the rights and benefits previously conferred on Franchisee hereunder. The foregoing remedy will not exclude any of the remedies which One Hour may have at law or in equity by reason of the default, breach or non-observance by Franchisee of any provision of this Agreement.

16.6 ***Franchisee's Obligations on Termination or Expiration.*** Upon the termination or expiration of this Agreement for any reason whatsoever, Franchisee will cease to be a franchisee of One Hour and is required to immediately:

      A.    pay to One Hour all amounts and charges as have become due hereunder through the date of termination or expiration of this Agreement or will become due hereunder or under any other agreement between Franchisee (or its affiliates) and One Hour (or its affiliates) and are then unpaid;

      B.    discontinue using and return to One Hour all copies of the Operations Manual, including any copies printed from the One Hour Website, any written embodiment of System Standards and other Confidential Information;

      C.    notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers, including Vanity telephone numbers or any national dial One Hour telephone numbers and all classified and other directory listings of the Franchised Business, including the Yellow Pages, and, at One Hour's option, assign any telephone numbers of the Franchised Business to One Hour, except that this type of assignment will not be required for any telephone number and listing that is already part of a telephone system owned and/or operated by One Hour;

      D.    transfer any websites and domain names related to the Franchised Business or another residential HVAC business operated during the Term and any Renewal Term to One Hour (Franchisee will not receive any compensation for such transfer);

      E.    satisfactorily address and resolve all warranty claims or customer disputes, at One Hour's option, or reimburse One Hour for the cost of doing so;

      F.    cease to operate the Franchised Business under the System, including any patented protected materials, or customized templates including the Straight Forward Pricing Guide, or otherwise and not, directly or indirectly, represent to the public that such Franchised Business is operated in association with One Hour or the System, or hold itself out as a present or former franchisee of One Hour;

G.      cease to use, directly or indirectly, in advertising or in any other manner whatever, any of the Licensed Marks, any colorable imitation thereof or any name or mark similar to any of the Licensed Marks, any other identifying characteristics or indicia of operation of the System, and any confidential standards, methods, procedures and specifications associated with the System;

H.      discontinue using for any purpose, and sell to One Hour at its request, at the fully depreciated book value thereof, any or all equipment, signs, advertising materials, fixtures, furnishings, inventory, invoices, supplies, forms or other products or materials which display any Licensed Marks or any distinctive feature or device associated with the System;

I.      take all actions as may be necessary to repaint or rewrap all vehicles used by the Franchised Business or owned by Franchisee which display any of the Licensed marks or which use any color or color scheme that is the same as or similar to the color or color schemes used by One Hour or its Franchised Businesses (including the colors trademarked by One Hour or its affiliates) and give One Hour evidence satisfactory to One Hour of compliance with Franchisee's obligation hereunder at the termination or expiration of this Agreement (the **De-Identification Period**") (Franchisee acknowledges that One Hour has the right to assess and collect a past due de-identification charge of $100, per vehicle, per day, for each day Franchisee fails to comply with this Section 16.6.(I) after this De-Identification Period);

J.      take all such action as may be necessary to cancel any fictitious or assumed name registration which contains any part of the Licensed Marks under any federal or state laws or regulations and give One Hour evidence satisfactory to One Hour of compliance with Franchisee's obligation hereunder within 30 days after the termination or expiration of this Agreement;

K.      permit One Hour, at Franchisee's expense, to enter the location from which the Franchised Business is conducted and remove any and all personal property of One Hour and any and all personal property of Franchisee which displays any of the Licensed Marks or any distinctive feature or device associated with the System, including any and all equipment, signs, advertising materials, fixtures, furnishings, inventory, invoices, supplies and vehicles and make such reasonable alterations in the exterior and interior decor as One Hour deems necessary to remove from the premises where the Franchised Business is operated any identification as a Franchised Business;

L.      delete any references to One Hour or the Licensed Marks, domain names, copyrighted materials, or any other proprietary materials from any website used by Franchisee; and

M.      observe and comply with the provisions of **Sections 13.2, 13.3** and **14.2** of this Agreement; and

-34-

N.   discontinue use of SuccessWare within 60 days or pay the current non-franchisee initial fees to SuccessWare.

**Article 17.   Relationship and Indemnification**

17.1 *Independent Parties*.   Franchisee is and will at all times remain an independent contractor and is not and will not represent itself to be the agent, joint venturer, partner or employee of One Hour, or to be related to One Hour other than as its independent franchisee. Franchisee will not make any representations or take any acts which could establish any apparent relationship of agency, joint venture, partnership or employment with One Hour, and One Hour will not be bound in any manner whatsoever by any agreements, warranties, representations or undertakings made by Franchisee to any other person nor with respect to any other action of Franchisee. Franchisee will not establish any bank account, make any purchase, apply for any loan or credit, or incur or permit any obligation to be incurred in the name or on the credit of One Hour. No acts of assistance given by One Hour to Franchisee will be construed so as to alter this relationship. Franchisee is solely responsible for paying all the operating costs of its Franchised Business, including all taxes.

17.2 *Liability of Franchisee*.   If 2 or more individuals sign this Agreement as Franchisee, the liability of each such individual hereunder will be joint and several.

17.3 *Non-Liability*.   One Hour is not obligated or liable for any injury or death of any person or damage to any property caused by Franchisee's acts, failure to act, negligence or willful conduct, or for any other liability of Franchisee.

17.4 *Franchisee Indemnity*.   Franchisee hereby agrees to indemnify, hold harmless and, upon request, defend One Hour, its affiliates, and their respective members, owners, shareholders, directors, officers, employees and agents (the "**Indemnified Parties**"), from and against all suits, proceedings, assessments, losses, claims, liabilities, demands or actions of any nature or kind whatsoever ("**Claims**"), directly or indirectly arising out of, or in any manner whatsoever associated or connected with:

A.   the failure of Franchisee to pay when due any levies, taxes or assessments that Franchisee may be required by applicable law to pay;

B.   Franchisee's operation of the Franchised Business; or

C.   Franchisee's acts, failure to act, or negligence or willful conduct;

and against any and all damages, costs, expenses and fees (including, without limitation, reasonable legal expenses and fees), losses, fines or penalties incurred by or on behalf of any of the Indemnified Parties in the investigation or defense of any and all Claims.

**Article 18.   Dispute Resolution**

18.1 *Resolution of Disputes*.   Any dispute between One Hour and Franchisee arising out of the relationship created by this Agreement is subject to the dispute resolution provisions written below.

-35-

18.2 *Mediation*.  In the event of any dispute, other than disputes that are the subject of Franchisee's default under **Section 16.2(A), Section 16.2(C), Section 16.2(E), Section 16.2(F) or Section 16.3(A),** or a dispute involving any alleged violation of **Articles 11, 12, 13, 14,** or **15** or **Section 16.6,** either party shall have the option to initiate a mediation proceeding by submitting a written request for mediation to the Judicial Arbitration & Mediation Services, Inc. ("**JAMS**") according to its procedures, or any other mediation service the parties mutually agree to according to such mediator's procedures.

The mediation process will begin promptly and will be concluded within 10 business days after the day the request for mediation is made, unless the parties mutually otherwise agree.  Any and all discussions, negotiations, findings or other statements by the mediator and/or the parties made in connection with the mediation will be privileged and confidential and will not be admissible into evidence in any litigation.

All mediation proceedings will take place in the city and state where One Hour has its principal place of business at the time the mediation is commenced.  The expenses of the mediation service will be borne equally by both parties, and all other expenses relating to such mediation will be borne by the party incurring them.

The commencement of any dispute resolution procedure shall not act to prevent One Hour from instituting or proceeding with any action that may be the subject of the dispute.

18.3 *Venue*.  Franchisee and each Owner agrees that (A) any state court of general jurisdiction sitting in the county and state where One Hour has its principal place of business at the time the action is commenced, or (B) the United States District Court for the county and state where One Hour has its principal place of business at the time the action is commenced will be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement, and Franchisee and each Owner irrevocably submits to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court.  If applicable law provides Franchisee additional rights as to notices, opportunities to cure or otherwise than as are provided by this Agreement as to termination, renewal, transfer or otherwise, One Hour will comply with the requirements of such laws if they exceed One Hour's obligations under this Agreement.

18.4 _*Injunctive Relief.*  Notwithstanding anything in this **Article 18** to the contrary, One Hour may seek to obtain at any time in any court of competent jurisdiction any order for specific performance or injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause One Hour irreparable harm.  One Hour may have such specific performance or injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and Franchisee's sole remedy in the event of the entry of such specific performance or injunction order, will be the dissolution of such order, if warranted (all claims for damages by reason of the wrongful issuance of any such order being expressly waived hereby).  Franchisee and each of its Owners acknowledges that any violation of **Articles 11, 12, 13, 14** or **15** or *Section 16.6 would* result in irreparable injury to **One Hour for** which no adequate remedy at law may be available.  Accordingly, Franchisee and each of its Owners consents to the issuance of an injunction at One Hour's request (without

-36-

posting a bond or other security) prohibiting any conduct in violation of any of those Sections and agrees that the existence of any claims Franchisee or any of its Owners may have against One Hour, whether or not arising herefrom, will not constitute a defense to the enforcement of any of those Sections.

18.5 ***Business Judgment***. The parties recognize, and any mediator, arbitrator or judge is affirmatively advised, that certain provisions of this Agreement describe the right of One Hour to take (or refrain from taking) certain actions in the exercise of its business judgment based on its assessment of the overall best interests of the System and/or franchise network. Where such discretion has been exercised and is supported by the business judgment of One Hour, neither a mediator nor an arbitrator nor a judge will substitute his or her judgment for the judgment so exercised by One Hour.

18.6 ***Limitations Period***.    Except for claims arising from Franchisee's non-payment or underpayment of amounts Franchisee owes One Hour, any and all claims arising out of or relating to this Agreement or any agreement related to this Agreement or signed concurrently or the relationship of the parties, will be barred unless a judicial proceeding is commenced within 2 years from the date the complaining party knew or should have known of the facts giving rise to such claim.

18.7 ***No Punitive, Exemplary or Consequential Damages***. EXCEPT WITH RESPECT TO FRANCHISEE'S OBLIGATION TO INDEMNIFY THE INDEMNIFIED PARTIES UNDER **SECTION 17.4** AND CLAIMS ONE HOUR BRINGS AGAINST FRANCHISEE FOR FRANCHISEE'S UNAUTHORIZED USE OF THE LICENSED MARKS OR UNAUTHORIZED USE OR DISCLOSURE OF ANY CONFIDENTIAL INFORMATION, ONE HOUR AND FRANCHISEE AND FRANCHISEE'S RESPECTIVE OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN THE PARTIES, THE PARTY MAKING A CLAIM WILL BE LIMITED TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

18.8 ***No Jury Trial***.    ONE HOUR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY.

18.9 ***Attorneys' Fees***.    The prevailing party in any litigation arising out of or relating to this Agreement will be entitled to recover from the other party all damages, costs and expenses, including court costs and reasonable attorneys' fees, incurred by the prevailing party in successfully enforcing any provision of this Agreement.

18.10***No Class or Consolidated Actions***.    ANY LITIGATION OR MEDIATION BETWEEN ONE HOUR AND FRANCHISEE, AND ANY OF THEIR RESPECTIVE CURRENT OR FORMER AFFILIATES, SUBSIDIARIES, PARENTS, DIRECTORS, OFFICERS, OR AGENTS SHALL BE CONDUCTED ON AN INDIVIDUAL BASIS, AND NOT AS PART OF A GROUP, ASSOCIATION, CONSOLIDTED, JOINT, COMMON, OR CLASS ACTION OR ON ANY REPRESENTATIVE BASIS.

-37-

**Article 19.    General**

19.1 ***Severability of Provisions***.  Every part of this Agreement is severable and the invalidity or unenforceability of any part of this Agreement will not affect the validity or enforceability of any other part of this Agreement.  If any covenant here, which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, length of time and/or business scope, but would be enforceable by reducing any part or all thereof, One Hour and Franchisee agree that the same will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought.

19.2 ***Counterparts***.  This Agreement may be signed in counterparts, and each counterpart when so signed and delivered will be deemed an original.

19.3 ***Force Majeure***.  Neither party will be responsible to the other for non-performance or delay in performance occasioned by any causes beyond its control (other than lack of funds) including, without limitation, acts or omissions of the other party, acts of civil or military authority, strikes, lock-outs, embargoes, insurrections or acts of God.  If any delay occurs, any applicable time period will be automatically extended for a period equal to the time lost, provided that the party affected makes reasonable efforts to correct the reason for such delay and gives to the other party prompt Notice of any delay; provided, however, that if the delay exceeds 120 days, One Hour will have the right to terminate this Agreement or to require Franchisee to move to a new location approved by One Hour within an additional period of 120 days.

19.4 ***Successors and Assigns***.  This Agreement will inure to the benefit of and be binding upon One Hour, Franchisee and their respective heirs, legal representatives, successors and permitted assigns.

19.5 ***Survival***.  All obligations of One Hour and Franchisee which expressly or by their nature survive termination or expiration or Transfer of this Agreement will continue in full force and effect subsequent to and notwithstanding such termination or expiration or Transfer and until they are satisfied or by their nature expire.

19.6 ***Notices***.  All notices, consents and approvals (a "**Notice**") permitted or required to be given under this Agreement will be in writing and will be deemed to be sufficiently and duly given if stated in writing and, in the case of Franchisee, left with an adult person working at the Franchised Business, or, in the case of either party, sent by a prepaid certified letter or by overnight courier service or transmitted by facsimile or other form of recorded communication (with a confirming copy mailed), to One Hour addressed as follows:

One Hour Air Conditioning Franchising, L.L.C.
Plaza Five Points
50 Central Avenue, Suite 920
Sarasota, Florida 34236
Attention: President
Facsimile: 941-552-5117

and to Franchisee addressed to the address written above or to its facsimile number provided to One Hour.

Any Notice so given or made will be deemed to have been given or made and received on the earlier of (i) the day of delivery or (ii) 1 business day after transmission by facsimile or other form of recorded communication service of the same or by overnight courier service, as the case may be, or (iii) on the 3rd business day following the day of mailing of the same by certified mail. Any party from time to time by Notice in writing given under the terms of this Agreement may change its address or facsimile number for the purpose of this Agreement.

19.7 **Right of Set-off.** Notwithstanding any other provision of this Agreement, upon the failure of Franchisee to pay One Hour as and when due any sums of money under this Agreement or any other amounts owing to One Hour, One Hour may, at its election, deduct any and all such sums remaining unpaid from any monies or credit held by One Hour for the account of Franchisee.

19.8 **Not Withhold Payment.** Franchisee agrees that Franchisee will not on the grounds of the alleged non-performance by One Hour of any of its obligations under this Agreement or under any other agreement between the parties, withhold payment of any amounts due to One Hour whether on account of equipment or goods purchased by Franchisee or otherwise.

19.9 **Non-Waiver.** The failure of either party to exercise any right, power or option given under this Agreement, or to insist upon strict compliance with the terms and conditions of this Agreement by the other party, will not constitute a waiver of the terms and conditions of this Agreement with respect to any other or subsequent breach of this Agreement or default under this Agreement, or a waiver by the first party of its right at any time to require strict compliance with all terms and conditions of this Agreement. One Hour's acceptance of payments due under this Agreement will not constitute a waiver of any breaches by Franchisee that precede the acceptance of such payments.

19.10 **Applicable Law.** This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state in which One Hour has its principal place of business at the time the action is commenced, without giving effect to its conflicts of law principles, provided, however, that the state's franchise law will apply only if its independent jurisdictional requirements are met. If applicable law provides Franchisee with additional rights as to notices, opportunities to cure or otherwise than as are provided by this Agreement as to termination, renewal, transfers or otherwise, One Hour will comply with the requirements of such laws if they exceed One Hour's obligations under this Agreement.

-39-

Multistate

19.11*Rights of One Hour are Cumulative.* The rights of One Hour under this Agreement are cumulative and no exercise or enforcement by One Hour of any right or remedy under this Agreement will preclude the exercise or enforcement by One Hour of any other right or remedy under this Agreement or which One Hour is otherwise entitled by law to enforce. At the option of One Hour, a default by Franchisee under this Agreement will constitute a default by Franchisee under any other agreement between the parties.

19.12*No Third Party Beneficiaries.* Except as otherwise expressly provided here, this Agreement is exclusively for the benefit of the parties and will not confer a benefit on, or give rise to liability to, a third party. No agreement between One Hour and a third party is for the benefit of Franchisee.

19.13*Approvals or Consents.* Requests by Franchisee for approvals or consents will be in writing and will be timely made. Approvals and consents by One Hour will not be effective unless in writing and duly signed by One Hour. Except as expressly provided to the contrary herein, One Hour may grant or withhold such approvals or consents, and may make any determinations permitted hereunder in its sole discretion and will not be required to show "reasonableness" or to comply with any other standard.

19.14*Effect of Standards.* One Hour's specifications of the System will not constitute a warranty or representation, express or implied, as to quality, safety, suitability, fitness for a particular purpose or any matter. One Hour will not be liable to Franchisee or others on account of the specifications of the System, including the designation of System Standards or the operation of the Franchised Business under the System.

19.15*Construction.* Franchisee acknowledges that it had the opportunity to be represented by an attorney in connection with the preparation and execution of this Agreement, and to review and understand the terms hereof and to consider the advisability of entering into this Agreement. This Agreement will be construed according to its plain meaning and neither for nor against either party hereof regardless of which party's counsel drafted the provision.

19.16*Further Assurances.* The parties agree to diligently do or cause to be done all acts or things and to sign all documents and instruments necessary to implement and carry into effect this Agreement to its fullest extent.

19.17*Entire Agreement/Amendments.* One Hour and Franchisee each acknowledge and warrant to each other that they wish to have all terms of the business relationship defined in this Agreement. Neither One Hour nor Franchisee wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different from or supplementary to the rights and obligations stated here. Accordingly, One Hour and Franchisee agree that this Agreement, together with any other documents or agreements signed by the parties contemporaneously, supersede and cancel any prior and/or contemporaneous discussions (whether described as representations, inducements, promises, agreements or any other term) between One Hour or anyone acting on its behalf and Franchisee or anyone acting on its behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the

-40-

relationship between the parties, and One Hour and Franchisee each agree that they have placed, and will place, no reliance on the discussion. This Agreement, together with any other documents or agreements signed by the parties contemporaneously or incorporated here by reference, constitutes the entire agreement between the parties and contains all of the terms, conditions, rights and obligations of the parties with respect to any aspect of the relationship between the parties. No further franchise rights or offer of franchise rights have been promised to Franchisee and no such franchise rights or offer of franchise rights will come into existence, except by means of a separate writing, signed by an officer of One Hour or such other entity granting the franchise rights and specifically identified as a modification of this Agreement. Apart from anything in this **Section 19.17** to the contrary, nothing in this Agreement or any related agreement is intended to disclaim any representation made by One Hour in One Hour's Franchise Disclosure Document. No change, modification, amendment or waiver of any of the provisions hereof will be effective and binding upon either party unless it is in writing, specifically identified as an amendment and signed by the party to be charged.

IN WITNESS WHEREOF, the parties have duly signed and delivered this Agreement as of the date first written above.

Franchisee:                                One Hour:

**ZUBIE AIR INC**                          ONE HOUR AIR CONDITIONING
                                           FRANCHISING, L.L.C.


By: _____                    By: _____
   **Evel L. Zubiate**                         Scott F. Boose
   **President**                               President

(03/26/11)                                Multistate

## Owner's Acknowledgment

Each following party is mentioned in this Agreement as having certain rights and/or duties as an Owner of Franchisee. Each following party is signing this Acknowledgment, not as a party, but only as necessary to indicate its, his or her acceptance of, and agreement to be bound by, the specific rights and duties of an Owner mentioned in this Agreement. Each Owner has read this Agreement and One Hour's Uniform Franchise Disclosure Document in full, and each Owner represents that he/she is capable of complying with all of the terms of this Agreement and the Owner's Guaranty.

**ZUBIE AIR INC**                          Owner:

By: _____        _____

    **Evel L. Zubiate**                      **Evel L. Zubiate**
    **President**

(03/26/11)                                                   Multistate

## Exhibit A

## BUSINESS TERMS

| | |
|---|---|
| Franchisee business name: | **ZUBIE AIR INC** |
| Contact: | **Evel L. Zubiate - Owner** |
| | **(Elmer Zubiate – GM)** |
| Address: | **13111 Look Out Ridge** |
| | **San Antonio, TX 78233** |
| Phone number: | **210-655-9448** |
| Cell number: | **432-770-5257** |
| Facsimile number: | **210-590-3054** |
| E-mail address: | **evelzubiate@yahoo.com** |
| Mark to be used: | |

☒ **ONE HOUR AIR CONDITIONING & HEATING**

☐ ONE HOUR HEATING & AIR CONDITIONING

| | |
|---|---|
| Effective Date of this Agreement: | **March 13, 2012** |
| Expiration Date of this Agreement: | **March 12, 2022** |
| Territory (City, State): | **New Braunfels, TX** |
| Population: | **152,186** |

Zip Codes:

| 78070 | 78108 | 78130 | 78132 | 78133 | 78148 | 78154 | 78233 | 78280 |
|---|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Approved Location of Franchised Business: | **13111 Look Out Ridge** |
| | **San Antonio, TX 78233** |
| Initial Fees: | **$65,439.98 ($430 per 1,000 in population =** |
| | **$65,439.98 less 25% AT500 discount** |
| | **of $16,360 = $49,079.98** |
| Continuing Franchise Fee Commences: | **July 1, 2012** |
| Prior Business Phone Numbers: | **210-655-9448** |

**Exhibit B**

**OWNER'S GUARANTY**

In consideration of, and as an inducement to, the grant of a franchise and the execution of the Franchise Agreement dated _____, _____ (the "**Franchise Agreement**") by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company ("**One Hour**"), and _____ ("**Franchisee**"), the undersigned hereby personally and unconditionally:  (1) guaranties to One Hour and its successors and assigns, for the Term of the Franchise Agreement and, including any renewal, as provided in the Franchise Agreement, that Franchisee will punctually pay and perform each and every undertaking, agreement and covenant stated in the Franchise Agreement and any documents, agreements, instruments and promissory notes signed with or in connection with the Franchise Agreement (collectively, the "**Franchise Documents**"); and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Documents applicable to Owners of Franchisee.

The undersigned waives:

    (1)    acceptance and notice of acceptance by One Hour of the foregoing undertakings;

    (2)    notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

    (3)    protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

    (4)    any right the undersigned may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

    (5)    any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

The undersigned consents and agrees that:

    (1)    the undersigned's direct and immediate liability under this Guaranty will be joint and several with all signatories to this and similar guaranties of Franchisee's obligations;

    (2)    the undersigned will render any payment or performance required under the Franchise Agreement upon demand if Franchisee fails or refuses punctually to do so;

    (3)    this Guaranty will apply to any claims One Hour may have due to return of any payments or property One Hour may have received from

Franchisee as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(4)     such liability will not be contingent or conditioned upon pursuit by One Hour of any remedies against Franchisee or any other person; and

(5)     such liability will not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which One Hour may from time to time grant to Franchisee or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during and after the terms of the Franchise Documents, as the same may be amended or renewed, until Franchisee's duties and obligations to One Hour are fully discharged and satisfied.

All capitalized terms when used will have the meanings ascribed to them in the Franchise Agreement.

This Guaranty will be governed, construed and interpreted in accordance with the substantive laws of the state where One Hour has its principal place of business at the time a dispute arises, without giving effect to its conflicts of law principles.

IN WITNESS WHEREOF, each of the undersigned has affixed his signature on the _____ day of _____, _____.

WITNESS(ES):                                    GUARANTOR(S):

_____     _____
Print or Type Name                              Print or Type Name

_____     _____
Signature                                       Signature

_____     _____
Print or Type Name                              Print or Type Name

_____     _____
Signature                                       Signature

(03/26/11)                                                                              Multistate

## Exhibit C

## OWNERS OF FRANCHISEE

| Name of Owner | Nature of Interest | Beneficial Interest in Franchisee |
|---|---|---|
| **Evel L. Zubiate** | **President** | **100%** |
| Total | | 100% |

## OWNER'S GUARANTY

In consideration of, and as an inducement to, the grant of a franchise and the execution of the Franchise Agreement dated **March 13, 2012** (the "Franchise Agreement") by and between ONE HOUR AIR CONDITIONING FRANCHISING, LLC, a Florida limited liability company ("Franchisor"), and **ZUBIE AIR INC,** a Texas corporation ("Franchisee"), the undersigned hereby personally and unconditionally: (1) guaranties to Franchisor and its successors and assigns, for the Term of the Franchise Agreement and thereafter, including any renewal, as provided in the Franchise Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Franchise Agreement and any documents, agreements, instruments and promissory notes executed pursuant to or in connection with the Franchise Agreement (collectively, the "Franchise Documents"); and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Documents applicable to Owners of Franchisee.

The undersigned waives:

(1) acceptance and notice of acceptance by Franchisor of the foregoing undertakings;

(2) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

(3) protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

(4) any right the undersigned may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

(5) any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

The undersigned consents and agrees that:

(1) the undersigned's direct and immediate liability under this Guaranty shall be joint and several with all signatories to this and similar guaranties of Franchisee's obligations;

(2) the undersigned shall render any payment or performance required under the Franchise Agreement upon demand if Franchisee fails or refuses punctually to do so;

(3) this Guaranty shall apply to any claims Franchisor may have due to return of any payments or property Franchisor may have received from Franchisee as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(4) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and

(5)    such liability shall not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during and after the terms of the Franchise Documents, as the same may be amended or renewed, until Franchisee's duties and obligations to Franchisor are fully discharged and satisfied.

All capitalized terms when used herein shall have the meanings ascribed to them in the Franchise Agreement.

This Agreement shall be governed, construed and interpreted in accordance with the substantive laws of the State of Florida, without giving effect to its conflicts of law principles.

IN WITNESS WHEREOF, each of the undersigned has affixed his signature on the **13th** day of **March, 2012.**

WITNESS:                          GUARANTOR:

_____        _____
Signature                              **Evel L. Zubiate**

_Rocio L Aguirre_
Print or Type Name

2



**ATTENTION FRANCHISEES**

You have been approved to participate in the UWIN Customer Complaint Resolution Program; attached is your UWIN Agreement, which includes terms and conditions of participation.

Fill out page 11 & A-1 with your Company Name, Type of Contractor, and Address, as applicable.

Sign page 11 (left side only) & A-2.

PLEASE RETURN ORIGINAL AGREEMENT (DO NOT FAX OR SEND A COPY) TO UWIN at the address listed on page 11.

Once UWIN receives your original, signed agreement you will be sent the UWIN Seal on disk for use. You will also be added as a contractor on the UWIN website.

### UWIN AGREEMENT FOR FRANCHISEES

THIS UWIN AGREEMENT FOR FRANCHISEES, dated as of the date on the signature page (the "**Agreement**"), is made by and between UWIN, LLC, a Florida limited liability company ("**UWIN**"), and the home services contractor identified on the signature page ("**Contractor**") who, in consideration of the promises set forth below, agree as follows:

### Article 1.   Nature and Scope of Agreement

1.1 *UWIN*.   UWIN is a customer service resource that provides customers current information, assistance, resolution and reparations concerning their transactions with participating home services contractors (the "**Customer Complaint Resolution Program**").   Participants in the Customer Complaint Resolution Program display UWIN's distinctive seal of approval and its associated marks, logos, and designs (collectively, the "**Seal**").

1.2 *Contractor*.   Contractor is a franchisee of one of UWIN's affiliates (each, a "**Franchisor**") and, pursuant to its franchise agreement, has obtained the right to use the Franchisor's system in conjunction with the operation of its residential home repair services business ("**Contractor's Business**").   In connection with the operation of the Contractor's Business, Contractor desires to participate in the Customer Complaint Resolution Program.

1.3        *Representations and Warranties*.   Contractor represents and warrants to UWIN as follows:

A. Contractor has independently investigated the business risks involved in participating in the Customer Complaint Resolution Program and such other matters as Contractor deems important.;

B. All information Contractor has provided to UWIN to induce UWIN to grant Contractor the right to participate in the Customer Complaint Resolution Program was true, correct, complete and accurate as of the date made, and, as of the date of this Agreement, no material change has occurred in such information;

C. Contractor's execution, delivery and performance of this Agreement does not violate or constitute a breach under any agreement or commitment made by Contractor;

D. If Contractor is a business entity, Contractor is duly organized and validly existing, is qualified to do business in each state where Contractor is or will conduct business, and is duly authorized to execute and deliver this Agreement and perform Contractor's obligations pursuant to this Agreement; and

E. This Agreement represents a valid, binding obligation of Contractor.

1.4 *Owner's Guaranty*   If Contractor is a business entity, each individual with an ownership interest in Contractor (each, an "**Owner**") is required to execute an Owner's Guaranty in favor of UWIN (the form of which is attached as **Exhibit A**) and deliver the executed copy to UWIN with this signed Agreement, or if such ownership interest is acquired later, within 10 days after becoming an Owner.

**Article 2. Scope of Participation**

2.1 *Participation in the Customer Complaint Resolution Program.* UWIN grants Contractor the non-exclusive right to participate in the Customer Complaint Resolution Program, pursuant to the terms of this Agreement and its requirements as established by UWIN from time to time. Contractor agrees to comply with the Customer Complaint Resolution Program and the requirements provided by UWIN from time to time.

2.2 *Grant of License.* Subject to the terms and conditions of this Agreement, UWIN grants Contractor a non-exclusive, revocable license to use the Seal in connection with the Customer Complaint Resolution Program and Contractor's Business. Contractor accepts such grant and agrees to display the Seal on its business materials, website, advertising and marketing only in the form and manner, and only with appropriate legends and proprietary notices, as may be prescribed by UWIN from time to time and to comply with UWIN's "**Graphics Manual**", a current copy of which Contractor hereby acknowledges having received. UWIN has the right (but not the obligation) to review and approve all labeling, advertising, displays and other items on which the Seal appears prior to the use of such items by Contractor. Contractor agrees to permit UWIN to inspect any materials bearing the Seal and to comply in a timely fashion with any instruction from UWIN as to the proper use of the Seal or any request to modify or discontinue any use of the Seal.

2.3 *Term.* Unless terminated earlier pursuant to **Article 9**, the term of this Agreement will be from the date of this Agreement until the expiration or termination of the Franchise Agreement ("**Term**"). If requested by UWIN, Contractor agrees to execute UWIN's then current form of agreement and all other agreements then customarily used by UWIN in granting rights to use the Customer Complaint Resolution Program, which agreements may contain terms and conditions that are materially different from the terms and conditions in this Agreement.

2.4 *Reserved Rights.* UWIN reserves all rights not specifically granted to Contractor herein. This Agreement does not limit the right of UWIN to use or authorize others to participate in the Customer Complaint Resolution Program, use the Seal, or to engage in or license any business activity, including, without limitation, the operation or franchising of residential home repair services businesses under the Seal at any location, and/or under any other trade name, trademark or service mark now or hereafter owned by or licensed to UWIN or its affiliates at any location.

2.5 *Modification of the Customer Complaint Resolution Program and/or Seal.* The parties agree that UWIN, in its sole discretion, may change or modify the Customer Complaint Resolution Program, including the Graphics Manual and/or the Seal, from time to time. Contractor agrees to modify its operations, including any display of the Seal, to comply with the new standards established by UWIN within a reasonable time after UWIN notifies Contractor of any such change. If such change is made, reference in this Agreement to the Customer Complaint Resolution Program and/or Seal will be deemed to refer to such new program, mark or seal.

2.6 *Goodwill.* All improvements and additions to or associated with the Customer Complaint Resolution Program, whenever and by whomever made, and all service mark and trademark registrations and goodwill at any time associated with the Customer Complaint Resolution Program, including the Seal, are the property of UWIN. All goodwill established by

Contractor's use of the Seal and Customer Complaint Resolution Program will inure to the sole and exclusive benefit of UWIN. Upon expiration or termination of this Agreement, no monetary amount will be assigned or attributed to any goodwill associated with Contractor's participation in the Customer Complaint Resolution Program or use of the Seal.

2.7 *Ownership of Customer Complaint Resolution Program*. Contractor acknowledges and agrees that it will not acquire any proprietary rights in the Customer Complaint Resolution Program or the Seal by virtue of its participation in the Customer Complaint Resolution Program. Contractor agrees not to contest (A) UWIN's unrestricted and exclusive ownership of the Customer Complaint Resolution Program and Seal or (B) UWIN's right to grant licenses to use the Seal. Contractor acknowledges that it does not have any right to authorize others to participate in any part of the Customer Complaint Resolution Program, including any use of the Seal, and that all materials relating to the Customer Complaint Resolution Program will at all times remain the sole property of UWIN.

**Article 3.  Customer Complaint Resolution**

3.1 *Resolution of Complaints*. Contractor agrees to follow, and authorizes UWIN to follow, the resolution provisions described in this **Article 3** for any and all disputes which may arise between Contractor and its customers during the Term.

3.2 *Contractor's Resolution*. Contractor will use good faith efforts to resolve any and all disputes that Contractor may have with its customers and former customers regarding the material used by Contractor, the labor performed or the craftsmanship displayed by Contractor with respect to work for which it has charged or intends to charge its customers.

3.3 *UWIN's Intervention*. If a customer of Contractor notifies UWIN that a dispute exists between such customer and Contractor regarding the material used by Contractor, labor performed or the craftsmanship displayed by Contractor with respect to work for which Contractor has charged, or intends to charge, that customer (a "**Customer Complaint**"), UWIN will advise the customer that UWIN will promptly notify Contractor of the Customer Complaint and that Contractor will have 48 hours to resolve the Customer Complaint to customer's satisfaction.

3.4 *Remedial Actions*. If Contractor fails to resolve a Customer Complaint to the customer's satisfaction within 48 hours after receiving notice of the Customer Complaint from UWIN, UWIN, in its sole discretion and without notice to Contractor, has the right to either:

        A.    pay customer the dollar amount that UWIN determines to be in dispute;

B.   pay customer the dollar amount that UWIN determines is required to complete the work, if unfinished; or

C.   pay an independent third party contractor to complete the work, if unfinished (each of these, a "**Remedial Payment**").

Contractor authorizes and directs UWIN to make any of the foregoing Remedial Payments and take such other related actions required to resolve the Customer Complaint as UWIN, in its sole discretion, deems appropriate. Nothing herein is intended to be deemed to cause UWIN to be a guarantor or third party to Contractor's obligation to its customers. **Contractor agrees to reimburse UWIN for the full amount of any Remedial Payment made under this Section 3.4 within 15 days after UWIN notifies Contractor of such Remedial Payment.** If Contractor does not reimburse UWIN for the full amount of any Remedial Payment within the 15-day period, UWIN has the right to assess and collect a past due service charge equal to the lesser of 1.5% per month or the maximum interest rate permitted by law on such past due amounts beginning from the date UWIN made the Remedial Payment. Contractor's obligations under this **Article 3** will continue after the termination or expiration of this Agreement with regard to (i) any work performed by Contractor prior to the date of termination or expiration of this Agreement and (ii) any work performed by Contractor while it is displaying the Seal, regardless of whether such work was performed prior to or after the date of termination or expiration of this Agreement.

3.5 *Records and Reports*. To assist with UWIN's intervention under this **Article 3** and assistance with Customer Complaints, Contractor agrees to maintain accurate books and records and to provide UWIN with information, within 5 days after UWIN's request, in a format specified by UWIN, regarding (A) the number of service calls made by Contractor, (B) the number and description of each complaint made by a customer of Contractor, (C) the status of each complaint and the steps taken by Contractor to resolve the complaint, and (D) the amount of money, if any paid by Contractor's customer or by Contractor to resolve the complaint.

### Article 4.   Transfer

4.1 *Transfer by UWIN*. UWIN has the right, directly or indirectly, to sell, assign, transfer or otherwise dispose of this Agreement, or any or all of its rights and obligations under this Agreement, to any individual, firm, partnership, association, bank, lending institution, corporation, affiliate, limited liability company or other third party as UWIN may in its sole discretion deem appropriate. In the event of any such sale, assignment, transfer, or other disposition, UWIN will be released from any liability under this Agreement for the obligations transferred.

4.2 *Transfer by Contractor*. Contractor acknowledges that the granting of the rights hereunder is based on UWIN's investigation of Contractor's qualifications and that such rights are personal to Contractor and therefore   Contractor will not sell, divide, encumber, assign, hypothecate, mortgage, sub-license, or otherwise transfer through any means any part of this Agreement or its rights or obligations hereunder. Any actual, attempted or purported transfer occurring without UWIN's prior written consent will constitute a default of this Agreement and will be null and void.

### Article 5.   Termination and Expiration

5.1 *Mutual Agreement*. The parties may terminate this Agreement at any time upon mutual agreement.

5.2 *Termination by UWIN*. UWIN may terminate this Agreement, in its sole discretion upon 60 days notice to Contractor.

5.3 *Termination by UWIN Without Opportunity to Cure*. Contractor will be deemed to be in default under this Agreement, and UWIN may, at its option, terminate this Agreement and all rights granted herein effective immediately, without giving Contractor notice of, or the opportunity to cure, the default, if Contractor either:

A. makes (or is deemed to have made) a general assignment for the benefit of creditors, or if a petition is filed against Contractor under the Bankruptcy Code and not dismissed within 60 days of filing, or if a petition is filed by Contractor under the Bankruptcy Code, or if Contractor is declared or adjudicated bankrupt, or if a liquidator, trustee in bankruptcy, custodian, receiver, receiver and manager, moderator, or any other officer with similar powers is appointed of or for Contractor, or if Contractor commits any act of bankruptcy or institutes proceedings to be adjudged bankrupt or insolvent or consents to the institution of such appointment or proceedings, or if Contractor admits in writing an inability to pay debts generally as they become due;

B. has any of the products or chattels of Contractor's Business at any time seized or taken in execution or in attachment by a creditor of Contractor, or a writ of execution is issued against such products or chattels;

C. has willfully or fraudulently misrepresented any fact, condition or report made in any application given to UWIN or required to be made by this Agreement; or

D. by its actions, or its failure to take an action that it is required to take, adversely affects the goodwill associated with the Customer Complaint Resolution Program or the Seal.

5.4 *Termination by UWIN After Opportunity to Cure*. Contractor will be deemed to be in default of this Agreement, and UWIN, at its option, may terminate this Agreement and all rights granted herein effective as of the time noted, if Contractor either:

A. fails to pay when due any monies owed to UWIN and such default is not cured within 10 days after receiving Notice thereof from UWIN;

B. fails to resolve one or more disputes with its customers to the satisfaction of UWIN in accordance with the Customer Complaint Resolution Program and this Agreement; or

C. is in default of any of Contractor's other obligations contained in this Agreement or in any other agreement or instrument entered into or made between Contractor and UWIN (or one of its affiliates) relating to Contractor's Business and fails to cure such default to UWIN's satisfaction within 30 days after receiving Notice from UWIN or its affiliate to cure the same.

5.5 *Other Relief*. Any termination under **Sections 5.1, 5.2, 5.3** and **5.4** of this Agreement will be without prejudice to any other rights (including any right of indemnity), remedy or relief vested in or to which UWIN may otherwise be entitled against Contractor. All moneys paid by Contractor to UWIN under this Agreement or otherwise will be retained by UWIN as consideration for the rights and benefits previously conferred on Contractor hereunder. The foregoing remedy does not exclude any of the remedies which UWIN may have at law or in

equity by reason of the default, breach or non-observance by Contractor of any provision of this Agreement.

5.6 **Contractor's Obligations on Termination or Expiration.** Upon the termination or expiration of this Agreement for any reason whatsoever, Contractor will forthwith cease to be enrolled in the Customer Complaint Resolution Program and must immediately:

A. pay UWIN all outstanding and unpaid amounts and charges that have or will thereafter become due hereunder or under any other agreement between Contractor and UWIN, including but not limited to the amount of any Remedial Payments and/or interest on past due Remedial Payments (as described in **Section 3.4** above);

B. thereafter not, directly or indirectly, represent to the public that Contractor's Business is operated in association with UWIN or the Customer Complaint Resolution Program, or hold itself out as a present or former participant in the Customer Complaint Resolution Program;

C. cease to use, directly or indirectly, in advertising or in any other manner whatever, the Seal, any mark similar to the Seal, or any other identifying characteristics or indicia of operation of the Customer Complaint Resolution Program;

D. notify the telephone company and all listing agencies of the termination or expiration of Contractor's right to use the Seal;

E. permit UWIN, at Contractor's expense, to enter the location from which Contractor's Business is conducted in order to remove any and all personal property of Contractor which displays the Seal or any distinctive feature or device associated with the Customer Complaint Resolution Program, including any and all equipment, signs, advertising materials, fixtures, furnishings, inventory, invoices, supplies or forms; and

F. delete any references to UWIN or the Seal from any website used by Contractor.

### Article 6.   Disputes among Parties and with Third Parties

6.1 **Complaints.** Contractor must immediately provide UWIN with copies of any correspondence, notices or other complaints relating to the operation or activities of Contractor's Business that Contractor receives from any of its customers, any Better Business Bureau or any federal, state or local regulatory or governmental agency

6.2 **Infringements.** Contractor must give Notice to UWIN immediately upon learning of any alleged infringement or a challenge to Contractor's use of the Customer Complaint Resolution Program or the Seal, or any claim by any third party of any rights in the Customer Complaint Resolution Program, the Seal or any other mark.   Contractor agrees not to communicate with any person other than UWIN or UWIN's attorneys and Contractor's attorneys in connection with any alleged infringement, challenge or claim.

6.3 **Disputes Concerning Customer Complaint Resolution Program.** UWIN has the sole right and responsibility to handle and resolve litigation, trademark office proceedings or other administrative proceedings, or other disputes with third parties (including imitators and

infringers) concerning the Customer Complaint Resolution Program and/or the use of all or any part of the Seal. UWIN does not have any obligation to initiate suit against imitators or infringers, and may settle any dispute by grant of a license or otherwise. Contractor will sign all instruments and documents, provide assistance and take any action that, in the opinion of UWIN's attorneys, may be necessary or advisable to protect and maintain UWIN's interests in any litigation, trademark office proceeding or other administrative proceeding or to otherwise protect and maintain UWIN's interest in the Customer Complaint Resolution Program and/or the Seal.

6.4 **No Punitive, Exemplary or Consequential Damages.** EXCEPT WITH RESPECT TO CONTRACTOR'S OBLIGATION TO INDEMNIFY THE INDEMNIFIED PARTIES PURSUANT TO **SECTION 7.3** AND CLAIMS UWIN BRINGS AGAINST CONTRACTOR FOR CONTRACTOR'S UNAUTHORIZED USE OF THE CUSTOMER COMPLAINT RESOLUTION PROCESS OR SEAL, UWIN AND CONTRACTOR AND CONTRACTOR'S RESPECTIVE OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER AND WILL BE LIMITED TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

6.5 **No Jury Trial.** UWIN AND CONTRACTOR IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY.

6.6 **Attorneys' Fees.** The prevailing party in any litigation arising out of or relating to this Agreement will be entitled to recover from the other party all damages, costs and expenses, including court costs and reasonable attorneys' fees, incurred by the prevailing party in successfully enforcing any provision of this Agreement.

6.7 **Applicable Law.** This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state in which UWIN has its principal place of business at the time a dispute arises, without giving effect to its conflicts of law principles.

6.8 **Venue.** UWIN and Contractor agree that (A) any state court of general jurisdiction sitting in the county and state where UWIN has its principal place of business at the time the action is commenced or (B) the United States District Court for the county and state where UWIN has its principal place of business at the time the action is commenced will be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement, and UWIN and Contractor irrevocably submit to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court.

**Article 7.   Relationship and Indemnification**

7.1 **Independent Parties.** Contractor is and will at all times remain an independent contractor and is not and will not represent itself to be the agent, joint venturer, partner or employee of UWIN, or to be related to UWIN other than as a participant in the Customer Complaint Resolution Program. Contractor will not make any representations or take any acts which could establish any apparent relationship of agency, joint venture, partnership or employment with UWIN, and UWIN will not be bound in any manner whatsoever by any agreements, warranties, representations or undertakings made by Contractor to any other person nor with respect to any other action of Contractor. No acts of assistance given by UWIN to Contractor will be construed so as to alter this relationship.

7.2 **Non-Liability.** UWIN is not obligated or liable for any injury or death of any person or damage to any property caused by Contractor's acts, failure to act, negligence or willful conduct, or for any other liability of Contractor.

7.3 **Contractor Indemnity.** Contractor hereby agrees to indemnify, hold harmless and, upon request, defend UWIN, its affiliates, and their respective members, owners, shareholders, directors, officers, employees and agents (the "**Indemnified Parties**"), from and against all suits, proceedings, assessments, losses, claims, liabilities, demands or actions of any nature or kind whatsoever ("**Claims**"), directly or indirectly arising out of, or in any manner whatsoever associated or connected with:

A. the failure of Contractor to pay when due any levies, taxes or assessments that Contractor may be required by applicable law to pay;

    B. Contractor's operation of Contractor's Business;

    C. Contractor's acts, failure to act, or negligence or willful conduct; or

D. the obligations and rights described under this Agreement, including but not limited to Remedial Payments made under **Section 3.4** and any related actions taken in connection therewith;

and against any and all damages, costs, expenses and fees (including, without limitation, reasonable legal expenses and fees), losses, fines or penalties incurred by or on behalf of any of the Indemnified Parties in the investigation or defense of any and all Claims.

**Article 8.   General**

8.1 **Inquiry by UWIN.** Contractor, by its execution of this Agreement, authorizes UWIN and its agents and representatives to make credit and background checks, including, without limitation, reasonable inquiries of Contractor's bankers, suppliers and other trade creditors regarding their dealings with Contractor in relation to Contractor's Business, to discuss the affairs, finances and accounts of Contractor's Business with Contractor's bankers; and Contractor, by its execution of this Agreement, authorizes and directs such bankers, suppliers and trade creditors to discuss with UWIN and its authorized agents and representatives the affairs, finances and accounts of Contractor's Business.   If requested, Contractor agrees to execute and deliver such directions and other documents as UWIN may require in order to authorize such bankers, suppliers and trade creditors to release or disclose any such information and documents to UWIN.

8.2 **Notices.** All notices, consents and approvals permitted or required to be given under this Agreement must be in writing and will be deemed to be sufficiently and duly given if set forth in writing and, in the case of Contractor, left with an adult person working at Contractor's Business, or, in the case of either party, if sent by a prepaid certified letter or by overnight courier service or transmitted by facsimile or other form of recorded communication tested prior to transmission (with a confirming copy mailed to the addresses shown on the signature page) or such other address or facsimile number provided by one party to the other party for notices.   Any notice so given or made will be deemed to have been given or made and received on the earlier of (A) the day of delivery or (B) one business day after transmission by facsimile or other form of recorded communication service of the same or by overnight courier

service, as the case may be, or (C) on the third business day following the day of mailing of the same by certified mail.

8.3 **Approvals or Consents**. Requests by Contractor for approvals or consents must be in writing and timely made. Approvals and consents by UWIN will not be effective unless in writing and duly executed by UWIN. Except as expressly provided to the contrary herein, UWIN may grant or withhold such approvals or consents, and may make any determinations permitted hereunder, in its sole discretion and will not be required to show "reasonableness" or to comply with any other standard in connection herewith.

8.4 **Non Waiver**. The failure of either party to exercise any right, power or option given under this Agreement, or to insist upon strict compliance with the terms and conditions of this Agreement by the other party, will not constitute a waiver of the terms and conditions of this Agreement with respect to any other or subsequent breach of this Agreement or default under this Agreement, nor a waiver by the first party of its right at any time thereafter to require strict compliance with all terms and conditions of this Agreement. UWIN's acceptance of payments due under this Agreement will not constitute a waiver of any breaches by Contractor that precede the acceptance of such payments.

8.5 **Effect of Standards**. UWIN's specifications of the Customer Complaint Resolution Program will not constitute a warranty or representation, express or implied, as to quality, safety, suitability, fitness for a particular purpose or any matter. UWIN will not be liable to Contractor or others on account of the specifications of the Customer Complaint Resolution Program.

8.6 **Further Assurances**. The parties agree to diligently do or cause to be done all acts or things and to execute all documents and instruments necessary to implement and carry into effect this Agreement to its fullest extent.

8.7 **Successors and Assigns**. This Agreement will inure to the benefit of and be binding upon UWIN, Contractor and their respective heirs, legal representatives, successors and permitted assigns.

8.8 **No Third Party Beneficiaries**. Except as otherwise expressly provided herein, this Agreement is exclusively for the benefit of the parties hereto and does not confer a benefit on, or give rise to liability to, a third party. No agreement between UWIN and a third party is for the benefit of Contractor.

8.9 **Construction**. Contractor acknowledges that it had the opportunity to be represented by an attorney in connection with the execution of this Agreement, and to review and understand the terms hereof and to consider the advisability of entering into this Agreement. This Agreement will be construed according to its plain meaning and neither for nor against either party hereof regardless of which party's counsel drafted the provision.

8.10 **Entire Agreement/Amendments**. UWIN and Contractor each acknowledge and warrant to each other that they wish to have all terms of the business relationship defined in this Agreement. Neither UWIN nor Contractor wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different from or supplementary to the rights and obligations set forth herein. Accordingly, UWIN and Contractor

agree that this Agreement, together with any other documents or agreements executed by the parties contemporaneously hereto, supersede and cancel any prior and/or contemporaneous discussions (whether described as representations, inducements, promises, agreements or any other term) between UWIN or anyone acting on its behalf and Contractor or anyone acting on its behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between the parties, and UWIN and Contractor each agree that they have placed, and will place, no reliance on any such discussion.  This Agreement, together with any other documents or agreements executed by the parties contemporaneously hereto or incorporated herein by reference, constitutes the entire agreement between the parties and contains all of the terms, conditions, rights and obligations of the parties with respect to any aspect of the relationship between the parties.  No further rights or offer of rights have been promised to Contractor and no such rights or offer of rights will come into existence, except by means of a separate writing, executed by an officer of UWIN or such other entity granting the rights and specifically identified as a modification of this Agreement.  No change, modification, amendment or waiver of any of the provisions hereof will be effective and binding upon either party unless it is in writing, specifically identified as an amendment hereto and signed by the party to be charged.

8.11 **Survival**.  All obligations of UWIN and Contractor which expressly or by their nature survive termination or expiration or transfer of this Agreement, including but not limited to the Remedial Payment obligations in **Article 3** and the dispute resolution provision in **Article 6**, will continue in full force and effect subsequent to and notwithstanding such termination or expiration or transfer and until they are satisfied or by their nature expire.

8.12 **Severability of Provisions**.  Every part of this Agreement is severable and the invalidity or unenforceability of any part of this Agreement will not affect the validity or enforceability of any other part of this Agreement.

8.13 **Counterparts**.  This Agreement may be executed in counterparts, and each counterpart when so executed and delivered will be deemed an original.

**Article 9.  Acknowledgements**

9.1 **Control of Contractor's Business**.  Contractor understands and acknowledges that UWIN will not be exercising any control over its method of operations or give Contractor any significant assistance in the day-to-day operations of its residential home repair services business. Specifically, UWIN has no control over and no obligation to provide any assistance with respect to any of the following activities: site approval or selection; site design or appearance; hours of operation; service techniques; account or management policies and practices; personal policies or practices; promotional campaigns; service or marketing territories; and training programs.

9.2 **Contractor Business Trademark**.  Contractor acknowledges that, notwithstanding the license of the Seal under this Agreement, the Contractor's Business will primarily be associated with Contractor's name, trademarks, and logos and not substantially associated with the Seal. Contractor's display and use of the Seal will be in connection with its participation in the Customer Complaint Resolution Program and not the overall operation of its residential home repair services business.  Contractor's Business will not be operated under a marketing plan or system prescribed in substantial part by UWIN.

9.3 *Contractor's Business Operation*. Contractor acknowledges that it is not relying on UWIN to furnish any advice, guidance, or assistance with respect to the established or continuing operation of its residential home repair services business in the form of marketing assistance or advice or any other business assistance, although UWIN may give Contractor assistance from time to time.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of March 13, 2012.

**ZUBIE AIR INC:**

**Evel L. Zubiate**
**President**


**An HVAC Contractor**
**Located at:**
**13111 Look Out Ridge**
**San Antonio, TX 78233**

UWIN:

UWIN, LLC

Scott F. Boose
President

UWIN, LLC
50 Central Avenue
Suite 920
Sarasota, Florida 34236
Attention:  Membership Services

**Exhibit A**

**OWNER'S GUARANTY**

In consideration of, and as an inducement to, the grant of a license to use the Seal and the execution of the UWIN Agreement for Franchisees, dated, **March 13, 2012** (the "**Agreement**") by and between UWIN, LLC, a Florida limited liability company ("**UWIN**"), and **ZUBIE AIR INC**, a Texas corporation, ("**Contractor**"), the undersigned owner of Contractor ("**Owner**") hereby personally and unconditionally:  (1) guaranties to UWIN and its successors and assigns, for the Term and thereafter, including any renewal, as provided in the Agreement, that Contractor will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and any documents, agreements, instruments and promissory notes executed pursuant to or in connection with the Agreement (collectively, the "**Documents**"); and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Documents applicable to Owners of Contractor.

**The undersigned waives:**

(1) acceptance and notice of acceptance by UWIN of the foregoing undertakings;

(2) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

(3) protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

(4) any right the undersigned may have to require that an action be brought against Contractor or any other person as a condition of liability; and

(5) any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

**The undersigned consents and agrees that:**

(1) the undersigned's direct and immediate liability under this Guaranty will be joint and several with all signatories to this and similar guaranties of Contractor's obligations;

(2) the undersigned agrees to render any payment or performance required under the Agreement upon demand if Contractor fails or refuses punctually to do so;

(3) this Guaranty applies to any claims UWIN may have due to return of any payments or property UWIN may have received from Contractor as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(4) such liability is not contingent or conditioned upon pursuit by UWIN of any remedies against Contractor or any other person; and

(5) such liability will not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which UWIN may from time to time grant to Contractor or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any

way modify or amend this Guaranty, which will be continuing and irrevocable during and after the terms of the Documents, as the same may be amended or renewed, until Contractor's duties and obligations to UWIN are fully discharged and satisfied.

All capitalized terms used in this Guaranty and not otherwise defined will have the meanings ascribed to them in the Agreement.

This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state where UWIN has its principal place of business at the time the dispute arises, without giving effect to its conflicts of law principles. Owner agrees that (A) any state court of general jurisdiction sitting in the county and state where UWIN has its principal place of business at the time the action is commenced or (B) the United States District Court for the county and state where UWIN has its principal place of business at the time the action is commenced will be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Guaranty, and Owner irrevocably submits to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court.

IN WITNESS WHEREOF, each of the undersigned has affixed his or her signature on March 13, 2012.

WITNESS:                                           GUARANTOR:

_____        _____
Signature                                              Evel L. Zubiate

Rocio L Aguirre
_____
Print or Type Name

## PROMISSORY NOTE AND GUARANTY

**AMOUNT:** $39,079.98            **DATE:**    March 13, 2012

FOR VALUE RECEIVED, the undersigned ("Maker"), hereby promises to pay to the order of ONE HOUR AIR CONDITIONING FRANCHISING, LLC, a Florida limited liability company ("One Hour"), the sum of **Thirty Nine Thousand Seven Nine Dollars and 98/100 ($39,079.98),** together with interest on the unpaid principal balance hereof at the rate of **Twelve percent (12%)** per annum, which principal and accrued interest shall be due and payable in **Thirty Six (36)** equal monthly installments of **One Thousand Two Hundred Ninety   Eight Dollars and 01/100 ($1,298.01)** each, commencing on **July 1, 2012**, and continuing thereafter on the 1st day of each month until **June 1, 2015**, when the outstanding principal balance and all unpaid accrued interest shall be due and payable in full.

Maker reserves the right to prepay all or any portion of this Promissory Note and Guaranty ("Promissory Note") at any time and from time to time without premium or penalty of any kind by paying, in addition to the principal amount of such prepayment, the interest accrued hereon to the date of such prepayment.

In the event that (a) Maker shall default in the payment of principal or interest due hereunder and such default shall continue for ten (10) days after the mailing of written notice of such default to Maker at Maker's last known address, or (b) a receiver is appointed for Maker or Guarantor (if applicable) or any part of Maker's property, or (c) Maker or Guarantor (if applicable) makes any general assignment for the benefit of Maker's or Guarantor's creditors, or any proceeding is commenced by or against Maker or Guarantor (if applicable) or any guarantor, surety, endorser, or other person directly or indirectly liable for any of the obligations hereunder, or (d) **ZUBIE AIR INC,** shall be deemed in default of the Franchise Agreement of even date between **ZUBIE AIR INC** and One Hour  ("Default"), the holder of this Promissory Note (the "Holder") shall have the right, in any of such events, to declare the outstanding principal balance hereof and all unpaid accrued interest immediately due and payable in full (the "Balance Due").  In the event that a Default occurs, Maker also agrees to pay upon demand all costs and expenses reasonably incurred or paid at any time by Holder, including, but not limited to, reasonable attorneys' fees and other legal costs, in enforcing payment and collection of the Balance Due of this Promissory Note.

1

Maker and Guarantor (if applicable) agree: no delay or omission by Holder in exercising any of its rights or remedies hereunder or otherwise shall impair any of such rights or remedies, nor shall any such delay or omission be construed as a waiver of any Default hereunder, and Holder may exercise every such right and remedy from time to time as often as Holder may deem expedient; all rights and remedies of Holder whether or not granted hereunder shall be cumulative and may be exercised singularly or concurrently, and no such right or remedy is intended to be exclusive of any other right or remedy of Holder; and no waiver by Holder of any Default hereunder shall be effective unless in writing and signed and delivered by Holder, and no such waiver or any default shall extend to or affect any subsequent or other Default or impair any rights or remedies of Holder.

This Promissory Note shall be the joint and several obligation of Maker, Guarantor (if applicable) and all guarantors, sureties, endorsers, and/or any other persons now or hereafter liable hereon, if any, and shall be binding upon them and their heirs, executors, personal representatives, successors and assigns.

Any demand upon or notice of other communication to Maker and/or Guarantor (if applicable) shall be effective if delivered by hand delivery or deposited in the mails, postage prepaid, addressed to Maker and/or Guarantor (if applicable) at the address(es) of Maker and/or Guarantor as set forth in Holder's records, or, if Maker and/or Guarantor (if applicable) has notified Holder of a change of address, to the last address of which Holder has been so notified.

Maker and Guarantor (if applicable), for Maker and Guarantor (if applicable) and for any guarantors, sureties, endorsers and/or any other persons now or hereafter liable hereon, if any, hereby waive demand for payment, presentment for payment, protest, notice of nonpayment or dishonor, and any and all other notices and demands whatsoever.

If any provision or application of this Promissory Note is adjudicated to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision or application of this Promissory Note that can be given effect without the invalid or unenforceable provision or application. Interest shall accrue hereunder at the lesser of (a) the rate stated hereinabove, or (b) the maximum rate permitted by law.

Notwithstanding any provision of this Promissory Note to the contrary, Maker and/or Guarantor (if applicable) and Holder intend that no provision of this Promissory Note be construed, applied or enforced as to permit or require the payment or collection of interest in excess of the highest rate of interest permitted to be paid or collected (the "Maximum Permitted Rate"). If any such provision is so construed, applied or enforced, then the parties intend: (i) that such provision automatically shall be deemed reformed nunc pro tunc so as to require payment only of interest at the Maximum Permitted Rate;

2

and (ii) if interest payments in excess of the Maximum Permitted Rate have been received, that the amount of such excess shall be deemed credited nunc pro tunc in reduction of the then outstanding principal amount of this obligation, together with interest at the Maximum Permitted Rate.

For additional and other value received, the existence, amount and sufficiency of which are hereby acknowledged, the undersigned guarantor(s) (singly or collectively referred to as "Guarantor") jointly and severally hereby guarantees to Holder (a) the immediate, absolute and unconditional payment of the Balance Due of this Promissory Note after Default and (b) the immediate, absolute and unconditional payment of all costs and expenses reasonably incurred or paid at any time by Holder, including, but not limited to, reasonable attorneys' fees and other legal costs, in enforcing payment and collection of the Balance Due of this Promissory Note.

This Promissory Note shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Florida applicable to contracts made and to be performed wholly within such state.

IN WITNESS WHEREOF, Maker and, Guarantor, if applicable, have executed and delivered this Promissory Note at the place specified above and as of the date first written above.

MAKER
**ZUBIE AIR INC,**
**a Texas  corporation**

By: _____

**Evel L. Zubiate**
**President**

**13111 Look Out Ridge**
**San Antonio, Texas 78233**

GUARANTOR(S)

_____

**Evel L. Zubiate**

**13111 Look Out Ridge**
**San Antonio, Texas 78233**

3