# EXHIBIT 4

## RECEIPT

This Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If One Hour Air Conditioning Franchising, L.L.C. offers you a franchise, One Hour Air Conditioning Franchising, L.L.C. must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with or make a payment to One Hour Air Conditioning Franchising, L.L.C. or an affiliate in connection with the proposed franchise sale.

New York and Rhode Island require that One Hour Air Conditioning Franchising, L.L.C. provides you this Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the Franchise Agreement or other agreement or the payment of any consideration that relates to the franchise relationship.

Michigan and Washington require that One Hour Air Conditioning Franchising, L.L.C. gives you this Disclosure Document at least 10 days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If One Hour Air Conditioning Franchising, L.L.C. does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency identified on Exhibit A.

The following is the name, principal business address and telephone number of each franchise seller offering this franchise.

_Bill Powers_ , Plaza Five Points, 50 Central Avenue, Suite 920, Sarasota, Florida 34236. 866-847-1113.

Date of Issuance: March 26, 2013

One Hour Air Conditioning Franchising, L.L.C. authorizes the respective parties identified on Exhibit C to receive service of process for One Hour Air Conditioning Franchising, L.L.C. in the particular state.

I received a Disclosure Document with a Federal Trade Commission issuance date of March 26, 2013. The state effective dates are listed on the State Cover Page of this Disclosure Document. This Disclosure Document included the following exhibits:

A. List of State Administrators
B. Intentionally Left Blank
C. Agents for Service of Process
D. Promissory Note and Guaranty
E. All Hands Confidentiality Agreement
F. List of Franchisees
G. Former Franchisees
H. Financial Statements.
I. Franchise Agreement, including Exhibits

J. Intentionally Left Blank
K. State Addenda
L. Renewal Addendum
M. General Release
N. UWIN Agreement
O. Receipts

*Each authorized officer is required to sign and return a copy of this receipt*

Date _____ 5/14/13 _____

Signed Receipt can be returned by faxing to (941)296-7909 or mailed to MSF, 50 Central Avenue, Suite 920, Sarasota, FL 34236

_14 days_

Business Entity _Zubie Air Inc._
Address _13111 Bookout Ridge_
City, State, Zip _SA TX 78233_
Telephone _210 6559448_

Print Name _Evel Zubiate_
Title
_Owner_ _(signature)_
Business Entity Officer Signature

(02/18/13) (04/01/13)                                                               Multistate

O-4

## RECEIPT

This Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If One Hour Air Conditioning Franchising, L.L.C. offers you a franchise, One Hour Air Conditioning Franchising, L.L.C. must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement with or make a payment to One Hour Air Conditioning Franchising, L.L.C. or an affiliate in connection with the proposed franchise sale.

New York and Rhode Island require that One Hour Air Conditioning Franchising, L.L.C. provides you this Disclosure Document at your first personal meeting or 10 business days before the execution of the Franchise Agreement or other agreement or the payment of any consideration that relates to the franchise relationship.

Michigan and Washington require that One Hour Air Conditioning Franchising, L.L.C. gives you this Disclosure Document at least 10 days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If One Hour Air Conditioning Franchising, L.L.C. does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency identified on Exhibit A.

The following is the name, principal business address and telephone number of each franchise seller offering this franchise.

*Bill Powers* , Plaza Five Points, 50 Central Avenue, Suite 920, Sarasota, Florida 34236, 866-847-1113.

Date of Issuance: March 26, 2013

One Hour Air Conditioning Franchising, L.L.C. authorizes the respective parties identified on Exhibit C to receive service of process for One Hour Air Conditioning Franchising, L.L.C. in the particular state.

I received a Disclosure Document with a Federal Trade Commission issuance date of March 26, 2013. The state effective dates are listed on the State Cover Page of this Disclosure Document. This Disclosure Document included the following exhibits:

A. List of State Administrators
B. Intentionally Left Blank
C. Agents for Service of Process
D. Promissory Note and Guaranty
E. All Hands Confidentiality Agreement
F. List of Franchisees
G. Former Franchisees
H. Financial Statements

I Franchise Agreement, including Exhibits
J. Intentionally Left Blank
K. State Addenda
L. Renewal Addendum
M. General Release
N. UWIN Agreement
O. Receipts

*Each individual owner is required to sign and return a copy of this receipt*

_5/14/13_
Date

Signed Receipt can be returned by faxing to
(941)296-7909 or mailed to:
MSP, 50 Central Avenue, Suite 920
Sarasota, FL 34236

*16 : 5-29-13*

_Girl_____
Prospective Franchisee Signature

_Evel Zubiate_
Print Name

## GENERAL RELEASE
## TRANSFER

This GENERAL RELEASE ("**Release**") is made this **14th day of June, 2013**, by **BFOH, INC** ("**Releasor**"), with reference to the following facts:

The undersigned Releasor is the Franchisee under, and signatory to, that certain Franchise Agreement dated **October 30, 2004** ("**Franchise Agreement**") by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company ("**One Hour**") and Releasor granting Releasor the right to use the ONE HOUR AIR CONDITIONING & HEATING® System and Licensed Marks to operate the Franchised Business subject to the terms provided thereunder.

Releasor agrees that all capitalized terms in this Release will have the meanings that are ascribed to them in the Franchise Agreement. This Release is being executed by the Releasor pursuant to the requirements of the Franchise Agreement in connection with Releasor's transfer of the Franchise Agreement. Releasor understands and agrees that execution of this Release is a condition of Releasor's rights under the Franchise Agreement to transfer the Franchise Agreement, and that Releasor's failure or refusal to execute this Release would result in Releasor's breach of the Franchise Agreement. In consideration of the rights granted by the Franchise Agreement, Releasor executes this Release for the benefit of One Hour.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS ACKNOWLEDGED, RELEASOR AGREES AS FOLLOWS:

1.      *General Release*. In consideration of, and as an inducement to, One Hour's consent to a transfer of the Franchise Agreement, Releasor, for itself and on behalf of its current and former parents, subsidiaries, affiliates and related entities, and its and their respective current and former shareholders, owners, officers, directors, members, managers, agents, representatives, employees, predecessors, successors and assigns, all persons acting on its or their behalf or claiming under it or them and all entities in which it or they has(ve) or had an ownership interest (individually, collectively, and in any combination, the "**Releasor Parties**"), hereby (i) releases and forever discharges One Hour, its current and former parents, subsidiaries, affiliates and related entities, and its and their current and former shareholders, members, officers, directors, owners, managers, attorneys, agents, representatives, employees, predecessors, successors and assigns (individually, collectively, and in any combination, the "**Released Parties**"), from any and all claims, debts, rights, demands, obligations, liabilities, actions, causes of action, suits, proceedings, controversies, disputes, agreements, promises, allegations, costs and expenses, of every nature, character or description whatsoever, at law or in equity, whether known or unknown, vested or contingent, suspected or unsuspected or anticipated or unanticipated which any or all of the Releasor Parties now own or have, have ever had, or may ever have, against any or all of the Released Parties arising prior to or as of the date of this Release, and (ii) agrees that none of them will institute any litigation or other legal action or proceeding, at law or in equity, against the Released Parties relating to any claim or demand released under this Section 1; provided, however, that this release and covenant not to sue will not apply to any claims that arise under any applicable federal or state franchise laws, except to the extent that such claims may by law be released by this Release. Releasor will take whatever actions are necessary or appropriate to carry out the terms of this release and covenant not to sue upon One Hour's request. This Section 1 will survive the expiration or termination of this Release.

2.      *Waiver of Rights*. This release is intended by Releasor to be a full and unconditional general release, as that phrase is used and commonly interpreted, and to constitute a full, unconditional and final accord and satisfaction, extending to all claims of any nature, whether or not known, expected or anticipated to exist in favor of Releasor (for itself and all other Releasor Parties) against the Released

Parties regardless of whether any unknown, unsuspected or unanticipated claim would materially affect settlement and compromise of any matter mentioned herein. Releasor, for itself and the other Releasor Parties, hereby expressly, voluntarily and knowingly waives, relinquishes and abandons each and every right, protection and benefit to which they would be entitled, now or at any time hereafter under the statutory or common law of the state where the Franchised Business is located, whether now or hereinafter existing under the laws of the state where the Franchised Business is located, or any other applicable federal and state law with jurisdiction over the parties relationship. Releasor, on its own behalf and on behalf of the other Releasor Parties, expressly waive the provisions of Section 1542 of the Civil Code of the State of California (as well as under any other statutes or common law principles of similar effect whether now or hereinafter existing), which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

In making this voluntary express waiver, Releasor acknowledges that claims or facts in addition to or different from those which are now known or believed to exist with respect to the matters mentioned herein may later be discovered and that it is Releasor's intention to hereby fully and forever settle and release any and all matters, regardless of the possibility of later discovered claims or facts.

3.    *Release Not Admission*. Releasor understands and agrees that the giving or acceptance of this Release and the agreements contained herein will not constitute or be construed as an admission of any liability by One Hour or an admission of the validity of any claims made by or against One Hour.

4.    *Authority of Parties*. Each person executing this Release on behalf of a party hereto warrants and represents that he or she is duly authorized to execute this Release on behalf of such party.

5.    *No Prior Assignments*. Releasor represents and warrants that Releasor has not previously assigned or transferred, or attempted to assign or transfer, to any third party any of the Claims which are the subject of this Release, all of such Claims being released.

6.    *Incorporation by Reference*. The parties hereby incorporate the recitals of this Release as part of the substantive provisions of this Agreement.

7.    *Controlling Law*. This Release will be governed, construed and interpreted in accordance with the substantive laws of the state where the Franchised Business is located.

IN WITNESS WHEREOF, Releasor has executed this Release on the date first shown above.

Releasor:                                    Releasor:

**BFOH, INC.**

*Fred J. Bilbo*                              *Fred J. Bilbo*

**By:    Freddie J. Bilbo**                  **Freddie J. Bilbo**
**President**



## TRANSFER OF ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C. FRANCHISE AGREEMENT

THIS ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C. FRANCHISE AGREEMENT TRANSFER AGREEMENT (the "**Transfer Agreement**"), dated **June 14, 2013** (the "**Effective Date**"), is made by and among ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company ("**Franchisor**"), **BFOH, INC**, a Texas corporation ("**Existing Franchisee**"), **Freddie J. Bilbo**, a Texas resident and owner of Existing Franchisee ("Transferor Owner") **ZUBIE AIR INC**, a Texas corporation ("**Transferee**") and **Evel L. Zubiate**, a Texas resident (collectively "**Transferee Owner(s)**").

## BACKGROUND

**A.** Franchisor and Existing Franchisee (or its predecessor) entered into a Franchise Agreement, dated as of **October 30, 2004**, (together with all addenda, riders, amendments, and any modifications thereto referred to collectively as the "**Original Agreement**") granting Franchisee the right to operate a ONE HOUR AIR CONDITIONING & HEATING® and ONE HOUR HEATING & AIR CONDITIONING® residential air conditioning and heating services, including indoor air quality services, maintenance, repairs and equipment replacement services businesses (a "**Franchised Business**").

**B.** Existing Franchisee desires to transfer to Transferee its Franchised Business for the sum of $_____.

**C.** Franchisor has agreed to allow Existing Franchisee to transfer its interest in the Franchised Business to Transferee under the terms and conditions included in this Transfer Agreement, including, but not limited to the execution of Franchisor's current form of franchise agreement (the "**New Franchise Agreement**") (the "**Proposed Transfer**").

**D.** Transferee Owner(s) own all of the equity interest in Transferee and are willing to guarantee Transferee's obligations under the New Franchise Agreement.

**E.** In consideration of, and as an inducement to, Franchisor's approval of the transaction contemplated herein, Transferor Owner will retain certain contingent obligations as described below.

**F.** All capitalized terms not defined in this Transfer Agreement shall have the respective meanings set forth in the New Franchise Agreement.

OH Transfer Agreement NEW FA (REVISED 2013-06-19)

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Transfer Agreement and in the New Franchise Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**Article 1.     Representations and Warranties**.

**1.1.     No Prior Transfer**.  Existing Franchisee represents and warrants that it has not previously caused a Transfer (as that term is defined in Section 15.2 of the New Franchise Agreement).  Existing Franchisee further represents and warrants that upon the signing of this Transfer Agreement it shall abide by Section 16.6 of the New Franchise Agreement.

**1.2.     Right of First Refusal**.  Existing Franchisee represents and warrants that it has submitted accurate and complete copies of all information requested by Franchisor to exercise its right of first refusal described in the Original Agreement and that there were no change in the terms and conditions of the proposed transaction or proposed Transferee (or if there was, Existing Franchisee promptly notified Franchisor of such changes).

**1.3.     Accurate Information**.  Transferee represents and warrants that the information it has submitted to Franchisor (either directly or indirectly through Existing Franchisee) in connection with its franchise application was accurate and complete on the date submitted and continues to be complete and accurate.

**1.4.     Satisfaction of Outstanding Accounts**.  Existing Franchisee represents and warrants that it has settled and paid, or made arrangements to pay (satisfactory to Franchisor), all outstanding accounts with and amounts owed to Franchisor and all trade creditors of the Franchised Business.

**1.5.     Payment of Transfer Fee**.  Existing Franchisee has paid the transfer fee to Franchisor.

**Article 2.     Transfer and Consent**.  Existing Franchisee hereby transfers, sets over and delivers to Transferee its interests in the Franchised Business and all of its right, title and interest therein and thereunder. Transferee hereby accepts the Franchised Business and assumes all of Existing Franchisee's rights, liabilities and obligations thereunder and agrees to execute the New Franchise Agreement.  Franchisor hereby consents to the transfer of the Franchised Business from Existing Franchisee to Transferee. After the full execution of this Transfer Agreement and the New Franchise Agreement the Transferee will be known in all subsequent references, including any subsequent documentation, as the Franchisee under the New Franchise Agreement.

If Transferor Owner is transferring ownership in the Existing Franchisee, then to the extent that, and for so long as, Transferor Owner retains any security interest in the Existing Franchisee, then Transferor Owner shall remain obligated to all guaranties that were executed in connection with the Original Agreement, and such guaranties shall remain in effect as to the New Agreement.  At such time that the security interest is

extinguished, then this paragraph shall be of no further force and effect, and such guarantees shall expire, unless they are otherwise independently valid.

All obligations of Franchisor and Existing Franchisee which expressly or by their nature survive termination or expiration of the Original Agreement will continue in full force and effect subsequent to and notwithstanding the Effective Date and such termination or expiration and until they are satisfied or by their nature expire.

### Article 3.    Further Agreements.

**3.1.    Customer Lists.** Existing Franchisee and Transferee acknowledge and agree that all current and future customers of the Franchised Business are assets of Franchisor and neither Existing Franchisee nor Transferee will have any ownership of such customer information. Customers of the Franchised Business will be serviced by Transferee after the Effective Date, as described in the New Franchise Agreement.

**3.2.    Telephone Numbers.** Existing Franchisee and Transferee acknowledge and agree that, except as specified in the Original Agreement, all telephone numbers of the Franchised Business are assets of Franchisor and neither Existing Franchisee nor Transferee will have any ownership of such telephone numbers. Existing Franchisee will not use these telephone numbers after the Effective Date for any purposes.

**3.3.    Contractor License and Business Name.** Existing Franchisee further covenants and agrees to take all action to transfer any contractor license and assumed name or fictitious name which contains any part of the Licensed Marks and furnish Franchisor with evidence satisfactory to it of compliance within fifteen (15) days from the Effective Date.

**3.4.    Training.** Transferee hereby agrees to complete Franchisor's initial training program and to pay Franchisor's reasonable costs of administering such program and all transportation and accommodation costs and living expenses of the Transferee and its manager and key employees for such initial training program.

**3.5.    Guaranty.** In consideration of, and as an inducement to, Franchisor's consent to the transfer of the Franchised Business, Transferee Owner(s) hereby agree to execute the Guaranty attached as Exhibit A to this Transfer Agreement.

**3.6.    Release.** In consideration of, and as an inducement to, Franchisor's consent to the transfer of the Franchised Business, Existing Franchisee and its owner(s) hereby agree to execute the Release attached as Exhibit B to this Transfer Agreement.

**3.7.    Term.** Transferee acknowledges and agrees that its "Term" under the New Franchise Agreement will begin on the Effective Date listed above and continue until the expiration date of the Original Agreement, which is **June 13, 2023.**

**3.8.** **Coordinated Telephone System.** Transferee agrees to obtain and utilize a new telephone number for the Franchised Business, as part of a coordinated telephone system for the Franchised Business organized by Franchisor or one of its affiliates and, will cease using any telephone numbers used in connection with its Prior Business as soon as commercially reasonable, but no later than 30 days after the Effective Date;

**3.9.** **Removal of Some Transferee Obligations.** Section **7.1(A)** of the New Franchise Agreement (related to timing for opening the Franchised Business) and Section **7.1(I)** of the New Franchise Agreement (related to the purchase of an opening inventory and supplies package) are deleted in their entirety and replaced with the phrase "**intentionally deleted.**"

**3.10.** **Phase-In of Minimum Sales Performance Standards.** Franchisor, Transferee, and Transferee Owner(s) acknowledge and agree that, as Transferee is purchasing an existing Franchised Business that has already been operating under the Original Agreement, Transferee is only entitled to the unexpired portion (if any) of Existing Franchisee's initial 3 year phase-in period to achieve and maintain Minimum Sales Performance Standards. If this period has already expired under the Original Agreement, Transferee acknowledges and agrees that it is required to achieve and maintain a revenue level of at least $5,000.00 for each 1,000 of population in the Territory (e.g. $500,000 per 100,000 population) per annum each year throughout the Term.

**3.11.** **Removal of Fee Phase-In.** Franchisor, Transferee, and Transferee Owner(s) acknowledge and agree that, in Section **8.2** of the New Franchise Agreement, under the heading "Continuing Franchise Fee," the phrase "Commencing on the first of the month following 90 days after the Effective Date..." is deleted and replaced by the following, "**Commencing on the first of the month following the Effective Date...**".

**3.12.** **UWIN, Comfort Club Memberships, Customer Guarantees and Warranties.** Transferee will offer a 100% satisfaction guarantee to all customers as required by the Operations Manual, and Transferee will execute the mediation and guarantee of services agreement with UWIN, LLC, Franchisor's affiliate ("**UWIN**"), and will participate, and timely and faithfully perform all of its obligations thereunder. Franchisor will provide Transferee with materials that will enable Transferee to offer membership in a maintenance service program, called "Comfort Club" or some other name selected by Franchisor ("**Comfort Club**");

**3.13.** **Description of In-Term Non-Competition Obligations.** [**THIS SECTION SUBJECT TO FRANCHISE MGMT DETERMINATION ON CASE BY CASE BASIS; REPLACE WITH "INTENTIONALLY DELETED" IF APPLICABLE**] Franchisor, Transferee, and Transferee Owner(s) acknowledge and agree that Section **14.1** of the **New Franchise Agreement**, under the heading "Non-Competition During the Term," is deleted in its entirety and replaced with the following:

**14.1** *Non-Competition During the Term.* During the Term, Franchisee (and its Owners if Franchisee is a business entity) will not own or be involved with a Competitive Business. A "Competitive Business" means a business that offers residential electrical products and services competitive with or similar to those offered by Franchisor, its affiliates, its franchisees, its licensees, or its affiliates' franchisees, licensees, and members (including, but not limited to, the Clockwork affinity groups). Franchisee (and its Owners if Franchisee is a business entity) may own and/or operate other commercial electrical businesses so long as such other commercial HVAC businesses: (i) do not provide residential air conditioning and heating services, including indoor air quality services, maintenance, repairs and equipment replacement in the Territory or an adjacent territory; (ii) do not use any portion of the Franchised Business, including the System, Confidential Information, or the Licensed Marks (such as the use of vehicles, invoices, and uniforms bearing the Licensed Marks); and (iii) do not interfere with Franchisee's operation of the Franchised Business (or diminish the Franchisee's ability to fully comply with Franchisee's obligations under this Agreement, including Sections 7.1(C), (D), and (E) hereof); and further provided that any such commercial HVAC services business is a legal entity separate and distinct from the Franchised Business and that its books and records are maintained completely separate from the Franchised Business. To verify compliance with this Section 14.1, Franchisee will make the books and records of any such authorized commercial HVAC services business available to Franchisor upon reasonable prior notice.

## Article 4.    General.

**4.1.**    **Construction**. The background recitals are incorporated into this Transfer Addendum by this reference. This Transfer Agreement, together with its Exhibits and the New Franchise Agreement, represents Franchisor's and Transferee's entire agreement pertaining to the subject matter of this Transfer Agreement and supersedes all prior and contemporaneous agreements, understandings and representations on that topic, whether oral or written. If there is an inconsistency between the terms of this Transfer Agreement and the New Franchise Agreement, this Transfer Agreement controls. The undersigned represent and warrant that they have consulted with competent legal counsel prior to executing this Transfer Agreement and that they have carefully read this Transfer Agreement in its entirety and understand it to be a full and final settlement, release, accord in satisfaction and discharge.

**4.2.**    **Resolution of Disputes**. Any dispute between or Franchisor, Existing Franchisee, Transferee, and/or Transferee Owner(s) arising out of the relationship created by this Transfer Agreement is subject to the dispute resolution provisions set forth in Article 18 of the New Franchise Agreement.

**4.3.** **Venue**.  The parties agree that (A) any state court of general jurisdiction sitting in the county and state where Franchisor has its principal place of business at the time the action is commenced, or (B) the United States District Court for the county and state where Franchisor has its principal place of business at the time the action is commenced will be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Transfer Agreement, and Existing Franchisee, Transferee and each Transferee Owner irrevocably submits to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court.

**4.4.** **Applicable Law**.  This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state in which Franchisor has its principal place of business at the time the dispute arises, without giving effect to its conflicts of law principles, provided, however, that the state's franchise law will apply only if its independent jurisdictional requirements are met.

**4.5.** **Successors and Assigns**.  This Transfer Agreement will inure to the benefit of and be binding upon Franchisor, Existing Franchisee, Transferee, each Transferee Owner, and their respective heirs, legal representatives, successors and permitted assigns.

**4.6.** **Entire Agreement**.  The parties each acknowledge and warrant to each other that they wish to have this Transfer Agreement be the entire, complete, sole and only understanding and agreement of, by and between the undersigned pertaining to and concerning the subject matter expressed here.  Accordingly, Franchisor, Existing Franchisee, Transferee, and each Transferee Owner, agree that this Transfer Agreement, together with any other documents or agreements signed by the parties contemporaneously, supersede and cancel any prior and/or contemporaneous discussions (whether described as representations, inducements, promises, agreements or any other term) between or among Franchisor (or anyone acting on its behalf), Existing Franchisee (or anyone acting on its behalf), Transferee (or anyone acting on its behalf), and each Transferee Owner (or anyone acting on his, her, or its behalf), which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between or among the parties, and each agree that they have placed, and will place, no reliance on the discussion.  This Transfer Agreement, together with any other documents or agreements signed by the parties contemporaneously or incorporated here by reference, constitutes the entire agreement between the parties and contains all of the terms, conditions, rights and obligations of the parties with respect to any aspect of the relationship between the parties.  No change, modification, amendment or waiver of any of the provisions hereof will be effective and binding upon either party unless it is in writing, specifically identified as an amendment and signed by the party to be charged.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

IN WITNESS WHEREOF, the parties have duly signed and delivered this Transfer Agreement as of the date first written above.

Franchisor:

Existing Franchisee:

ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C.

**BFOH, INC.**

By: _____

By: _____

Mark Baker
President

**Freddie J. Bilbo**
**President**

Transferee:

Transferor Owner(s):

**ZUBIE AIR INC**

By: _____

_____

**Evel L. Zubiate**
**President**

**Freddie J. Bilbo**

Transferee Owner:

_____

**Evel L. Zubiate**

IN WITNESS WHEREOF, the parties have duly signed and delivered this Transfer Agreement as of the date first written above.

Franchisor:

ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C,

By:_____
   Mark Baker
   President

Existing Franchisee:

**BFOH, INC.**

By:_____
   **Freddie J. Bilbo**
   **President**

Transferee:

**ZUBIE AIR INC**

By:_____
   **Evel L. Zubiate**
   **President**

Transferor Owner(s):

_____
**Freddie J. Bilbo**

Transferee Owner:

_____
**Evel L. Zubiate**

## TRANSFER GUARANTY

In consideration of, and as an inducement to, the franchisor's consent to transfer the franchise rights granted under a Franchise Agreement dated **October 30, 2004** (together with all addenda, riders, amendments, and any modifications thereto referred to collectively as the **"Original Agreement"**) by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company (**"Franchisor "**), and **BFOH, INC,** a Texas corporation ("Existing Franchisee"), **ZUBIE AIR INC,** a Texas corporation (**"Transferee"**) under Franchisor's current form of Franchise Agreement (the **"New Franchise Agreement"**), the undersigned hereby jointly and severally, personally and unconditionally: (1) guarantee to Franchisor and its successors and assigns, for the Term of the New Franchise Agreement and, including any renewal, as provided in the New Franchise Agreement, that Transferee will punctually pay and perform each and every undertaking, agreement and covenant stated in the New Franchise Agreement and any documents, agreements, instruments and promissory notes signed with or in connection with the New Franchise Agreement (collectively, the **"Franchise Documents"**); and (2) agree to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Documents applicable to owners of the franchisee.

Each of the undersigned hereby waives:

(1)     acceptance and notice of acceptance by Franchisor    of the foregoing undertakings;

(2)     notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

(3)     protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

(4)     any right the undersigned may have to require that an action be brought against Transferee or any other person as a condition of liability; and

(5)     any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

Each of the undersigned hereby consents and agrees that:

(1)     the undersigned's direct and immediate liability under this Guaranty will be joint and several with all signatories to this and similar guaranties of Transferee's obligations;

(2)     the undersigned will render any payment or performance required under the Franchise Documents upon demand if Transferee fails or refuses punctually to do so;

EAST\43904640.2

(3)    this Guaranty will apply to any claims Franchisor may have due to return of any payments or property Franchisor may have received from Transferee as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(4)    such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Transferee or any other person; and

(5)    such liability will not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which Franchisor may from time to time grant to Transferee or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during and after the terms of the Franchise Documents, as the same may be amended or renewed, until Transferee's duties and obligations to Franchisor are fully discharged and satisfied.

All capitalized terms when used will have the meanings ascribed to them in the Franchise Documents.

This Guaranty will be governed, construed and interpreted in accordance with the substantive laws of the state where Franchisor has its principal place of business at the time a dispute arises, without giving effect to its conflicts of law principles.

IN WITNESS WHEREOF, each of the undersigned has affixed his signature on the 14th day of June, 2013.

WITNESS:                                          GUARANTOR:

_____                          _____
Signature                                        **Evel L. Zubiate**

_____
Print or Type Name



**FRANCHISE AGREEMENT**
**for operation of a**
**ONE HOUR AIR CONDITIONING & HEATING**
**FRANCHISED BUSINESS**
**or a**
**ONE HOUR HEATING & AIR CONDITIONING**
**FRANCHISED BUSINESS**

Franchisee:   **ZUBIE AIR INC**

Territory Name: **OH0064 SAN ANGELO, TX**

Date:   **June 14, 2013**

# Table of Contents

Article 1.    Nature and Scope of Agreement ........................................................................... 1

Article 2.    Representations and Owner's Guaranty ................................................................. 2

Article 3.    Scope of License ................................................................................................... 3

Article 4.    Term and Renewal ............................................................................................... 5

Article 5.    Location and Business Site .................................................................................. 6

Article 6.    Franchisor's Responsibilities .............................................................................. 6

Article 7.    Franchisee's Responsibilities .............................................................................. 9

Article 8.    Fees .................................................................................................................... 14

Article 9.    Records, Reports, Inspections and Inquiries ...................................................... 15

Article 10.   Advertising/Marketing Fund ............................................................................. 17

Article 11.   Licensed Marks ................................................................................................. 22

Article 12.   Rights to the System ......................................................................................... 24

Article 13.   Operations Manual and Confidentiality ............................................................ 24

Article 14.   Non-Competition .............................................................................................. 26

Article 15.   Transfer ............................................................................................................ 27

Article 16.   Termination and Expiration .............................................................................. 30

Article 17.   Relationship and Indemnification ..................................................................... 35

Article 18.   Dispute Resolution ........................................................................................... 36

Article 19.   General ............................................................................................................. 38

Exhibit A    Business Terms
Exhibit B    Owner's Guaranty
Exhibit C    Owners of Franchisee

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT, dated **June 14, 2013** (this "**Agreement**"), is made by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company ("**One Hour**" or "**Franchisor**"), located at Plaza Five Points, 50 Central Avenue, Suite 920, Sarasota, Florida 34236, and **ZUBIE AIR INC**, a Texas corporation ("**Franchisee**"), located at **13111 Look Out Ridge, San Antonio, TX,** who in consideration of the promises stated below agree as follows:

### Article 1.  Nature and Scope of Agreement

1.1  ***The Franchisor***.  Franchisor has developed a distinctive business format and system and related standards, specifications and procedures that Franchisor has for operating a Franchised Business (defined below), including, but not limited to, the Operations Manual and System Standards (defined below) (the "**System**") that is designed to provide residential air conditioning and heating services, including indoor air quality services, maintenance, repairs and equipment replacement, and other related services designated by Franchisor under the service marks ONE HOUR AIR CONDITIONING & HEATING® and ONE HOUR HEATING & AIR CONDITIONING® and associated marks, logos and designs that Franchisor now uses or may use as a component of the System (the "**Licensed Marks**"), and offers franchises to operate either a ONE HOUR AIR CONDITIONING & HEATING or a ONE HOUR HEATING & AIR CONDITIONING residential air conditioning and heating services businesses (each, a "**Franchised Business**").

1.2  ***The Franchise***.  Franchisee acknowledges that it has independently investigated the business risks involved and other matters as Franchisee deems important, including current and potential market conditions and competitive factors and risks, has had the opportunity to read Franchisor's Franchise Disclosure Document (the "**Franchise Disclosure Document**") provided to Franchisee in connection with the offer to Franchisee of the Franchised Business to be operated pursuant to this Agreement, and has not relied on any representations not stated in this Agreement or in the Franchise Disclosure Document.  Aware of the relevant facts, Franchisee desires to enter into this Agreement to obtain a license to use the System and the Licensed Marks to operate a Franchised Business within the geographic area stated on **Exhibit A** to this Agreement (the "**Territory**"). The Territory shall be determined by reference to the geographic areas within the zip codes specified in **Exhibit A** as of the date of this Agreement and subsequent remapping changes by the U.S. Post Office shall not operate to expand the scope of the Territory.

1.3  ***The System***.  The System is used by residential air conditioning and heating service and repair businesses that operate under the Licensed Marks.  The System presently includes, but is not limited to: the Licensed Marks; installation of a talking thermostat invention; advertising, publicity and other marketing programs; training programs and training materials; and other requirements that are stated or referred to in this Agreement and in Franchisor's OpX Operations Manual (the "**Operations Manual**"), or that Franchisor, periodically, may otherwise state in writing and designate as part of standards for the System ("**System Standards**"). Franchisor, in its sole discretion, may change or modify the System, including System Standards, and Franchisee agrees to comply with the System and System Standards as they may exist

periodically (including all required operational policies, procedures, programs and plans stated in the Operations Manual or otherwise stated in writing), all of which shall constitute provisions of this Agreement as if fully set forth herein.

Franchisee acknowledges that because uniformity under many varying conditions may not be possible or practical, Franchisor reserves the right to materially vary its standards or franchise agreement terms for any Franchised Business, based on the timing of the grant of the franchise, the peculiarities of the particular territory or circumstances, business potential, population, existing business practices, other non-arbitrary distinctions or any other condition which Franchisor considers important to the successful operation of the Franchised Business. Franchisee will have no right to require Franchisor to disclose any variation or to grant the same or a similar variation to Franchisee.

### Article 2.  Representations and Owner's Guaranty

2.1  ***Representations and Warranties.***   Franchisee hereby represents and warrants to Franchisor as follows:

> A.     Franchisee is acquiring this franchise for Franchisee's own account for the purpose of operating a Franchised Business, and not for the purpose of resale or redistribution or other speculative matter;

> B.     All information provided to Franchisor in Franchisee's application and other documents to induce Franchisor to enter into this Agreement was true, correct, complete and accurate as of the date made, and, as of the date of this Agreement, no material change has occurred in this information;

> C.     Franchisee's execution, delivery and performance of this Agreement does not violate or constitute a breach under any agreement or commitment made by Franchisee;

> D.     If Franchisee is a business entity, Franchisee is duly organized and validly existing, is qualified to do business in each state where Franchisee is or shall conduct business, and is duly authorized to sign and deliver this Agreement and perform Franchisee's obligations under this Agreement; and

> E.     This Agreement represents a valid, binding obligation of Franchisee and each of Franchisee's owners, jointly and severally (each, an "**Owner**").

2.2  ***Owner's Guaranty.***   If Franchisee is a business entity, each Owner shall sign an owner's guaranty, the form of which is attached to this Agreement as **Exhibit B** (the "**Owner's Guaranty**"), in favor of Franchisor and deliver the signed Owner's Guaranty to Franchisor concurrently with execution of this Agreement, or if the ownership interest is acquired later, within ten (10) days after obtaining the ownership interest.

2

### Article 3.  Scope of License

3.1  ***Grant of License.***  Subject to the terms and conditions of this Agreement, Franchisor hereby grants to Franchisee a license to operate one (1) Franchised Business using the System and the Licensed Marks within the Territory from and only from the location stated on **Exhibit A** to this Agreement (the "**Approved Location**").  Franchisee hereby accepts this grant and agrees to operate a Franchised Business in accordance with the System under the Licensed Marks from and only from the Approved Location and to continuously exert its best efforts to promote and enhance the operation of the Franchised Business and the goodwill associated with the Licensed Marks.

3.2  ***Exclusive Rights.***  The license granted hereunder will be exclusive in the Territory during the Term (defined below) provided Franchisee has fully complied with the terms and conditions of this Agreement, including **Section 7.6** relating to Minimum Sales Performance Standards, and any other agreement between One Hour (or its affiliates) and Franchisee (or its affiliates), and this Agreement has not been terminated or expired. "**Exclusive**" for purposes of this **Section 3.2** means that during the Term, except as provided in **Section 3.3** and **3.4** Franchisor will not operate, or grant to another person or business entity a franchise to operate, another Franchised Business that uses the Licensed Marks in the Territory and will not permit another person or business entity to service HVAC customers located within the Territory as a Franchised Business that uses the Licensed Marks.  For avoidance of doubt, except as provided in **Section 3.4**, nothing herein shall require Franchisor or any affiliate of Franchisor to cease operation of any business operating in the Territory under any  trade name, trademark or service mark other than the Licensed Marks, whether operating at the time of this Agreement or subsequently acquired.

3.3  ***Customers.***  Franchisee shall primarily service customers located within the Territory.  Franchisee may service customers outside the Territory, if such customers are located in areas geographically contiguous to the Territory and not in areas that are in the territories of other franchisees' Franchised Businesses (an "**Open Territory**").

As provided in this Section 3.3, Franchisee also may service , for a period of time, Prior Business Customers and Former Open Territory Customers (both defined below and collectively referred to as "**Prior Customers**") located in the territory of another franchisee's Franchised Business.

"**Prior Business Customers**" are customers who, on the Effective Date (defined below) of this Agreement, were located in the territory of another franchisee's Franchised Business and (i) paid for HVAC services from a residential air conditioning and heating services business owned and operated by  Franchisee prior to Franchisee entering into this Agreement (a "**Prior Business**") during all or any part of the 24 months prior to the Effective Date of the Agreement, and (ii) appear, by name and address, on a written list received by Franchisor from Franchisee within 90 days of the Effective Date of this Agreement.  If, and only if, conditions (i) and (ii) are satisfied, Franchisee may continue to service Prior Business Customers for a period not to exceed 24 months after the Effective Date of this Agreement.  At the conclusion of the 24-month period, Franchisee must turn Prior Business Customers over to the franchisee in whose territory the customer is located.

3

"**Former Open Territory Customers**" are customers who, on the Effective Date of this Agreement, were located in an Open Territory and (i) paid for HVAC services from Franchisee's Franchised Business during all or any part of the 24 months prior to the previously Open Territory becoming part of the territory of another franchisee's Franchised Business, and (ii) appear, by name and address, on a written list received by Franchisor from Franchisee within 30 days of Franchisee becoming aware (by notice from Franchisor or otherwise) that previously Open Territory has become part of the territory of another franchisee's Franchised Business. If, and only if, conditions (i) and (ii) are satisfied, Franchisee may continue to service Former Open Territory Customers for a period not to exceed 24 months after the date that a previously Open Territory becomes part of the territory of another franchisee's Franchised Business. At the conclusion of the 24-month period, Franchisee must turn Former Open Territory Customers over to the franchisee in whose territory the customer is located.

Franchisee acknowledges and agrees that other One Hour franchisees using the Licensed Marks may continue to service customers located in the Territory if such franchisees have continuing rights to service those customers under their franchise agreements. Franchisee shall refer service calls it cannot service itself to another One Hour franchisee, if one is available.

Other than as provided in this **Article 3**, Franchisee shall not solicit or accept orders from customers outside of the Territory, including by use of alternate channels of distribution, such as the Internet, telemarketing or other direct marketing.

3.4 **Reserved Rights**. Franchisor reserves all rights not specifically granted to Franchisee under this Agreement. The rights reserved to Franchisor include, without limitation, the right of Franchisor or its affiliates (1) to use or license the System or to engage in or license any business activity, including, without limitation, the operation or franchising of residential HVAC businesses under the Licensed Marks at any location outside the Territory; (2) to operate a residential HVAC business under the Licensed Marks inside the Territory if (i) Franchisor (or its affiliate) is operating a residential HVAC business under the Licensed Marks in the Territory as of the date of this Agreement, or (ii) Franchisor has notified Franchisee before Franchisee has signed this Agreement that Franchisor (or its affiliate) intends to operate a residential HVAC business under the Licensed Marks in the Territory; (3) to engage in or license any business activity, including, without limitation, the operation or franchising of residential HVAC businesses under any trade name, trademark or service mark other than the Licensed Marks now or at any time owned by or licensed to Franchisor or its affiliates at any location inside or outside the Territory, and nothing herein shall require Franchisor or any affiliate of Franchisor to cease operation of any business operating in the Territory under any other trade name, trademark or service mark, whether operating at the time of this Agreement or subsequently acquired; provided however, if Franchisor, or one of its affiliates, acquires or otherwise begins to operate a residential HVAC business under another trade name, trademark or service mark in Franchisee's Territory after the date of the Agreement, Franchisor will initiate a discussion with Franchisee to amicably resolve any issues arising from the operation of the business. If the business operates under the control of Franchisor or an affiliate in Franchisee's Territory for longer than twelve months (the "**Resolution Period**") without a mutually agreeable resolution, then Franchisee may deliver to Franchisor written notice of intent to terminate this Agreement. At the end of 90 days

following Franchisor's receipt of such notice from Franchisee, this Agreement will terminate if there is still no mutually agreeable resolution. If Franchisor has not received such a notice from Franchisee within 90 days of the expiration of the Resolution Period, then Franchisee will be deemed to have waived any objection to the operation of the business by Franchisor or one of its affiliates. Franchisee acknowledges that Franchisor's rights to use and/or license the System pre-date this Agreement and are not limited or modified by the terms of this Agreement. Franchisee agrees that by acknowledging such rights, the parties do not intend to make Franchisor's exercise of such rights subject to rules applicable to contractual performance or the exercise of contractual discretion under this Agreement.

### Article 4.  Term and Renewal

4.1  ***Term.***  Unless terminated earlier under Article 16, the initial term of this Agreement shall be ten (10) years ("Term") commencing on the effective date stated on **Exhibit A** to this Agreement (the "Effective Date") and terminating on the expiration date stated on **Exhibit A** to this Agreement (the "Expiration Date").

4.2  ***Renewal.***  This Agreement may be renewed by Franchisee for one additional term of ten (10) years, provided that all of the following conditions shall be met before this Agreement may be renewed:

    A.    Franchisee has substantially complied with all the provisions of this Agreement (including, without limitation, making all payments in full when due) and all other agreements between Franchisee (or its affiliates) and Franchisor (or its affiliates) during the Term, and is in full compliance with this Agreement and all other agreements at the end of the Term;

    B.    Franchisee has signed Franchisor's then-current form of franchise agreement and all other agreements then customarily used by Franchisor in granting franchises for Franchised Businesses, with a renewal term as provided above, which agreements may contain different terms and conditions (including, without limitation, different or increased fees and other financial terms, Continuing Franchise Fees and/or Marketing Fund Contributions, and a requirement that Franchisee remodel, refurbish, renovate (including, without limitation, as to any upgrading or refurbishing of vehicles used in the Franchised Business as may be requested by Franchisor) or re-equip the Franchised Business to bring it into full compliance with all System Standards for new Franchised Businesses and may not contain any further renewal terms;

    C.    Franchisee and its Owners have signed a general release, in form satisfactory to Franchisor, of all claims Franchisee may have against Franchisor and its officers, directors, owners, employees, affiliates, successors and assigns;

    D.    Franchisee has given Franchisor notice of its intention to renew this Agreement at least three (3) months but not more than six (6) months prior to the expiration of the Term; and

    E.    Franchisee has paid Franchisor a renewal fee in an amount equal to

    

$10,000.00, payable in a lump sum.

### Article 5.  Location and Business Site

5.1  **Location**.  Franchisee shall operate the Franchised Business from, and only from, the Approved Location.  Franchisee may not change the location of the Franchised Business without Franchisor's prior written approval.  If Franchisee has other franchise agreements with Franchisor for contiguous territories, Franchisee may operate the Franchised Business from an approved location within a contiguous territory.  In such event, if Franchisee opens an Approved Location within the Territory, Franchisee may continue to direct all order processing and head office functions (including maintenance of books, records and accounts) through one central location of its choosing within one of its contiguous territories while all other operations of the Franchised Business are conducted from the Approved Location within the Territory.

5.2  **Site Criteria**.  The layout of the business site shall comply with the criteria described in the Operations Manual.  The business site for the Franchised Business shall include a dispatching area, reception/talking area, tech/training/break area, restroom and warehouse space.  In addition, the business site shall comply with local zoning and business requirements, and have adequate parking to accommodate trucks and employees.

5.3  **Franchisor's Approval**.  Franchisor's approval of Franchisee's business site only indicates that Franchisor believes that the business site falls within Franchisor's then-current criteria, and is not a warranty of success for the Franchised Business.  Franchisee acknowledges that its acceptance of a business site is based on its own independent investigation of the suitability of the business site.

5.4  **Conversion and Construction/Opening**.  Franchisee is responsible for converting, constructing and opening the business site as a Franchised Business in accordance with the layout and other criteria described in the Operations Manual or in other written communications by Franchisor.  Franchisee shall complete the conversion and construction of the business site and open the Franchised Business within three (3) months after the Effective Date.

5.5  **Maintenance, Appearance and Remodeling**.  Franchisee shall maintain the business site of the Franchised Business and its appearance in accordance with Franchisor's standards communicated periodically to Franchisee in the Operations Manual, in System Standards, or by other written or electronic communications.  Not more often than once every five (5) years, Franchisee shall remodel the business site to comply with Franchisor's then-current System Standards or Operations Manual if Franchisor, in the exercise of its business judgment, believes that such remodeling is necessary.

### Article 6.  Franchisor's Responsibilities

6.1  **Franchisor Obligations**.  Franchisor will have the following obligations:

A.  Franchisor will endeavor in the exercise of its business judgment to maintain a high standard of quality for the System, and to promote, protect and

enhance the public image and reputation of the System;

B.     Franchisor will, as Franchisor deems appropriate, provide Franchisee and its manager and key employees with required training courses, programs and materials, which will be conducted at the locations and times as Franchisor may designate.  Franchisor (or its affiliate) will provide an initial training course without cost to Franchisee, except that Franchisee shall be responsible for paying the travel, living and meal expenses and salaries for Franchisee and its manager or employees who attend the training classes;

C.     Before the opening of the Franchised Business, Franchisor will give Franchisee, or provide Franchisee, via Franchisor's interactive electronic website, a copy of the Operations Manual and System Standards and Franchisor will, as it deems appropriate, provide Franchisee with amendments to the Operations Manual and System Standards during the Term;

D.     Before the opening of the Franchised Business, Franchisor will inform Franchisee how to obtain, at a minimal cost to Franchisee, the SuccessWare®21 (ASP Option) software package (or other software package specified by Franchisor) which Franchisee shall use in the Franchised Business; Franchisee shall be responsible for all ongoing license fees, training fees, and the costs of any upgrades or replacements to the software package;

E.     Franchisor will develop and maintain a list of standards for trucks, inventory, equipment, tools, uniforms, and other items that Franchisee may use in the Franchised Business;

F.     Franchisor, as it may deem appropriate, will make available to Franchisee additional and optional or mandatory training courses, programs and materials through its affiliate, Success Academy (the "**Success Academy Services Program**"), and SuccessWare; such training shall be conducted at locations and times designated by Franchisor and SuccessWare and at fees established by Franchisor;

G.     Franchisor will make available to Franchisee the sales, marketing and technical assistance, and consultation and advice on operating procedures that Franchisor may deem necessary or desirable in the exercise of its business judgment;

H.     Franchisor will provide Franchisee with a list of approved Suppliers and marketing campaign materials through use of an Internet catalog and/or the Operations Manual and/or other written or electronic communications;

I.     Franchisor will make available to Franchisee improvements and changes in Franchisor's services or operating procedures relating to residential HVAC services provided by the Franchised Business;

J.     Franchisor will work with its affiliate, BuyMax, LLC, or with

7

other vendors to further develop and maintain a vendor purchase program to negotiate purchase arrangements with Suppliers for the benefit of franchisees;

      K.     Franchisor will make available for purchase by Franchisee from approved Suppliers ready-to-go forms, letterheads, business cards and other daily use marketing items;

      L.     Franchisor will provide Franchisee with materials that will enable Franchisee to establish a service club, under the name "The Comfort Club"™ or such other name designated by Franchisor, which will allow Franchisee to offer its customers discounts, scheduling preferences and maintenance and service programs (the "**Comfort Club**");

      M.     Franchisor, in its sole discretion, will provide mystery shopping services;

      N.     Franchisor will provide a website that will be available twenty-four (24) hours a day, seven (7) days a week to Franchisee's residential customers;

      O.     Franchisor will provide a web and/or DVD-based training resource, currently called "**Clockwork University**," which may be used by Franchisee on an on-going basis to train on and review the concepts found in the Operations Manual; and

Franchisor may have a franchisee who has signed a "Model Center Agreement" who may provide Franchisee with some or all of the services described in the foregoing sub- **Sections 6.1(B)**, **(C)**, **(F)** and **(G)**.

      6.2   *Approved Suppliers*. Franchisor reserves the right to designate or approve, periodically, one or more third parties (a "**Supplier**" or "**Suppliers**"), or Franchisor itself or one of its affiliates, to supply Franchisee with certain categories of products and services using the Licensed Marks. If Franchisor does so designate or approve, Franchisee shall purchase the categories of products or services using the Licensed Marks only from Suppliers that Franchisor has so designated or approved or from Franchisor.

Franchisor may approve a Supplier for any products or services using the Licensed Marks and may approve a Supplier only as to certain products or services, including supplies to be used in the Franchised Business. Franchisor may concentrate purchases with one or more Suppliers to obtain lower prices, better advertising support and/or better services for any group of Franchised Businesses. Franchisee shall not purchase products or services using the Licensed Marks from any Supplier unless and until Franchisor has approved the Supplier. Franchisor may approve a single Supplier for any item, and may approve a Supplier only as to certain items. In approving Suppliers, Franchisor takes into consideration the price and quality of the products or services, and the reliability of the Supplier in getting the products or services to Franchisee in a timely manner. Franchisor may concentrate purchases with one or more Suppliers to obtain the lowest price, or any other benefit Franchisor deems, in its sole discretion, may benefit the Licensed Marks. If Franchisor later disapproves a Supplier, Franchisor will notify Franchisee in writing of

                                                                                         Multistate

Franchisor's disapproval, and Franchisee shall cease purchasing from that Supplier within a reasonable time after Franchisee's receipt of Franchisor's notice of disapproval.

If Franchisee proposes to purchase products or services using the Licensed Marks from any Supplier that Franchisor has not previously approved for these products or services, Franchisee shall first notify Franchisor in writing and submit to Franchisor all information, specifications and samples that Franchisor requests.  Franchisor shall have the right to require that its representatives, at Franchisee's expense, be permitted to inspect the proposed Supplier's facilities and that samples from the proposed Supplier be delivered to Franchisor or its designated testing facility for evaluation and testing.  Franchisor shall have sole discretion as to whether or not to approve any Supplier.  Approval of a Supplier as to any products or services using the Licensed Marks, if given, shall be in writing and may be conditioned on requirements relating to the frequency of delivery, standards of service, including prompt attention to complaints, concentration of purchases and other criteria, and may be conditioned on the Supplier providing Franchisor with adequate insurance protection, the Supplier's execution of reasonable indemnity and confidentiality agreements, payment of reasonable continuing inspection fees and administrative costs, and the Supplier's payment of reasonable license fees to Franchisor, and may be temporary or conditional, pending Franchisor's further evaluation of the Supplier.

Franchisor reserves the right to re-inspect, at any time, the facilities, products and/or services of any approved Supplier and to revoke its approval upon the Supplier's failure to continue to meet any of Franchisor's then-current criteria.

### Article 7.  Franchisee's Responsibilities

7.1  *Franchisee's Obligations*.  In addition to Franchisee's other obligations under this Agreement, Franchisee shall also have the following obligations:

        A.     Franchisee shall open the Franchised Business for business within the time period provided in **Section 5.4**;

        B.     Franchisee shall operate the Franchised Business from, and only from, the Approved Location (unless otherwise permitted under **Section 5.1**) according to the System and System Standards and under the Licensed Marks, and not deviate from the System and System Standards without Franchisor's prior written consent;

        C.     Franchisee shall use its best efforts in the Territory to promote, develop and expand the market for the services of the Franchised Business;

        D.     Franchisee shall devote sufficient time and effort to the Franchised Business as required by **Section 7.2** to ensure the proper, efficient and effective operation of the Franchised Business;

        E.     Franchisee shall comply with all of Franchisor's mandatory standards, methods, policies, products, procedures, techniques and specifications that Franchisor may prescribe periodically, whether in the Operations Manual,

9

System Standards or in other written or electronic communications, including the wearing of uniforms while performing services, and using only trucks, inventory, equipment, tools, uniforms, computers, software and telephones that meet or exceed Franchisor's standards;

     F.     Franchisee shall offer all and only such products and services as have been expressly approved by Franchisor from time to time (in the Operations Manual or otherwise in writing) and shall refrain from or discontinue offering any products or services which Franchisor may, in its discretion, disapprove in writing at any time;

     G.     Franchisee must service all customer accounts to the satisfaction of Franchisor and in accordance with the System and System Standards, and shall hire the employees as are necessary or appropriate to staff the Franchised Business, and Franchisee shall ensure that all employees have all licenses required by law;

     H.     Franchisee shall offer a 100% satisfaction guarantee to all customers as required by the Operations Manual, and Franchisee shall execute the mediation and guarantee of services agreement with UWIN, LLC, Franchisor's affiliate ("**UWIN**"), and shall participate, and timely and faithfully perform all of its obligations thereunder;

     I.     Franchisee shall purchase the opening inventory and supplies package designated by Franchisor in the Operations Manual ("**Opening Inventory and Supplies Package**") from an approved Supplier;

     J.     Franchisee shall obtain and utilize a new telephone number for the Franchised Business (if so instructed by Franchisor, as part of a coordinated telephone system for Franchised Businesses organized by Franchisor or one of its affiliates) and shall cease marketing or redirect to Phone Facts any telephone numbers used in connection with its Prior Business as soon as commercially reasonable, but no later than thirty (30) days after the Effective Date. Franchisee shall notify Franchisor of any number it wishes to retain, and no such number shall be marketed in relation to the Franchised Business, or in any other manner, after the signing of this Agreement;

     K.     Franchisee and its manager, if any, and key employees shall attend and successfully complete the two-phase initial training program to be conducted by Franchisor (or its affiliate) and shall successfully complete the SuccessWare®21 (ASP Option) software system training, or such other software system training that Franchisor may designate, to be able to maintain all the daily financial records of the Franchised Business. Franchisee shall be responsible for all the travel, living and meal expenses, and salaries, of Franchisee and its managers and key employees who attend the initial training class (Franchisor retains the right to waive opening training requirements for qualifying, experienced franchisees, at its sole discretion);

     Multistate

L.     Franchisee shall use the Licensed Marks exactly and only as permitted;

M.     Franchisee shall honor the Territory's boundary in accordance with **Section 3.3** of this Agreement;

N.     Franchisee shall maintain a drug free workplace and formal drug testing procedures for its employees as provided in the Operations Manual;

O.     Franchisee shall pay all fees and other payments due to Franchisor hereunder promptly when due;

P.     Franchisee shall comply at all times with all federal, state and municipal laws, orders, regulations, ordinances and the like pertaining to the operation of the Franchised Business, including, without limitation, all governmental regulations relating to OSHA, workers' compensation, unemployment insurance, and withholding and payment of federal, state and local income taxes and sales taxes;

Q.     Franchisee shall promptly pay when due all taxes, expenses and surcharges of any kind levied or assessed by any governmental body, whether federal, state or local, by reason of or in connection with Franchisee's operation of the Franchised Business;

R.     Franchisee shall submit the information and reports required by **Section 9.3** and permit Franchisor to access its data as provided in **Sections 9.1, 9.2, and 9.4**;

S.     Franchisee shall conduct the Franchised Business in a manner that does not reflect adversely on Franchisor, the System, or the Licensed Marks, or which might depreciate or otherwise adversely affect the goodwill associated with any of them;

T.     Each of Franchisee's Owners, officers, directors, members, partners, managers and employees who obtain Confidential Information (defined below) shall sign a confidentiality agreement in the form that Franchisor may prescribe periodically;

U.     Franchisee or one of its Owners or managers shall attend Franchisor's annual franchise system meetings that have traditionally been called "Congress" and "Operation: Brand Dominance." Franchisee shall be responsible for all the expenses Franchisee or its representative incurs in attending these meetings. Franchisee shall be required to attend two (2) such meetings, if offered by Franchisor, in any calendar year, and Franchisee acknowledges that Franchisor may alter the number of such meetings, as well as the names and schedules under which such meetings are held;

V.     Franchisee, in the manner and with the frequency prescribed by

Franchisor, shall use a system that is designed to track Franchisee's progress and assist Franchisee to prioritize its time, train employees, and plan the Franchised Business (currently known as the "GEARS"), which may be operated by an independent third party or by an affiliate of Franchisor; and

W.      Franchisee agrees not to use or permit to be used any part of the System in connection with any business in which Franchisee has an interest, direct or otherwise, other than the Franchised Business.

## 7.2   *Operation of Franchised Business*.

A.      Franchisee (or its principal Owner if Franchisee is a business entity) shall diligently and fully exploit the rights granted in this Agreement by providing direct supervision in the operation of the Franchised Business. Franchisee shall not engage in conflicting enterprises or other activities that could be detrimental to or interfere with the operation of the Franchised Business.

B.      Franchisee shall not display, advertise  or use in connection with the Franchised Business any trade name, trademark, logo, or other intellectual property that is not part of the Licensed Marks; provided, however, that Franchisee may continue to use any trade name, trademark, logo, or other intellectual property previously used to identify its Prior Business ("**Prior Marks**") for up to three (3) years after the Effective Date to the extent necessary to convert and consolidate its Prior Business into the Franchised Business, as approved by Franchisor.

C.      Franchisee may appoint a manager to conduct the day-to-day operations of the Franchised Business.  Any such appointed manager shall be required to attend and successfully complete Franchisor's initial training program. Franchisor shall have the right, in its sole discretion, to approve or reject any manager appointed by Franchisee, and any manager who has been rejected by Franchisor may not conduct the day-to-day operations of the Franchised Business.

7.3 *Insurance*.  Franchisee will purchase, and at all times during the Term maintain in full force and effect, the policies of insurance in the amounts as are required by Franchisor, as specified in the Operations Manual, and which may include, without limitation, product liability, comprehensive general liability, automobile liability, workers compensation/employers liability, and property insurance, in respect of the Franchised Business.  Franchisee shall name Franchisor (and any other parties that may be required by the terms of the Operations Manual) as an additional insured in each such policy and such policies shall provide that the insurer will send Franchisor duplicate copies of all policy documentation and correspondence regarding same.  At least fourteen (14) days before the opening of the Franchised Business, Franchisee will provide Franchisor with a certificate of coverage issued by the insurer indicating that all required insurance is in full force and effect and that it will not be terminated, permitted to lapse, expire or be changed without at least thirty (30) days' prior written notice to Franchisor.  In the event that Franchisee fails to maintain insurance coverage as required, or fails to provide reasonable evidence of same when requested by Franchisor,

Franchisor shall have the right to procure and maintain such insurance coverage from an insurer selected by Franchisor, at the sole expense of Franchisee. Franchisee shall promptly reimburse Franchisor for any costs so incurred. Franchisee, at its sole cost, may participate in any group or blanket insurance program, which Franchisor may establish or otherwise facilitate for the benefit of its franchisees.

      7.4 ***Computer System/Office Equipment***. Franchisee shall acquire and use in the Franchised Business a computer system, including software, of a type that Franchisor may designate from time to time that is compatible with the software or other required system designated for use by franchisees from time to time. Franchisee shall also acquire and use the office equipment that Franchisor may designate for use by franchisees from time to time. Franchisee shall implement, and have fully operational within three (3) months from the Effective Date, the SuccessWare®21 (ASP Option) software program, the SonicWALL firewall protection system, and all other software programs that Franchisor may designate, from time to time, for use in the Franchised Business. At its sole expense, Franchisee shall maintain and upgrade its computer system, including software, to meet Franchisor's requirements from time to time.

      7.5 ***Franchise Advisory Council***. Franchisor has established a franchise advisory council of franchisees and Franchisor's representatives (the "Franchise Advisory Council.") The Franchise Advisory Council provides non-binding advice to Franchisor. Franchisor pays for expenses associated with the Franchise Advisory Council, and may modify or terminate it at any time.

      7.6 ***Minimum Sales Performance Standards***. Franchisee must achieve a revenue level of at least $5,000 per 1,000 of population in the Territory (*e.g.*, $500,000 per 100,000 of population) per annum ("**Minimum Sales Performance Standards**") within three (3) years after the Effective Date. After the third anniversary of the Effective Date, Franchisee must maintain at least the Minimum Sales Performance Standards each year throughout the Term. If Franchisee fails to meet the Minimum Sales Performance Standards by the third anniversary of the Effective Date, or fails to maintain the Minimum Sales Performance Standards for the remainder of the Term, Franchisor has the right, by giving notice to Franchisee, **to declare** that Franchisee's Territory is no longer Exclusive; that is, henceforth Franchisor shall have the right to (A) serve, or authorize others to serve, residential HVAC customers within the Territory; and/or (B) operate, or to grant a franchise to another person or business entity to operate, a Franchised Business in Franchisee's Territory. The Minimum Sales Performance Standards are not **purchase** commitments, but notice to Franchisee of the minimum sales goals that Franchisor expects Franchisee to achieve in the Territory. Franchisor may, in its sole discretion temporarily waive compliance with this **Section 7.6** based on Franchisee's business circumstances; provided, however, any delay by Franchisor in declaring Franchisee's Territory non-Exclusive does not constitute a waiver of its right to, at any time, require strict compliance with the Minimum Sales Performance Standards or its right to notify Franchisee that its Territory has become non-Exclusive. In addition, as further described in **Section 19.9** below, any such waiver regarding one failure by Franchisee to comply with the Minimum Sales Performance Standards does not constitute a waiver with respect to any other failure by Franchisee to meet its Minimum Sales Performance Standards.

7.7 *Owners of Franchisee*. **Exhibit C** to this Agreement shall at all times completely and accurately describe all the Owners of Franchisee and their beneficial ownership interests in Franchisee. Franchisee and its Owners shall sign and deliver to Franchisor the revised **Exhibit C** as may be necessary to reflect any permitted changes in the information contained therein within five (5) days following the occurrence thereof and to furnish other information about Franchisee's organization or formation as Franchisor may request.

### Article 8.  Fees

8.1 *Initial Fees*. Franchisee shall pay Franchisor the initial fees stated on **Exhibit A** to this Agreement (the "**Initial Fees**"), which amount Franchisee acknowledges is fully earned by Franchisor and is not refundable.

8.2 *Continuing Franchise Fee*. Commencing on the first of the month following ninety (90) days after the Effective Date as stated on **Exhibit A**, Franchisee shall pay Franchisor a semi-monthly continuing franchise fee (the "**Continuing Franchise Fee**") of five percent (5%) of Net Sales (as defined in **Section 8.5**).

8.3 *Payment of Continuing Franchise Fee.* Franchisee shall calculate and pay the Continuing Franchise Fee twice a month: (A) the first payment is due by the 25th day of each month for Net Sales from sales from the 1st day through the 15th day of the month, and (B) the second payment is due by the 10th day of the next month for Net Sales from sales from the 16th day through the last day of the immediately preceding month. The minimum Continuing Franchise Fee is $1,500 per month.

8.4 *Marketing Fund Payments*. While Franchisor has a Marketing Fund in effect under **Section 10.4**, Franchisee shall pay Franchisor a semi-monthly Marketing Fund Contribution in the amount designated by Franchisor, but not to exceed four percent (4%) of Net Sales for the preceding period ("**Marketing Fund Contribution**"). Payments of the Marketing Fund Contribution shall commence at the later of the date that Franchisor implements a Marketing Fund or ninety (90) days after the Effective Date. The Marketing Fund Contribution shall be calculated and paid twice a month: (A) the first payment is due by the 25th day of each month for Net Sales from sales from the 1st day through the 15th day of the month; and (B) the second payment is due by the 10th day of the next month for Net Sales from sales from the 16th day through the last day of the immediately preceding month.

8.5 *Net Sales*. "**Net Sales**" is defined as: (A) all sales and revenue (and all other income of every kind and nature) related to, derived from, or originating from the Franchised Business) (whether within or outside the Territory), including proceeds of any business interruption insurance policies; (B) all sales and revenues from the sale of commercial HVAC products and services by Franchisee (whether or not authorized by **Section 14.1** of this Agreement); and (C) all sales and revenues deemed to be Net Sales as provided in **Section 9.1**, less (i) the amount of sales tax or similar receipts which, by law, are chargeable to customers, if such taxes are separately stated when the customer is charged and if such taxes are paid to the appropriate taxing authority; (ii) any *bona fide* refunds, rebates or discounts granted to customers in the ordinary course of business; (iii) any *bona fide* and reasonable payments made in the ordinary course of business to unaffiliated subcontractors who perform services unrelated to

14

Franchisee's core business and at Franchisee's customer's premises; and (iv) any reasonable and customary job service permit fees paid to governmental entities if such permit fees are properly documented and if such permit fees are paid to the appropriate governmental entity. Franchisee acknowledges and agrees that "Net Sales" under **Section 8.5(A)** include, but are not limited to, all sales and revenues related to Franchisee's sale and delivery of any products and services of any kind or nature whatsoever (whether or not such products or services are approved by Franchisor) that were procured or delivered in any manner using any portion of the Franchised Business, including the Licensed Marks (such as trucks, vehicles, invoices, and uniforms bearing the Licensed marks), the System, Confidential Information, any of the employees of the Franchised Business, or the telephone number of the Franchised Business.

8.6   *Past Due Service Charge*.   If any amount owed by Franchisee to Franchisor under this Agreement is past due, Franchisor has the right to assess and collect a past due service charge (including, without limitation, as a late fee) equal to the lesser of one and a half percent (1.5%) per month or the maximum permissible rate on any past due amounts.

8.7   *Service Deficiency Reimbursements*.   If a customer of Franchisee complains to Franchisor that Franchisee's services were deficient and Franchisor determines after discussion with Franchisee that there is merit to the customer's complaint, Franchisor reserves the right to perform or cause to be performed these services to the customer's reasonable satisfaction or to reimburse the customer for any money the customer may have paid for these services upon written notice to Franchisee if Franchisee does not do so itself. In such event, Franchisee shall promptly reimburse Franchisor for any costs incurred by Franchisor to perform or have performed these services or for the payment made by Franchisor to the customer upon receipt of an invoice from Franchisor.

8.8   *Payments*.   Franchisee shall make all payments to Franchisor by electronic funds transfer to an account designated by Franchisor, or by the other methods that Franchisor may designate from time to time. Franchisee shall be required to complete an Automatic Clearing House (ACH) agreement, in a form prescribed by Franchisor, authorizing automatic withdrawals.

### Article 9. Records, Reports, Inspections and Inquiries

9.1   *Records*.   During the Term, Franchisee shall maintain and preserve full, complete and accurate books, records and accounts relating to the conduct and operation of the Franchised Business. The books, records, and accounts shall be kept at the Approved Location unless otherwise permitted under **Section 5.1**. Franchisee shall establish and maintain, at its own expense, a bookkeeping, accounting and record keeping system in accordance with generally accepted accounting principles ("**GAAP**") consistently applied and conforming to the requirements that Franchisor may prescribe from time to time. If Franchisee operates any business other than the Franchised Business, Franchisee shall keep books, records and accounts of such other business (the "**Other Business Records**") separate and distinct from the books, records and accounts of the Franchised Business (the "**Franchised Business Records**"), failing which the revenues received by Franchisee from such other business shall be deemed for all purposes, including the calculation and payment of Continuing Franchise Fees, to be revenues attributable to the Franchised Business. Franchisor has the right to access and obtain any

information required to be delivered to it by Franchisee for the Franchised Business under the terms of this Agreement directly from the computer and other systems used by Franchisee, and if Franchisor cannot or does not do so, Franchisee shall transmit to Franchisor all information requested by Franchisor in the manner and at the time Franchisor specifies.

9.2 *Access to Data*. Franchisor will use the SuccessWare®21 (ASP Option) software program (or other software program specified by Franchisor) to gather information on the entire One Hour AIR CONDITIONING & HEATING and One Hour HEATING & AIR CONDITIONING franchise system and its customers, or may in the absence of such software access require Franchisee to deliver such information to Franchisor. Franchisee acknowledges that Franchisor may gather and use (and authorize others to gather and use) such information to, among other uses: (A) monitor progress by its franchisees; (B) prepare a financial performance representation for Franchisor's Franchise Disclosure Document; and (C) provide services to former customers serviced by the Franchised Business (including, without limitation, Existing Customers) after the expiration or termination of this Agreement for any reason. Franchisee hereby grants Franchisor and any other party Franchisor may authorize access to the information in Franchisee's SuccessWare®21 (ASP Option) software program database, or other software program specified by Franchisor, including its financial reports, to be used by Franchisor for those purposes and other purposes permitted by this Agreement.

9.3 *Reports*. Franchisee shall give Franchisor, in the form prescribed by Franchisor from time to time: (A) its then-current lists of customers serviced by the Franchised Business; (B) concurrently with each payment of the Continuing Franchise Fee, a report of Net Sales for the preceding period; (C) by the third business day following the end of each month-end, a Profit and Loss Statement for the immediately preceding month along with a completed balance sheet as of the last day of that same month; (D) upon Franchisor's request, the other data, inventory reports, information and supporting records for these periods as Franchisor may require; and (E) within 120 days after the end of Franchisee's fiscal year, a Profit and Loss Statement, a fiscal year-end balance sheet, and statement of cash flows for the Franchised Business for the fiscal year, reflecting all year-end adjustments. Franchisee also shall maintain and furnish, upon Franchisor's request, complete copies of all federal, state and local income tax returns and any amendments that Franchisee files with the Internal Revenue Service and state tax departments reflecting sales and income of the Franchised Business. These records shall be maintained at the Approved Location except as otherwise permitted under **Section 5.1**. Franchisee's chief financial officer (if Franchisee is a business entity) or Franchisee's principal Owner shall certify all reports that Franchisee provides to Franchisor. If Franchisee fails to send Franchisor the Net Sales reports along with the month-end Profit and Loss Statement described above when due, Franchisor may estimate Franchisee's Net Sales for the prior month based on Franchisee's previous Net Sales plus fifteen (15%). Franchisee authorizes Franchisor to withdraw Continuing Franchise Fee payments as described in **Section 8.8** above based on such estimate of Net Sales.

9.4 *Inspection and Audits*. Franchisor, or its authorized agents and representatives, has the right during business hours, but without prior notice to Franchisee, to inspect the following operations and material to ascertain that Franchisee is operating the Franchised Business in accordance with the System and the terms of this Agreement: (A) all aspects of the operation of the Franchised Business at the Approved Location; (B) all Franchised

Business Records; (C) Other Business Records (if any); and (D) all accounting and other records, books of account, tax returns and other documents and materials in the possession of or under the control of Franchisee relating to the Franchised Business, Franchisee, and/or the subject matter and terms of this Agreement, including, without limitation, all records of Franchisee required to be maintained under applicable law.  If any of the materials described in this **Section 9.4** are kept at another location under **Section 5.1**, Franchisee shall permit Franchisor to inspect these materials at such other location.  Franchisor and its authorized agents and representatives shall be allowed to make extracts from or copies of all the materials described in this **Section 9.4**.  In the event that Franchisor's inspection reveals a discrepancy which has resulted in the underpayment of any fee, including the Marketing Fund Contribution, Franchisee shall promptly pay the underpayment, and if the underpayment of any fee shows a discrepancy of more than three percent (3%) as compared to Franchisee's reported Net Sales for any period audited, Franchisee shall promptly pay the underpayment and reimburse Franchisor upon receipt of an invoice for all expenses associated with the inspection.

      9.5  *Inquiry by Franchisor*.  Franchisee, by its execution of this Agreement, authorizes Franchisor and its agents and representatives to make credit and background checks, including, without limitation, reasonable inquiries of Franchisee's bankers, suppliers and other trade creditors regarding their dealings with Franchisee in relation to the Franchised Business and the subject matter and terms of this Agreement, to discuss the affairs, finances and accounts of the Franchised Business and the subject matter and terms of this Agreement; and Franchisee, by its execution of this Agreement, authorizes and directs these bankers, suppliers and trade creditors to discuss with Franchisor and its authorized agents and representatives the affairs, finances and accounts of the Franchised Business and to obtain information and copies of invoices relating to sales or other dealings between all these parties and Franchisee in any way relating to the Franchised Business and the subject matter and terms of this Agreement.  If requested, Franchisee agrees to sign and deliver these directions and other documents as Franchisor may require to authorize the bankers, suppliers and trade creditors to release or disclose such information and documents to Franchisor.

### Article 10.    Advertising/Marketing Fund

      10.1 *Advertising and Marketing*.  Franchisee agrees that all advertising and marketing by Franchisee with respect to the Franchised Business in any medium shall be conducted in a dignified manner and shall conform to the System and System Standards. Franchisee agrees to use only the current Licensed Marks in its advertising and marketing, except to the extent Franchisor authorizes Franchisee to gradually phase out use of the Prior Marks during the conversion term described in **Section 7.2(B)**.  Franchisor reserves the right, upon notice to Franchisee, to require that all advertising that Franchisee proposes to use be approved by Franchisor before Franchisee's use of the materials.  Franchisor may disapprove any advertising or marketing materials used or proposed to be used by Franchisee, without liability to Franchisee for any costs incurred by Franchisee in connection with the same.

      10.2 *Yellow Pages or Comparable Telephone Directory Listing*.  Franchisee shall list the Franchised Business in the Yellow Pages or comparable telephone directory for the Territory as soon as possible after signing this Agreement; provided, however, Franchisee shall not market the Franchised Business in any Yellow Pages (or any similar telephone directory), if

                                                     

the purpose, intent or effect of such marketing is to reach customers who reside outside the Territory. If Franchisee operates the Franchised Business in a marketing area that is shared by Franchisor's other franchisees, Franchisee and all the other franchisees shall use a common toll-free telephone number in their advertising or marketing materials.

10.3 *Local Marketing*. Franchisor recommends that Franchisee spend annually at least eight percent (8%) to twelve percent (12%) of Net Sales on local marketing. Franchisee may reduce this recommended amount by the amount of any Marketing Fund Contribution that Franchisee pays under **Sections 8.4** and **10.4**. Franchisee's Yellow Pages or comparable telephone directory expenses as required by **Section 10.2** will be counted towards the recommended local marketing expenditure.

10.4 *Establishment of Marketing Fund*. Franchisor may establish, maintain and administer a national and one or more regional marketing funds (each a "**Marketing Fund**") by giving Franchisee not less than thirty (30) days' notice of the effective date of the Marketing Fund and the amount of the Marketing Fund Contribution. Franchisor may modify the amount of the Marketing Fund Contribution on not less than thirty (30) days' notice to Franchisee. While a Marketing Fund is in existence, Franchisee shall pay the Marketing Fund Contribution required by **Section 8.4**, and Franchisor will direct all marketing programs financed by the Marketing Fund and have sole discretion over the creative concepts, materials and endorsements used and the geographic, market and media placement and allocation of the marketing programs. Among other things, Franchisor may use the Marketing Fund to pay the costs of preparing and producing video, audio and written advertising materials; administering local, regional, multi-regional and national advertising programs including, without limitation, purchasing direct mail and other media advertising; employing advertising, public relations and media buying agencies to assist in these activities; supporting public relations, market research and other advertising and marketing activities; and constructing and maintaining a website used to promote the Franchisor marketing programs. Franchisor may elect to use the Marketing Fund to provide Franchisee with marketing, advertising and promotional formats and sample materials without additional charge, or to provide Franchisee with multiple copies of marketing, advertising and promotional materials at a reasonable price.

10.5 *Use of Marketing Fund Contributions*. The Marketing Fund is not a trust. However, Franchisor will account for the Marketing Fund Contributions separately from Franchisor's other funds and will not use the Marketing Fund Contributions to defray any of Franchisor's general operating expenses, except for costs, salaries, travel expenses, administrative costs, overhead and other similar expenses that Franchisor may incur in activities reasonably related to the administration of the Marketing Fund and its marketing programs (including, without limitation, conducting market research, preparing advertising and marketing materials, general production costs and collecting and accounting for contributions to the Marketing Fund). Franchisor may spend in any fiscal year an amount greater or less than the total contributions of all Franchised Businesses to the Marketing Fund in such year and Franchisor may cause the Marketing Fund to invest any surplus for future use by the Marketing Fund. Franchisee authorizes Franchisor to collect for remittance to the Marketing Fund any advertising or promotional monies or credits offered by any supplier to the Marketing Fund based upon Franchisee's purchases. All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs of the Marketing Fund before other assets of the

Marketing Fund are expended. Franchisor will prepare an annual statement of monies collected and costs incurred by the Marketing Fund and will furnish it to Franchisee upon Franchisee's written request. Franchisor will have no obligation to have the Marketing Fund audited.

10.6 ***Benefit of Marketing Fund***.  Franchisee agrees that the Marketing Fund, while in effect, will be intended to maximize recognition of the Licensed Marks and patronage of all applicable Franchised Businesses in the United States. Although Franchisor will endeavor to utilize the Marketing Fund to develop advertising and marketing materials and programs, and to place advertising that will benefit all applicable Franchised Businesses in the United States, Franchisor undertakes no obligation to ensure that expenditures by the Marketing Fund in or affecting any geographic area will be proportionate or equivalent to the contributions to the Marketing Fund by franchisees operating in that geographic area or that any Franchised Businesses will benefit directly or in proportion to its contribution to the Marketing Fund from the development of advertising and marketing materials or the placement of advertising. Although Franchisor intends the Marketing Fund to be of unlimited duration, Franchisor shall have the right to terminate and, if terminated, to reinstate, the Marketing Fund at any time after all money in the Marketing Fund has been expended.

10.7 ***Franchisor Obligations***.  Except as expressly provided in this **Article 10**, Franchisor assumes no direct or indirect liability or obligation to Franchisee with respect to the maintenance, direction or administration of the Marketing Fund.

10.8 ***No Representation and Warranty***.  Franchisor makes no representation and warranty that any marketing, advertising or promotional materials or programs that it provides to Franchisee, or that is prepared by Franchisee and approved by Franchisor, comply with federal, state or local laws, rules, and regulations, or the terms and conditions of any agreements or orders to which Franchisee may be subject. Franchisee shall be solely responsible for the use of all such materials and programs, and Franchisor assumes no direct or indirect liability or obligation to Franchisee with respect to the use of any such materials and programs by Franchisee. Franchisee shall, at its own expense and risk, obtain all governmental approvals of all such materials and programs and defend any claim that such materials and programs are not in compliance with law, and Franchisee shall indemnify Franchisor (as provided pursuant to **Section 17.4(D)**) in connection with Franchisee's use of any marketing, advertising or promotional materials or programs in Franchisee's operation of the Franchised Business.

10.9 ***Franchisor's Website***.   Franchisor has established a website (the "**Franchisor Website**") that is designed to assist Franchisee with respect to the promotion and operation of the Franchised Business.  Franchisee shall use the Franchisor Website, and may also use a domain name associated with its Prior Business (a "**Retained Domain**"), subject to the following terms:

        A.    As soon as commercially reasonable after the Effective Date, but no later than thirty (30) days after the Effective Date, Franchisee shall modify any website to which a user is directed by the Retained Domain so that such website displays only the Licensed Marks, and no marks or trade dres of the Prior Business or any other business, consistent with the requirements of Section 11.7. Franchisee may transfer domain names of any Prior Business to Franchisor, and if

Franchisee does so, Franchisor will take responsibility for ensuring such domains are properly linked and/or redirected. Franchisee shall not receive any compensation for such transfer. Franchisee shall use the Franchisor Website and any website associated with the Franchised Business or the Retained Domain (a "**Licensed Site**") solely to promote and operate the Franchised Business and shall not use the Licensed Site in any way that is unlawful or harms Franchisor, its affiliates or franchisees or any customer of Franchisor its affiliates or franchisees, as determined in Franchisor's sole discretion.  Franchisee shall not use the Licensed Site in any manner that breaches the terms of this Franchise Agreement, or any code of conduct, policy, the Operations Manual or other notice that is applicable to Franchisor's franchisees.  Without limiting the generality of the foregoing, Franchisee shall not use the Licensed Site in any manner that could damage, disable, overburden or impair the Franchisor Website or interfere with any other party's use and enjoyment of the Franchisor Website.

B.      Without limiting the generality of the foregoing, Franchisee shall not use the Licensed Site to transmit, either directly or indirectly, any unsolicited bulk e-mail or unsolicited commercial e-mail.  Franchisee understands and accepts that Franchisor may use filtering technology or other measures in its efforts to stop unsolicited commercial e-mail, and that if Franchisee's use of the Franchisor Website includes e-mail related services, then the filtering technology or other measures may block, either temporarily or permanently, some e-mail sent to Franchisee through the Franchisor Website.

C.      For materials that Franchisee posts or otherwise provides to Franchisor related to the Franchisor Website, Franchisee hereby permits Franchisor to (i) use, copy, distribute, transmit, publicly display, publicly perform, reproduce, edit, modify, translate and reformat such materials, each in connection with the Franchisor Website, and (ii) sublicense such material to the maximum extent permitted by applicable law.  Franchisor will not pay Franchisee for such materials, and Franchisor may remove such materials at any time.  For each of the materials that Franchisee provides to Franchisor, Franchisee represents that it has all rights necessary for Franchisor to make the grants made in this sub-**Section C**.  If permitted by applicable law, Franchisor may monitor Franchisee's e-mail, or other electronic communications and may disclose such information in the event Franchisor has a good faith reason to believe it is necessary for the purposes of ensuring Franchisee's compliance with this Agreement, and protecting the rights, property and interests of Franchisor, its affiliates and franchisees and any customer of Franchisor, its affiliates and franchisees.

D.      Franchisor does not warrant or guarantee the accuracy or timeliness of any information that is available from the Franchisor Website. FRANCHISOR PROVIDES THE FRANCHISOR WEBSITE "AS IS," "WITH ALL FAULTS" AND "AS AVAILABLE," AND THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND EFFORT IS WITH FRANCHISEE.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FRANCHISOR MAKES NO REPRESENTATIONS,

WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED. FRANCHISOR DISCLAIMS ANY AND ALL WARRANTIES OR CONDITIONS, EXPRESS, STATUTORY OR IMPLIED, INCLUDING, WITHOUT LIMITATION, (I) WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, WORKMANLIKE EFFORT, ACCURACY, TITLE QUIET ENJOYMENT, NO ENCUMBRANCES OR LIENS AND NON-INFRINGEMENT, (II) WARRANTIES OR CONDITIONS ARISING THROUGH COURSE OF DEALING OR USAGE OF TRADE, OR (III) WARRANTIES OR CONDITIONS THAT ACCESS TO OR USE OF THE FRANCHISOR WEBSITE SHALL BE UNINTERRUPTED OR ERROR-FREE. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE FACE OF THIS FRANCHISE AGREEMENT.

E.    WITHOUT LIMITING THE GENERALITY OF SECTION 18.7, IN NO EVENT SHALL FRANCHISOR BE LIABLE FOR ANY DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES ARISING OUT OF, BASED ON, OR RESULTING FROM FRANCHISEE'S USE OF THE FRANCHISOR WEBSITE, EVEN IF FRANCHISOR HAS BEEN ADVISED OF THE POSSIBILITY OF THESE DAMAGES.    THE EXCLUSION OF DAMAGES UNDER THIS SUB-SECTION E IS INDEPENDENT OF FRANCHISEE'S EXCLUSIVE REMEDY AND SURVIVES IN THE EVENT THE REMEDY FAILS OF ITS ESSENTIAL PURPOSE OR IS OTHERWISE DEEMED UNENFORCEABLE. THESE LIMITATIONS AND EXCLUSIONS APPLY WITHOUT REGARD TO WHETHER THE DAMAGES ARISE FROM (I) BREACH OF CONTRACT, (II) BREACH OF WARRANTY, (III) NEGLIGENCE, OR (IV) ANY OTHER CAUSE OF ACTION, IF THE EXCLUSION AND LIMITATIONS ARE NOT PROHIBITED BY APPLICABLE LAW. IF FRANCHISEE IS DISSATISFIED WITH THE FRANCHISOR WEBSITE, DOES NOT AGREE WITH ANY PART OF THIS SECTION 10.9, OR HAS ANY OTHER DISPUTE OR CLAIM WITH OR AGAINST FRANCHISOR WITH RESPECT TO THE FRANCHISOR WEBSITE, FRANCHISEE'S SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE FRANCHISOR WEBSITE.

F.    Franchisor may change the Franchisor Website or delete features in any way, at any time and for any reason. As Franchisee uses the Franchisor Website, Franchisee may receive, access or use information, materials, graphics, software, data and content originated by Franchisor or other parties. WITHOUT LIMITING THE GENERALITY OF SUB-SECTIONS D AND E, FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR IS NOT RESPONSIBLE OR LIABLE FOR (I) ANY CONTENT, INCLUDING, WITHOUT LIMITATION, ANY INFRINGING, INACCURATE, OBSCENE, INDECENT, THREATENING, OFFENSIVE DEFAMATORY, TORTIOUS, OR ILLEGAL CONTENT, OR (II) ANY THIRD PARTY CONDUCT, TRANSMISSIONS OR DATA. IN ADDITION, WITHOUT LIMITING THE GENERALITY OF SUB-SECTIONS D AND E, FRANCHISEE

21

ACKNOWLEDGES AND AGREES THAT FRANCHISOR IS NOT RESPONSIBLE OR LIABLE FOR (I) ANY VIRUSES OR OTHER DISABLING FEATURES THAT AFFECT ACCESS TO OR USE OF THE FRANCHISOR WEBSITE, (II) ANY INCOMPATIBILITY BETWEEN THE FRANCHISOR WEBSITE AND OTHER WEBSITES, SERVICES, SOFTWARE AND HARDWARE, (III) ANY DELAYS OR FAILURES FRANCHISEE MAY EXPERIENCE IN INITIATING, CONDUCTING OR COMPLETING ANY TRANSMISSION OR TRANSACTIONS IN CONNECTION WITH THE FRANCHISOR WEBSITE IN AN ACCURATE OR TIMELY MANNER, OR (IV) ANY DAMAGES OR COSTS OF ANY TYPE ARISING OUT OF OR IN ANY WAY CONNECTED WITH FRANCHISEE'S USE OF ANY SERVICES AVAILABLE FROM THIRD PARTIES THROUGH LINKS CONTAINED ON THE FRANCHISOR WEBSITE. THE LIMITATIONS, EXCLUSIONS AND DISCLAIMERS IN SUB-SECTIONS D, E AND F APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND ARE NOT INTENDED TO DEPRIVE FRANCHISEE OF ANY MANDATORY PROTECTIONS PROVIDED TO FRANCHISEE UNDER APPLICABLE LAW.

G.      Franchisor may terminate or suspend Franchisee's access to the Franchisor Website at any time, with or without cause, with or without notice. Upon a termination or suspension, Franchisee's right to use the Franchisor Website shall immediately cease and any information Franchisee may have stored on the Franchisor Website may be permanently deleted.

## Article 11.   Licensed Marks

11.1 *Use of Licensed Marks*.  Franchisee shall have the non-exclusive right and license for the Term to use the Licensed Marks solely for purposes of operating the Franchised Business under the System in compliance with this Agreement.  Franchisee may use the Licensed Marks only in the manner and format specified in the Operations Manual or otherwise with the prior written consent of Franchisor.  Franchisor reserves the right to specify the use of the Licensed Marks and to pre-approve in writing any non-specified use of the Licensed Marks. Franchisee shall not use or permit to be used any of the Licensed Marks in connection with any other business owned or operated by Franchisee or its affiliates.  Franchisee shall not use any marks to identify the Franchised Business other than the Licensed Marks as specified by Franchisor.

11.2 *Goodwill*.  Franchisee acknowledges and agrees that Franchisee shall not acquire any proprietary rights in the Licensed Marks by virtue of the license granted to Franchisee in this Agreement or otherwise.  All goodwill established by Franchisee's use of the Licensed Marks shall inure to the sole and exclusive benefit of Franchisor.  Franchisee agrees not to contest at any time either the validity, or Franchisor's ownership, of any of the Licensed Marks.  Any unauthorized use of the Licensed Marks by Franchisee shall constitute an infringement of Franchisor's rights in and to the Licensed Marks.

11.3 *No Use in Business Name*. Except as provided in **Section 11.4**, Franchisee

22

may not use the Licensed Marks in connection with Franchisee's corporate, business organization or trade name, or in connection with any prefix, suffix or other modifying words, terms, designs or symbols or in any modified form. Franchisee may not use the Licensed Marks when selling any unauthorized product or service or in any other manner that Franchisor has not expressly authorized in writing.

11.4 *Identification*. Franchisee shall identify itself as the independent owner of the Franchised Business, give notices of trademark and service mark registrations in the manner Franchisor specifies, and make the fictitious or assumed name registrations as may be required under applicable law or as may be required by Franchisor to distinguish itself from Franchisor.

11.5 *Infringements*. Franchisee shall give notice to Franchisor immediately upon learning of any alleged infringement or a challenge to Franchisee's use of the Licensed Marks, or any claim by any third party of any rights in the Licensed Marks or any similar mark, and shall not communicate with any person other than Franchisor or Franchisor's attorneys and Franchisee's attorneys in connection with the alleged infringement, challenge or claim. Franchisor has the sole discretion to take the action, if any, it deems appropriate and the right to exclusively control any litigation, trademark office proceeding or other administrative proceeding arising out of any infringement, challenge or claim or otherwise concerning any of the Licensed Marks. Franchisee shall sign all instruments and documents, provide assistance and take any action that, in the opinion of Franchisor's attorneys, may be necessary or advisable to protect and maintain Franchisor's interests in any litigation, trademark office proceeding or other administrative proceeding or to otherwise protect and maintain Franchisor's interest in the Licensed Marks.

Franchisor will bear all legal expenses incident to Franchisee's participation, at Franchisor's request, in any action to prevent the infringement or illegal use of the Licensed Marks, except for the cost of any legal counsel separately retained by Franchisee. Except as expressly provided in this Section, Franchisor shall not be liable to Franchisee for any damages, costs, expenses, loss of profits or business opportunities, or indirect, incidental or consequential damages of any kind or nature whatsoever relating to any action involving the Licensed Marks.

11.6 *Modification or Discontinuance*. Franchisor has the right to modify or discontinue its or Franchisee's use of the Licensed Marks or the specifications for use of the Licensed Marks, or to require Franchisee to commence use of new or substitute Licensed Marks. Franchisee agrees that Franchisor may change the mark under which Franchisee operates the Franchised Business to another mark, and, if such change is made, within the time specified by Franchisor, Franchisee shall cease using the old mark and use the new Licensed Mark as directed by Franchisor at Franchisee's expense. If such change is made, reference in this Agreement to the Licensed Marks shall be deemed to refer to such new mark.

11.7 *Electronic Commerce*. Franchisee shall comply with the requirements stated in the Operations Manual regarding its use of the Licensed Marks in electronic commerce, which includes all forms of electronic or computer communication, including the Franchisor Website, as well as any social media format. Franchisor may require that various types of marketing or advertising utilize a specific template or format. Franchisee shall give Franchisor copies of all proposed applications for registrations of any of the Licensed Marks or any

variation thereof for use in and for electronic commerce. Franchisee shall obtain Franchisor's prior written approval before filing any application, which approval Franchisor may withhold in its sole discretion. Franchisee may not use the Licensed Marks, any portion thereof, or any words confusingly similar to the Licensed Marks in any e-mail address, domain name, or other identification of Franchisee or the Franchised Business in any electronic medium, unless agreed to in advance, in writing, by Franchisor.

### Article 12.    Rights to the System

12.1 ***Ownership of System***.    Franchisee shall not contest Franchisor's unrestricted and exclusive ownership of the System or Franchisor's right to grant licenses to use the System. All Improvements and additions to or associated with the System, whenever and by whomever made, and all service mark and trademark registrations and goodwill at any time associated with the System, including the Licensed Marks, are the property of Franchisor. Franchisee acknowledges that it does not have any right to license others to use any part of the System, and that all materials relating to the System shall at all times remain the sole property of Franchisor. Upon expiration or termination of this Agreement, no monetary amount will be assigned or attributed to any goodwill associated with Franchisee's use of the System.

12.2 ***Disputes Concerning System***.    Franchisor has the sole right to handle and resolve litigation and other disputes with third parties (including imitators and infringers) concerning the use of all or any part of the System. Franchisor will not have any obligation to initiate suit against imitators or infringers, and may settle any dispute by grant of a license or otherwise. Franchisee shall, at its reasonable expense, extend its full cooperation to Franchisor in all such matters.

12.3 ***System and Business Improvements***.    During the Term, any addition, modification, adaptation, improvement, refinement, discovery, invention or innovation of the System or any Licensed Mark (collectively, an "**Improvement**") made by Franchisee, or its Owners, managers, or employees while employed by or owning the Franchised Business, shall be the sole and exclusive property of Franchisor, regardless of Franchisee's, its Owners' or employees' participation or sole participation in its development, and will be deemed assigned to Franchisor. Upon Franchisor's request, Franchisee and its Owners shall, and shall cause their managers and employees to, sign any instruments and documents that Franchisor requests which assist Franchisor to perfect or protect all intellectual property rights in such Improvement. Franchisee, its Owners and employees shall not be entitled to any compensation for the use or licensing of any Improvement. All of the Improvements and any related information remain Franchisor's sole property.

12.4 ***Complaints***.    Franchisee shall immediately provide Franchisor with copies of any complaints relating to the operation or activities of the Franchised Business that Franchisee receives from any of its customers, any Better Business Bureau or any federal, state or local regulatory or governmental agency.

### Article 13.    Operations Manual and Confidentiality

13.1 ***Operations Manual***.    Franchisor will entrust to Franchisee a copy of the

Operations Manual and Franchisee shall comply with all provisions of the Operations Manual. Franchisor may make the Operations Manual available solely through a secure Internet link from time to time during the Term. Franchisor may communicate to Franchisee mandatory and suggested standards, methods, procedures and specifications applicable to the System and System Standards and information relative to other obligations of Franchisee under this Agreement and to the operation of the Franchised Business. Franchisor may make such communications through the Operations Manual, System Standards or written or electronic media. For the purposes of this Agreement, the Operations Manual and all Franchisor communications are collectively referred to as the "**Operations Manual**." The Operations Manual at all times shall remain the exclusive property of Franchisor, and Franchisee shall return the Operations Manual (and all copies thereof which Franchisee has made) to Franchisor promptly upon request by Franchisor and, in any event, upon termination of expiration of this Agreement for any reason whatsoever. Franchisee shall not at any time copy, duplicate, record or otherwise reproduce or transcribe the Operations Manual or any of the forms supplied by Franchisor hereunder without Franchisor's prior written consent. If the Operations Manual is supplied electronically, Franchisee may print one copy solely to use in its operation of the Franchised Business. Franchisor reserves the right from time to time revise the Operations Manual, and Franchisee expressly agrees to make corresponding revisions to its copy of the Operations Manual and to comply with each new or changed standard immediately upon receipt of such revision. In the event of any discrepancy between the Operations Manual held by Franchisee and the Operations Manual maintained by Franchisor, Franchisee agrees that the terms of the Operations Manual maintained by Franchisor shall control.

13.2 *Confidential Information*. Franchisee acknowledges that certain information relating to the operation of the Franchised Business including, without limitation, the standards, methods, procedures and specifications of the System, including System Standards and the contents of the Operations Manual, is derived from information that Franchisor has disclosed to Franchisee and that all such information is of a proprietary and confidential nature and a trade secret of Franchisor (the "**Confidential Information**"). Franchisee and each of its Owners, officers, directors, members, partners, managers and employees shall maintain the absolute confidentiality of all the Confidential Information both during the Term and after the termination or expiration of this Agreement and shall use the Confidential Information only if necessary to operate the Franchised Business, and shall not disclose the Confidential Information for any reason whatsoever, except as hereinafter provided. Franchisee may disclose the Confidential Information to its Owners, officers, directors, members, partners, manager and employees only if necessary to operate the Franchised Business and only in accordance with this Agreement. Franchisee shall cause those persons receiving the Confidential Information to sign a Confidentiality Agreement. Franchisee shall not use the Confidential Information, directly or indirectly, in any other business or in any other manner or obtain any benefit therefrom not specifically approved in writing by Franchisor during or after the Term of this Agreement.

13.3 *Use of Confidential Information*. Franchisee shall not acquire any interest in the Confidential Information other than the right to use the Confidential Information in connection with its ownership and operation of the Franchised Business during the Term, and Franchisee acknowledges that its use or duplication of the Confidential Information in any other business or capacity shall constitute an unfair method of competition with Franchisor, its affiliates and Franchisor's other franchisees.

Franchisee acknowledges that Franchisor is disclosing the Confidential Information to Franchisee solely on the condition that Franchisee agrees, and Franchisee hereby agrees, that the Confidential Information received from Franchisor: (A) shall only be used by Franchisee for purposes of performing its obligations under this Agreement; (B) shall not be used by Franchisee in any other business, manner or capacity; (C) shall have its absolute confidentiality maintained by Franchisee both during and after the Term; (D) shall not be copied by Franchisee without Franchisor's written authorization; and (E) shall not be disclosed by Franchisee to any third party without the prior written consent of Franchisor. Franchisee must use reasonable care to prevent the disclosure of the Confidential Information to any third party, and further must limit the dissemination of the Confidential Information within its own organization to individuals whose duties justify the need to know the Confidential Information, and then only provided that there is a clear understanding by such individuals of their obligation to maintain the confidential status of the Confidential Information and to restrict its use solely to the purposes specified herein. Franchisee shall cause each person receiving the Confidential Information to sign the form of confidentiality agreement provided by Franchisor.

Franchisee acknowledges that no other right or license to use the Confidential Information is granted by this Agreement, and agrees that the amount of the Confidential Information to be disclosed to Franchisee is completely within the discretion of Franchisor.

Franchisee further acknowledges and agrees that the identity, background and/or work capabilities of Franchisor's employees constitutes, by way of example and not limitation, the Confidential Information and, accordingly, that Franchisee shall not directly or indirectly solicit, retain or hire for employment or for any other type of working relationship any employee of Franchisor or any of its affiliates without the prior express written consent of the Franchisor.

### Article 14.    Non-Competition

14.1 *Non-Competition During the Term*. Commencing on the Effective Date and for balance of the Term, Franchisee (and its Owners if Franchisee is a business entity) shall not, directly or indirectly, own or be involved with a Competitive Business. A "**Competitive Business**" means a business that offers residential air conditioning and heating products and services competitive with or similar to those offered by Franchisor, its affiliates, its franchisees or its licensees or its affiliates' franchisees, licensee and members (including, but not limited to, the members of the Clockwork affinity groups), without regard to geographic location. For purposes of this **Article 14**, "Competitive Business" does not include the continued, temporary operation of a Prior Business during a reasonable conversion time period after the Effective Date. Franchisee agrees to terminate any day-to-day operations of a Prior Business within the six (6) month anniversary of the Effective Date. Franchisee (and its Owners if Franchisee is a business entity) may own and/or operate other commercial air conditioning and heating services businesses so long as such other commercial air conditioning and heating services businesses: (A) do not provide residential air conditioning and heating products and services and repair services in the Territory or an adjacent territory; (B) do not use any portion of the Franchised Business, including the System, Confidential Information or the Licensed Marks (such as the use of vehicles, invoices, and uniforms bearing the Licensed Marks); and (C) do not interfere with Franchisee's operation of the Franchised Business (or diminish Franchisee's ability to fully comply with Franchisee's obligations under this Agreement, including **Section 7.1(C)**, **(D) and (E)** hereof; and further provided that any such commercial air conditioning and heating services

26

business is a legal entity separate and distinct from the Franchised Business and that its books and records are maintained completely separate from the Franchised Business. To verify compliance with this **Section 14.1**, Franchisee shall make the books and records of any such authorized commercial air conditioning and heating services business available to Franchisor upon reasonable prior notice.

14.2 ***Post-Term Non-Competition***.   In the event that this Agreement is terminated for any reason other than the natural expiration of its Term, or in the event that this Agreement is subject to a transfer, then for a period of twenty-four (24) months after termination or Transfer Franchisee (and its Owners if Franchisee is a business entity) agrees that it (or they) shall not, either directly or indirectly,(a) own or be involved with a Competitive Business that is located in or serves customers within the Territory or any zip code where the Franchised Business served customers during the Term; (b) divert or attempt to divert any customer serviced by the Franchised Business during the Term (including, without limitation, Existing Customers) to a Competitive Business; (c) induce or attempt to induce any such customer(s) described herein to modify their behavior in a way that would result in a reduction of the business such customer may do with the Franchised Business or any successor business using the Franchisor's Licensed Marks; or induce or attempt to induce any customer of Franchisor or it's affiliates, including franchisees, to modify their behavior in a way that would result in a reduction of the business such customer may do with Franchisor or its affiliate.

14.3 ***Severability of Restrictive Covenants***.   Franchisee acknowledges that the invalidity or unenforceability of any portion of **Section 14.1** or **Section 14.2** shall not affect the validity or enforceability of any other portion of **Section 14.1** or **Section 14.2** or any other section of this Agreement and any invalid or unenforceable portion of **Section 14.1** or **Section 14.2** shall be deemed to be severable and subject to **Section 19.1**.

14.4 ***Amendment of Restrictive Covenants***.   Franchisee acknowledges that the provisions of this **Article 14** have been included for the sole benefit of Franchisor and that Franchisor has the right, from time to time during the Term, in its sole discretion, to waive in whole or in part or otherwise reduce the scope of any covenant written in this **Article 14** or any portion of this Agreement without Franchisee's consent effective upon Franchisor giving notice to Franchisee.

14.5 ***Acknowledgements regarding Restrictive Covenants***.   Franchisee agrees that the covenants not to compete set forth in this Agreement are fair and reasonable, and will not impose any undue hardship on Franchisee, since Franchisee has other considerable skills, experience and education which afford it the opportunity to derive income from other endeavors.

**Article 15.    Transfer**

15.1 ***Transfer by Franchisor***.   Franchisor has the right, directly or indirectly, to sell, assign, transfer or otherwise dispose of this Agreement, or any or all of its rights and obligations under this Agreement, to any individual, firm, partnership, association, bank, lending institution, corporation, limited liability company or other third party as Franchisor may in its sole discretion deem appropriate. In the event of such transfer, Franchisor shall be released from any liability under this Agreement for the obligations transferred.

27

15.2 *Transfer by Franchisee*. Franchisee acknowledges that the granting of the rights hereunder is based upon Franchisor's investigation of Franchisee's qualifications and that such rights are personal to Franchisee. Except as otherwise provided herein, Franchisee shall not sell, divide, encumber, assign, hypothecate, mortgage, sub-license, or transfer through bequest, inheritance, transfer in trust, divorce or operation of law or by any other means, or otherwise dispose of the rights granted herein or any part of this Agreement, or any rights or privileges incidental to this Agreement, or the Franchised Business or any of its interest, or Franchisee's rights or interest in this Agreement, and if Franchisee is a business entity, Franchisee's Owners shall not transfer the shares of the corporation or of the ownership or membership interests in such entity (collectively referred to as a "**Transfer**"), to any individual, firm, partnership, association, bank, lending institution, corporation, limited liability company or other third party without the prior written consent of Franchisor. Franchisor shall not unreasonably withhold its consent to such Transfer having regard to factors which may include, without limitation, the viability of the investment by the transferee based on the price for the Franchised Business payable by the transferee. Any actual, attempted or purported Transfer without Franchisor's prior written consent shall constitute a default of this Agreement and shall be null and void. Franchisor reserves the right to require any or all of the following as a condition to its consent to any Transfer:

    A.    the proposed transferee is acceptable to Franchisor based upon standards for new franchisees used by Franchisor at such time;

    B.    Franchisee is not in default in the performance or observance of any of Franchisee's obligations under this Agreement (including, without limitation, making all payments in full when due), and any other agreement between Franchisee (or its affiliates) and Franchisor (or its affiliates) relating to the Franchised Business or any other agreement between Franchisee (or its affiliates) and Franchisor (or its affiliates);

    C.    Franchisee has settled and paid, or made satisfactory arrangements to pay, all outstanding accounts with and amounts owed to Franchisor and all trade creditors of the Franchised Business;

    D.    Franchisee has delivered to Franchisor a general release, in a form satisfactory to Franchisor, of all claims Franchisee may have against Franchisor, its members, officers, directors, owners, employees, affiliates, successors and assigns;

    E.    except in the case of a Transfer under **Section 15.3** or a Transfer to Franchisor under **Section 15.4**, Franchisee has paid Franchisor's then-current transfer fee;

    F.    the proposed transferee has agreed, in writing, to complete Franchisor's initial training program and to pay Franchisor's reasonable costs of administering such program and all transportation and accommodation costs and living expenses of the transferee and its manager and key employees for such initial training program;

G.     the proposed transferee assumes all rights and the obligations of Franchisee hereunder and, if required by Franchisor, signs Franchisor's then-current form of franchise agreement (and all other agreements, instruments and documents then customarily used by Franchisor in the granting of Franchised Businesses) on the then prevailing terms, conditions and fees (but without obligation to pay initial fees) for a period equal to the then unexpired portion of the Term;

H.     Franchisee has paid Franchisor a transfer fee of $10,000.00 to reimburse Franchisor for its expenses in connection with the Transfer (provided, however, that a transfer fee will not be charged solely for mortgages or other encumbrances); and

I.     the Transfer is completed in accordance with any applicable bulk sales legislation.

It is understood and agreed that upon satisfaction of all the foregoing conditions and upon payment of all amounts that are owed by Franchisee, Franchisee will be released from any further liability under this Agreement with respect to matters or periods subsequent to the date of the Transfer; provided, however, Franchisee's obligations under **Section 14.2** shall survive the transfer of this Agreement.

15.3 *Transfer to a Corporation or Limited Liability Company*.  If Franchisee is an individual, Franchisee may, coincident with or at any time after execution of this Agreement, after obtaining the written consent of Franchisor and provided all obligations of Franchisee to Franchisor have been satisfied, transfer and assign all of Franchisee's rights and obligations hereunder to a corporation or limited liability company, provided Franchisee is and throughout the Term remains a principal executive officer of such corporation or limited liability company and the beneficial and registered owner of greater than fifty percent (50%) of the issued and outstanding voting and equity rights and interests in such corporation or limited liability company (and any rights or options convertible into such voting or equity rights or interests), and provided that Franchisee forthwith:

A.     causes the corporation and its directors and shareholders or, if a limited liability company, its owners or members, to acknowledge this Agreement and to agree in writing to be bound by the provisions of this Agreement; signs and causes the corporation and its directors and shareholders or, if a limited liability company, its owners or members, to sign any agreement as may be specified by Franchisor relating to the assumption by the corporation or limited liability company of any rights and obligations under this Agreement; and causes the corporation or limited liability company to inform Franchisor and to keep it informed as to the names and addresses of the then current directors and shareholders or members of, and those persons who have a financial interest in, the corporation or limited liability company from time to time;

B.     signs such documents in respect of the transfer and assignment as Franchisor may direct, including the attached Owner's Guaranty; and

29

C.      pays to Franchisor all of Franchisor's reasonable costs (including, without limitation, legal costs and fees) for the administration of the Transfer and the preparation, execution and filing of all documentation required by Franchisor in connection with the Transfer.

15.4 ***Death or Incapacity***.  If Franchisee dies or becomes incapacitated (or if Franchisee is a corporation, limited liability company, partnership or other entity, the death or incapacity of a principal Owner) so that Franchisee, a principal Owner, or a qualified manager appointed or employed by Franchisee, is not able to devote full time and attention to the operation of the Franchised Business, then the heirs or personal representatives of Franchisee shall Transfer the rights granted hereunder to a third party acceptable to Franchisor within a reasonable time, not to exceed six (6) months from the date of death or Incapacity.  Franchisor reserves the right to require any or all of the conditions set out in **Section 15.2** to be satisfied prior to providing its consent to such Transfer.  In the event that any of the required conditions stated in **Section 15.2** are not satisfied (except in **Section 15.2(E)**), Franchisor shall have the right in its sole discretion to terminate this Agreement by notice, in the case of death, sent to the estate of Franchisee and, in the case of Incapacity of Franchisee, to Franchisee.  For purposes of this **Section 15.4**, "**Incapacity**" means that, in the reasonable opinion of Franchisor, Franchisee or its principal Owner, by reason of physical or mental illness or disability, is unable to operate the Franchised Business in the ordinary course for a period of thirty (30) days or more in any consecutive ninety (90) day period.  In the event of Franchisee's or the principal Owner's death or Incapacity, Franchisor may elect to service Franchisee's customers itself or through the use of another franchisee if those customers cannot otherwise be adequately serviced as a result of such Incapacity or death.  Franchisor or such other franchisee shall be entitled to be paid for such services in accordance with Franchisor's or such other franchisee's then current fees for such services.

15.5 ***Right of First Refusal***.  If Franchisee or one or more of its Owners proposes to make a Transfer to any individual or entity other than a corporation, partnership or other entity wholly owned by Franchisee or its Owners, Franchisor has the right for a period of thirty (30) days after Franchisee or such Owners have submitted all information requested by Franchisor to exercise a right of first refusal and substitute itself for the proposed transferee in the transaction.  If Franchisor declines to do so and there is any change in the terms and conditions of the proposed transaction or the proposed transferee, Franchisee shall promptly notify Franchisor, and Franchisor has the further right to exercise its right of first refusal regarding the revised transaction for a period of fifteen (15) days.  If Franchisor exercises its right of first refusal, Franchisor shall have not less than ninety (90) days to close the transaction, and Franchisor has the right to substitute cash for any alternative form of consideration contemplated by the proposed transaction.  If Franchisor does not exercise its right of first refusal, Franchisee or the transferring Owners may make a Transfer on the terms and conditions of the offer considered by Franchisor if Franchisee and its Owners have complied with all of the provisions of **Section 15.2**.

### Article 16.      Termination and Expiration

16.1 ***Termination by Franchisor Without Opportunity to Cure***.  Franchisee shall be deemed to be in default under this Agreement, and Franchisor may, at its option, terminate

this Agreement and all rights granted herein, effective immediately, without giving Franchisee notice of, or the opportunity to cure, the default, if Franchisee either:

A.    (i) makes or is deemed to have made a general assignment for the benefit of creditors; (ii) if a petition is filed against Franchisee under the Bankruptcy Code and not dismissed within sixty (60) days of filing; (iii) if a petition is filed by Franchisee under the Bankruptcy Code; (iv) if Franchisee is declared or adjudicated bankrupt; (v) if a liquidator, trustee in bankruptcy, custodian, receiver, receiver and manager, moderator, or any other officer with similar powers is appointed of or for Franchisee; (vi) if Franchisee commits any act of bankruptcy or institutes proceedings to be adjudged bankrupt or insolvent or consents to the institution of such appointment or proceedings; or (vii) if Franchisee admits in writing an inability to pay debts generally as they become due;

B.    (i) has any of the products or chattels of the Franchised Business at any time seized or taken in execution or in attachment by a creditor of Franchisee; (ii) a writ of execution is issued against such products or chattels; or (iii) if Franchisee, without the prior written consent of Franchisor, gives any security interest in any of such products or chattels or sells any of such products or chattels, except in the normal course of business, and, as a consequence of these acts, in the judgment of Franchisor, the operation of the Franchised Business or any security interest which Franchisor may have in respect of this Agreement is materially impaired;

C.    willfully or fraudulently misrepresents any fact, condition or report made in any application given to Franchisor or required to be made by this Agreement;

D.    is subject in any twelve (12) month period to three (3) or more notices regarding a curable default;

E.    under reports net sales two or more times in a fiscal year;

F.    dies or becomes incapacitated and a Transfer is not consummated as described in **Section 15.4**;

G.    by its actions, or its failure to take an action that it is required to take, adversely affects the goodwill associated with Franchisor, the Licensed Marks or the Franchised Business;

H.    (or any of its affiliates) defaults under any other agreement with Franchisor (or its affiliates) and Franchisor (or its affiliates) has the right to terminate such other agreement without giving Franchisee (or its affiliate) an opportunity to cure the default;

I.    fails to pay two (2) or more times in Franchisee's fiscal year the full amount of any Continuing Franchise Fee that Franchisor's audit or inspection

31

reveals was underpaid;or

    J.    Abandons the franchised business, or by its conduct indicates an intent to do so.

16.2 ***Termination by Franchisor After Opportunity to Cure***.  Franchisee shall be deemed to be in default of this Agreement, and Franchisor, at its option, may terminate this Agreement and all rights granted herein effective as of the time noted, if Franchisee:

    A.    fails to pay when due any monies owed to Franchisor or any affiliate of Franchisor, including, without limitation, the Initial Fees, any Continuing Franchise Fees or any Marketing Fund Contributions, or fails to pay any monies owed Franchisor under **Section 8.6** and such default is not cured within ten (10) days after receiving notice thereof from Franchisor;

    B.    is in default in paying any monies owed to any Supplier under the normal payment terms and conditions of such Supplier and fails to cure such default and satisfy Franchisor that such default has been cured within thirty (30) days after receiving notice from Franchisor to cure the same;

    C.    fails to service satisfactorily all of Franchisee's customer accounts to the satisfaction of Franchisor and in accordance with the System and System Standards and fails to cure such default and satisfy Franchisor that such default has been cured within thirty (30) days after receiving notice from Franchisor to cure the same;

    D.    is in default of any of Franchisee's other obligations contained in this Agreement or in any other agreement or instrument entered into or made between Franchisee (or its affiliates) and Franchisor (or its affiliates) relating to the Franchised Business including, without limitation, any promissory note or security agreement, and fails to cure such default and satisfy Franchisor that such default has been cured within thirty (30) days after receiving notice from Franchisor to cure the same;

    E.    has received from Franchisor during any consecutive twelve (12) month period three (3) or more notices relating to a default under this **Section 16.2** (whether such notices relate to the same or different defaults and whether or not such defaults have been cured by Franchisee), such termination to be effective immediately upon the giving of notice by Franchisor;

    F.    (or any of its affiliates) is in default under any other franchise agreement or other agreement with Franchisor (or its affiliates) and, has not cured such default within the applicable cure period; or

G. fails to pay two (2) or more times in Franchisee's fiscal year the full amount of any Continuing Franchise Fee that Franchisor's audit or inspection reveals was underpaid.

32

Multistate

16.3 **Other Relief.** Any termination under **Sections 16.1** and **16.2** shall be without prejudice to any other rights (including any right of indemnity), remedy or relief vested in or to which Franchisor may otherwise be entitled against Franchisee. Franchisor shall have the right to retain all moneys paid to it by Franchisee under this Agreement or otherwise as consideration for the rights and benefits previously conferred on Franchisee hereunder. The foregoing remedy shall not exclude any of the remedies which Franchisor may have at law or in equity by reason of the default, breach or non-observance by Franchisee of any provision of this Agreement.

16.4 **Franchisee's Obligations on Termination or Expiration.** Upon the termination or expiration of this Agreement for any reason whatsoever, Franchisee shall cease to be a franchisee of Franchisor and shall immediately:

      A.     pay to Franchisor all amounts and charges as have become due hereunder through the date of termination or expiration of this Agreement or will become due hereunder or under any other agreement between Franchisee (or its affiliates) and Franchisor (or its affiliates) and are then unpaid;

      B.     discontinue using and return to Franchisor all copies of the Operations Manual, including any copies printed from the Franchisor Website, any written embodiment of System Standards, and the Confidential Information;

      C.     notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers, including Vanity telephone numbers or any national dial Franchisor telephone numbers and all classified and other directory listings of the Franchised Business, including the Yellow Pages, and, assign any telephone numbers of the Franchised Business to Franchisor, except that this type of assignment will not be required for any telephone number and listing that is already part of a telephone system owned and/or operated by Franchisor or a number which Franchisee notified Franchisor, upon signing the Agreement, it wished to retain, and which Franchisee did not market during the term;

      D.     transfer any websites and domain names related to the Franchised Business or another residential HVAC business operated during the Term to Franchisor (Franchisee shall not receive any compensation for such transfer) or in the case of Retained Domains remove any Licensed Marks and references to the Licensed Marks or the Franchise Business;

      E.     satisfactorily address and resolve all warranty claims or customer disputes, at Franchisor's option, or reimburse Franchisor for the cost of doing so;

      F.     cease to operate the Franchised Business under the System, including any patent protected materials, or customized templates including the Straight Forward Pricing Guide, or otherwise and not, directly or indirectly, represent to the public that such Franchised Business is operated in association with Franchisor or the System, or hold itself out as a present or former franchisee

of Franchisor;

G.      cease to use, directly or indirectly, in advertising or in any other manner whatever, any of the Licensed Marks, any colorable imitation thereof or any name or mark similar to any of the Licensed Marks, any other identifying characteristics or indicia of operation of the System, and any confidential standards, methods, procedures and specifications associated with the System;

H.      discontinue using for any purpose, and sell to Franchisor at its request, at the fully depreciated book value thereof, any or all equipment, signs, advertising materials, fixtures, furnishings, inventory, invoices, supplies, forms or other products or materials which display any Licensed Marks or any distinctive feature or device associated with the System;

I.      take all actions as may be necessary to repaint or rewrap all vehicles used by the Franchised Business or owned by Franchisee which display any of the Licensed marks or which use any color or color scheme that is the same as or similar to the color or color schemes used by Franchisor or its Franchised Businesses (including the colors trademarked by Franchisor or its affiliates) within ten (10) days from the date of termination and give Franchisor evidence satisfactory to Franchisor of compliance with Franchisee's obligation hereunder at the termination or expiration of this Agreement (the "**De-Identification Period**") (Franchisee acknowledges that Franchisor has the right to assess and collect a past due de-identification charge of $100, per vehicle, per day, for each day Franchisee fails to comply with this **Section 16.4(I)** after the De-Identification Period.);

J.      take all such action as may be necessary to cancel any fictitious or assumed name registration which contains any part of the Licensed Marks under any federal or state laws or regulations and give Franchisor evidence satisfactory to Franchisor of compliance with Franchisee's obligation hereunder within thirty (30) days after the termination or expiration of this Agreement;

K.      permit Franchisor, at Franchisee's expense, to enter the location from which the Franchised Business is conducted and remove any and all personal property of Franchisor and any and all personal property of Franchisee which displays any of the Licensed Marks or any distinctive feature or device associated with the System, including any and all equipment, signs, advertising materials, fixtures, furnishings, inventory, invoices, supplies and vehicles and make such reasonable alterations in the exterior and interior decor as Franchisor deems necessary to remove from the premises where the Franchised Business is operated any identification as a Franchised Business;

L.      delete any references to Franchisor or the Licensed Marks, domain names, copyrighted materials, or any other proprietary materials from any website used by Franchisee; and

M.      observe and comply with the provisions of **Sections 13.2, 13.3** and

34

**14.2** of this Agreement; and

N.      discontinue use of SuccessWare within sixty (60) days or pay the current non-franchisee reclassification fees to SuccessWare.

### Article 17.    Relationship and Indemnification

17.1    *Independent Parties*.   Franchisee is and shall at all times remain an independent contractor and is not and shall not represent itself to be the agent, joint venturer, partner or employee of Franchisor, or to be related to Franchisor other than as its independent franchisee.   Franchisee shall not make any representations or take any action which could establish any apparent relationship of agency, joint venture, partnership or employment with Franchisor, and Franchisor shall not be bound in any manner whatsoever by any agreements, warranties, representations or undertakings made by Franchisee to any other person nor with respect to any other action of Franchisee.   Franchisee shall not establish any bank account, make any purchase, apply for any loan or credit, or incur or permit any obligation to be incurred in the name or on the credit of Franchisor.   No acts of assistance given by Franchisor to Franchisee shall be construed so as to alter this relationship.   Franchisee is solely responsible for paying all operating costs of the Franchised Business, including all taxes.

Franchisor will not have the power to hire or fire Franchisee's employees and Franchisee expressly agrees that it will never contend otherwise.   Franchisor acknowledges and agrees, and will never contend otherwise, that it alone will exercise day-to-day control over all operations, activities and elements of the Franchised Business and that under no circumstance shall Franchisor do so or be deemed to do so.   Franchisee further acknowledges and agrees, and will never contend otherwise, that the various requirements, restrictions, prohibitions, specifications and procedures of the System which Franchisee is required to comply with under this Agreement, whether set forth in the Operations Manual or otherwise, do not directly or indirectly constitute, suggest, infer or imply that Franchisor controls any aspect or element of the day-to-day operations of the Franchised Business, which Franchisee alone controls, but only constitute standards Franchisee must adhere to when exercising its control of the day-to-day operations of the Franchised Business.

17.2    *Liability of Franchisee*.   If two (2) or more individuals sign this Agreement as Franchisee, the liability of each such individual hereunder shall be joint and several.

17.3    *Non-Liability*.   Franchisor is not obligated or liable for any injury or death of any person or damage to any property caused by Franchisee's acts, failure to act, negligence or willful conduct, or for any other liability of Franchisee.

17.4    *Franchisee Indemnity*.   Franchisee hereby agrees to indemnify, hold harmless and, upon request, defend Franchisor, its affiliates, and their respective members, owners, shareholders, directors, officers, employees and agents (the "**Indemnified Parties**"), from and against all suits, proceedings, assessments, losses, costs of investigation, claims, liabilities, demands or actions of any nature or kind whatsoever ("**Claims**"), directly or indirectly arising out of, or in any manner whatsoever associated or connected with:

A.      the failure of Franchisee to pay when due any levies, taxes or

assessments that Franchisee may be required by applicable law to pay;

     B.    Franchisee's operation of the Franchised Business; or

     C.    Franchisee's acts, failure to act, or negligence or willful conduct;

and against any and all damages, costs, expenses and fees (including, without limitation, reasonable legal expenses and fees), losses, fines or penalties incurred by or on behalf of any of the Indemnified Parties in the investigation or defense of any and all Claims. Under no circumstance will any Indemnified Party be required to seek recovery from third parties or otherwise mitigate its losses to maintain a claim against Franchisee.

### Article 18. Dispute Resolution

18.1 **_Resolution of Disputes_**. Any dispute between Franchisor and Franchisee relating to or arising out of the relationship created by this Agreement is subject to the dispute resolution provisions written below.

18.2 **_Mediation_**. In the event of any dispute, other than disputes that are the subject of Franchisee's default under **Section 16.1(A), Section 16.1(C), Section 16.1(E), Section 16.1(F)** or **Section 16.2(A)**, or a dispute involving any alleged violation of **Articles 11, 12, 13, 14,** or **15** or **Section 16.4**, the disputing party shall be obligated to first attempt to resolve such dispute through mediation, which proceeding shall be a condition precedent to commencing any legal action and shall be initiated by submitting a written request for mediation to the Judicial Arbitration & Mediation Services, Inc. ("**JAMS**") according to its procedures, or any other mediation service the parties mutually agree to according to such mediator's procedures.

The mediation process shall begin promptly and shall be concluded within thirty (30) days after the day the request for mediation is made, unless the parties mutually agree otherwise. Any and all discussions, negotiations, findings or other statements by the mediator and/or the parties made in connection with the mediation shall be privileged and confidential and shall not be admissible into evidence in any litigation. During the pendency of any dispute resolution proceeding, the parties shall not disclose any information relating to the dispute or the dispute resolution proceeding to any person not party to the mediation. Franchisee expressly agrees not to commence any legal action until mediation has been concluded.

All mediation proceedings shall take place in the city and state where Franchisor has its principal place of business at the time the mediation is commenced. The expenses of the mediation service shall be borne equally by both parties, and all other expenses relating to such mediation shall be borne by the party incurring them.

The commencement of any dispute resolution procedure will not act to prevent Franchisor, if required to prevent the possible loss of any rights, from instituting or proceeding with any action that may be the subject of the dispute.

18.3 **_Venue_**. Franchisee and each Owner agrees that (A) any state court of general jurisdiction sitting in the county and state where Franchisor has its principal place of business at the time the action is commenced, or (B) the United States District Court for the

                                            

county and state where Franchisor has its principal place of business at the time the action is commenced shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement, and Franchisee and each Owner irrevocably submits to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court. If applicable law provides Franchisee additional rights as to notices, opportunities to cure or otherwise than as are provided by this Agreement as to termination, renewal, transfer or otherwise, Franchisor shall comply with the requirements of such laws if they exceed Franchisor's obligations under this Agreement.

18.4    *Injunctive Relief.*    Notwithstanding anything in this **Article 18** to the contrary, Franchisor may seek to obtain at any time in any court of competent jurisdiction any order for specific performance or injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause Franchisor irreparable harm. Franchisor may have such specific performance or injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and Franchisee's sole remedy in the event of the entry of such specific performance or injunction order, shall be the dissolution of such order, if warranted (all claims for damages by reason of the wrongful issuance of any such order being expressly waived hereby). Franchisee and each of its Owners acknowledges that any violation of **Articles 11, 12, 13, 14** or **15** or **Section 16.4** would result in irreparable injury to Franchisor for which no adequate remedy at law may be available. Accordingly, Franchisee and each of its Owners consents to the issuance of an injunction at Franchisor's request (without posting a bond or other security) prohibiting any conduct in violation of any of those Sections and agrees that the existence of any claims Franchisee or any of its Owners may have against Franchisor, whether or not arising herefrom, shall not constitute a defense to the enforcement of any of those Sections.

18.5    *Business Judgment.*    The parties recognize, and any mediator, arbitrator or judge is affirmatively advised, that certain provisions of this Agreement describe the right of Franchisor to take (or refrain from taking) certain actions in the exercise of its business judgment based on its assessment of the overall best interests of the System and/or franchise network. Where such discretion has been exercised and is supported by the business judgment of Franchisor, neither a mediator nor a judge shall substitute his or her judgment for the judgment so exercised by Franchisor.

18.6    *Limitations Period.*    Except for claims arising from Franchisee's non-payment or underpayment of amounts Franchisee owes Franchisor, any and all claims arising out of or relating to this Agreement or any agreement related to this Agreement or signed concurrently or the relationship of the parties, shall be barred unless a judicial proceeding is commenced within two (2) years from the date the complaining party knew or should have known of the facts giving rise to such claim. Such limitation period, however, shall be considered tolled during the pendency of a mediation proceeding.

18.7    *No Punitive, Exemplary or Consequential Damages.*    EXCEPT WITH RESPECT TO FRANCHISEE'S OBLIGATION TO INDEMNIFY THE INDEMNIFIED PARTIES UNDER **SECTION 17.4** AND CLAIMS FRANCHISOR BRINGS AGAINST FRANCHISEE FOR FRANCHISEE'S UNAUTHORIZED USE OF THE LICENSED MARKS

OR UNAUTHORIZED USE OR DISCLOSURE OF ANY CONFIDENTIAL INFORMATION, FRANCHISOR AND FRANCHISEE AND FRANCHISEE'S RESPECTIVE OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN THE PARTIES, THE PARTY MAKING A CLAIM SHALL BE LIMITED TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

18.8   *No Jury Trial*.  FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY.

18.9   *No Class or Consolidated Actions*.  ANY LITIGATION OR MEDIATION BETWEEN FRANCHISOR AND FRANCHISEE, AND ANY OF THEIR RESPECTIVE CURRENT OR FORMER AFFILIATES, SUBSIDIARIES, PARENTS, DIRECTORS, OFFICERS, OR AGENTS SHALL BE CONDUCTED ON AN INDIVIDUAL BASIS, AND NOT AS PART OF A GROUP, ASSOCIATION, CONSOLIDATED, JOINT, COMMON, OR CLASS ACTION OR ON ANY REPRESENTATIVE BASIS.

### Article 19.    General

19.1   *Severability of Provisions*.  Every part of this Agreement is severable and the invalidity or unenforceability of any part of this Agreement shall not affect the validity or enforceability of any other part of this Agreement.  If any covenant herein, which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, length of time and/or business scope, but would be enforceable by reducing any part or all thereof, Franchisor and Franchisee agree that the same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought.

19.2   *Counterparts*.  This Agreement may be signed in counterparts, and each counterpart when so signed and delivered shall be deemed an original.

19.3   *Force Majeure*.  Neither party shall be responsible to the other for non-performance or delay in performance occasioned by any causes beyond its control (other than lack of funds) including, without limitation, acts or omissions of the other party, acts of civil or military authority, strikes, lock-outs, embargoes, insurrections or acts of God.  If any delay occurs, any applicable time period shall be automatically extended for a period equal to the time lost, provided that the party affected makes reasonable efforts to correct the reason for such delay and gives to the other party prompt notice of any delay; provided, however, that if the delay exceeds 120 days, Franchisor shall have the right to terminate this Agreement or to require Franchisee to move to a new location approved by Franchisor within an additional period of 120 days.

19.4   *Successors and Assigns*.  This Agreement shall inure to the benefit of and be binding upon Franchisor, Franchisee and their respective heirs, legal representatives, successors and permitted assigns.

19.5   *Survival*.  All obligations of Franchisor and Franchisee which expressly or

by their nature survive termination or expiration or Transfer of this Agreement shall continue in full force and effect subsequent to and notwithstanding such termination or expiration or Transfer and until they are satisfied or by their nature expire.

      19.6   ***Notices***.  All notices, consents and approvals permitted or required to be given under this Agreement shall be in writing and shall be deemed to be sufficiently and duly given if stated in writing and, in the case of Franchisee, left with an adult person working at the Franchised Business, or, in the case of either party, sent by a prepaid certified letter or by overnight courier service or transmitted by facsimile, electronic mail or other form of recorded communication (with a confirming copy mailed), to Franchisor addressed as follows:

> One Hour Air Conditioning Franchising, L.L.C.
> Attention:  President
> Plaza Five Points
> 50 Central Avenue, Suite 920
> Sarasota, Florida  34236
> Facsimile:  941-296-7509

and to Franchisee addressed to the address written above or to its facsimile number provided to Franchisor.

      Any notice so given or made shall be deemed to have been given or made and received on the earlier of (A) the day of delivery or (B) one (1) business day after transmission by facsimile or other form of recorded communication service of the same or by overnight courier service, as the case may be, or (C) on the 3rd business day following the day of mailing of the same by certified mail.  Any party from time to time by notice in writing given under the terms of this Agreement may change its address or facsimile number for the purpose of this Agreement.

      19.7   ***Right of Set-off***.  Notwithstanding any other provision of this Agreement, upon the failure of Franchisee to pay Franchisor as and when due any sums of money under this Agreement or any other amounts owing to Franchisor, Franchisor may, at its election, deduct any and all such sums remaining unpaid from any monies or credit held by Franchisor for the account of Franchisee.

      19.8   ***Not Withhold Payment***.  Franchisee agrees that Franchisee shall not on the grounds of the alleged non-performance by Franchisor of any of its obligations under this Agreement or under any other agreement between the parties, withhold payment of any amounts due to Franchisor whether on account of equipment or goods purchased by Franchisee or otherwise.

      19.9   ***Non-Waiver***.  The failure of either party to exercise any right, power or option given under this Agreement, or to insist upon strict compliance with the terms and conditions of this Agreement by the other party, shall not constitute a waiver of the terms and conditions of this Agreement with respect to any other or subsequent breach of this Agreement or default under this Agreement, or a waiver by such party of its right at any time to require strict compliance with all terms and conditions of this Agreement.  Franchisor's acceptance of

payments due under this Agreement shall not constitute a waiver of any breaches by Franchisee that precede the acceptance of such payments.

19.10 *Applicable Law.* This Agreement shall be governed, construed and interpreted in accordance with the substantive laws of the state of Florida, without giving effect to its conflicts of law principles, provided, however, that the state's franchise law shall apply only if its independent jurisdictional requirements are met. If applicable law provides Franchisee with additional rights as to notices, opportunities to cure or otherwise than as are provided by this Agreement as to termination, renewal, transfers or otherwise, Franchisor will comply with the requirements of such laws if they exceed Franchisor's obligations under this Agreement.

19.11 *Rights of Franchisor are Cumulative.* The rights of Franchisor under this Agreement are cumulative and no exercise or enforcement by Franchisor of any right or remedy under this Agreement shall preclude the exercise or enforcement by Franchisor of any other right or remedy under this Agreement or which Franchisor is otherwise entitled by law to enforce. At the option of Franchisor, a default by Franchisee under this Agreement shall constitute a default by Franchisee under any other agreement between the parties.

19.12 *No Third Party Beneficiaries.* Except as otherwise expressly provided herein, this Agreement is exclusively for the benefit of the parties hereto and shall not confer a benefit on, or give rise to liability to, any third party. No agreement between Franchisor and any third party.

19.13 *Approvals or Consents.* Requests by Franchisee for approvals or consents shall be in writing and shall be timely made. Approvals and consents by Franchisor shall not be effective unless in writing and duly signed by Franchisor. Except as expressly provided to the contrary herein, Franchisor may grant or withhold such approvals or consents, and may make any determinations permitted hereunder in its sole discretion and shall not be required to show "reasonableness" or to comply with any other standard.

19.14 *Effect of Standards.* Franchisor's specifications of the System shall not constitute a warranty or representation, express or implied, as to quality, safety, suitability, fitness for a particular purpose or any matter. Franchisor shall not be liable to Franchisee or others on account of the specifications of the System, including the designation of System Standards or the operation of the Franchised Business under the System.

19.15 *Construction.* Franchisee acknowledges that it had the opportunity to be represented by an attorney in connection with the preparation and execution of this Agreement, and to review and understand the terms hereof and to consider the advisability of entering into this Agreement. This Agreement shall be construed according to its plain meaning and neither for nor against either party hereof regardless of which party's counsel drafted the provision.

19.16 *Further Assurances.* The parties agree to diligently do or cause to be done all acts or things and to sign all documents and instruments necessary to implement and carry into effect this Agreement to its fullest extent.

19.17 *Entire Agreement/Amendments.* Franchisor and Franchisee each acknowledge and warrant to each other that they wish to have all terms of the business

relationship defined in this Agreement. Neither Franchisor nor Franchisee wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different from or supplementary to the rights and obligations stated herein. Accordingly, Franchisor and Franchisee agree that this Agreement, together with any other documents or agreements signed by the parties contemporaneously herewith, supersede and cancel any prior and/or contemporaneous discussions (whether described as representations, inducements, promises, agreements or any other term) between Franchisor or anyone acting on its behalf and Franchisee or anyone acting on its behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between the parties, and Franchisor and Franchisee each agree that they have placed, and shall place, no reliance on such discussions. This Agreement, together with any other documents or agreements signed by the parties contemporaneously or incorporated herein by reference, constitutes the entire agreement between the parties and contains all of the terms, conditions, rights and obligations of the parties with respect to any aspect of the relationship between the parties. No further franchise rights or offer of franchise rights have been promised to Franchisee and no such franchise rights or offer of franchise rights shall come into existence, except by means of a separate writing, signed by an officer of Franchisor or such other entity granting the franchise rights. Notwithstanding anything in this **Section 19.17** to the contrary, nothing in this Agreement or any related agreement is intended to disclaim any representation made by Franchisor in Franchisor's Franchise Disclosure Document. No change, modification, amendment or waiver of any of the provisions hereof shall be effective and binding upon either party unless it is in writing, specifically identified as an amendment and signed by the party to be charged.

IN WITNESS WHEREOF, the parties have duly signed and delivered this Agreement as of the date first written above.

**Franchisee:**                                      Franchisor:

**ZUBIE AIR INC**                              ONE HOUR AIR CONDITIONING
                                                        FRANCHISING, L.L.C.


By: _____        By: _____
     Evel L. Zubiate                              Mark Baker
     President                                        President

## Exhibit A

### BUSINESS TERMS

| | |
|---|---|
| Franchisee business name: | **ZUBIE AIR INC** |
| Contact: | **Evel L. Zubiate - Owner** |
| | **(Elmer Zubiate – GM)** |
| Address: | **13111 Look Out Ridge** |
| | **San Antonio, TX 78233** |
| Phone number: | **210-655-9448** |
| Cell number: | **432-770-5257** |
| Facsimile number: | **210-590-3054** |
| E-mail Address: | **evelzubiate@yahoo.com / elmer@ontimeelmer.com** |
| Effective Date of this Agreement: | **June 14, 2013** |
| Expiration Date of this Agreement: | **June 13, 2023** |
| Approved Location of Franchised Business: | **13111 Look Out Ridge, San Antonio, TX 78233** |
| Transfer Fees: | **$2000.00** |
| Prior Business Phone Numbers: | **(325) 947-8776** |
| Territory Name: | **OH0064 SAN ANGELO, TX** |

Mark to be used:

☒ ONE HOUR AIR CONDITIONING & HEATING

☐ ONE HOUR HEATING & AIR CONDITIONING

Population:  **167,369**

Zip Codes:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 76801 | 76821 | 76823 | 76825 | 76827 | 76836 | 76837 | 76841 | 76845 | 76848 |
| 76849 | 76852 | 76854 | 76855 | 76856 | 76858 | 76859 | 76861 | 76862 | 76865 |
| 76866 | 76867 | 76872 | 76873 | 76874 | 76875 | 76878 | 76882 | 76883 | 76884 |
| 76886 | 76888 | 76901 | 76902 | 76903 | 76904 | 76905 | 76906 | 76908 | 76909 |
| 76930 | 76933 | 76934 | 76935 | 76936 | 76937 | 76939 | 76940 | 76941 | 76945 |
| 76949 | 76950 | 76951 | 76953 | 76955 | 76957 | 76958 | 78028 | 78618 | 78624 |
| 78631 | | | | | | | | | |

**Acknowledged and Agreed:**

For Franchisee:

_____

By:  Evel L. Zubiate

      President

For Franchisor:

_____

By:  Mark Baker

      President

## Exhibit B

## OWNER'S GUARANTY

In consideration of, and as an inducement to, the grant of a franchise and the execution of the Franchise Agreement dated _____, _____ (the "**Franchise Agreement**") by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company ("**Franchisor**"), and _____ ("**Franchisee**"), the undersigned hereby personally and unconditionally: (1) guaranties to Franchisor and its successors and assigns, for the Term of the Franchise Agreement and, including any renewal thereof, as provided in the Franchise Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant stated in the Franchise Agreement and any documents, agreements, instruments and promissory notes signed with or in connection with the Franchise Agreement (collectively, the "**Franchise Documents**"); and (2) agrees to be personally bound by, and personally liable for, the breach of each and every provision in the Franchise Documents applicable to Owners of Franchisee.

The undersigned waives:

(1)    acceptance and notice of acceptance by Franchisor of the foregoing undertakings;

(2)    notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

(3)    protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

any right the undersigned may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

The undersigned consents and agrees that:

(4)    the undersigned's direct and immediate liability under this Guaranty shall be joint and several with all signatories to this and similar guaranties of Franchisee's obligations;

(5)    the undersigned shall render any payment or performance required under the Franchise Agreement upon demand if Franchisee fails or refuses punctually to do so;

(6)    this Guaranty shall apply to any claims Franchisor may have due to return

(02/18/13) (04/01/13)      Multistate

of any payments or property Franchisor may have received from Franchisee as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(7)     such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and

(8)     such liability shall not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during and after the terms of the Franchise Documents, as the same may be amended or renewed, until Franchisee's duties and obligations to Franchisor are fully discharged and satisfied.

All capitalized terms when used shall have the meanings ascribed to them Franchise Agreement.

This Guaranty shall be governed, construed and interpreted in accordance with the substantive laws of the state where Franchisor has its principal place of business at the time a dispute arises, without giving effect to its conflicts of law principles.

IN WITNESS WHEREOF, each of the undersigned has affixed signature on the _____ day of _____, _____.

WITNESS(ES):                                   GUARANTOR(S):

_____                _____
Print or Type Name                             Print or Type Name

_____                _____
Signature                                      Signature

_____                _____
Print or Type Name                             Print or Type Name

_____                _____
Signature                                      Signature

(02/18/13) (04/01/13)                                                        Multistate

## Exhibit C

## OWNERS OF FRANCHISEE

| Name of Owner | Nature of Interest | Beneficial Interest in Franchisee |
|---|---|---|
| **Evel L. Zubiate** | **President** | **100%** |
| Total | | 100% |

**OWNER'S GUARANTY**

In consideration of, and as an inducement to, the grant of a franchise and the execution of the Franchise Agreement dated **June 14, 2013** (the "**Franchise Agreement**") by and between ONE HOUR AIR CONDITIONING FRANCHISING, L.L.C., a Florida limited liability company ("**Franchisor**"), and **ZUBIE AIR INC,** a Texas corporation ("**Franchisee**"), the undersigned hereby personally and unconditionally: (1) guaranties to Franchisor and its successors and assigns, for the Term of the Franchise Agreement and, including any renewal thereof, as provided in the Franchise Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant stated in the Franchise Agreement and any documents, agreements, instruments and promissory notes signed with or in connection with the Franchise Agreement (collectively, the "**Franchise Documents**"); and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Documents applicable to Owners of Franchisee.

The undersigned waives:

(1) acceptance and notice of acceptance by Franchisor of the foregoing undertakings;

(2) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

(3) protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

(4) any right the undersigned may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

(5) any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

The undersigned consents and agrees that:

(1) the undersigned's direct and immediate liability under this Guaranty shall be joint and several with all signatories to this and similar guaranties of Franchisee's obligations;

(6) the undersigned shall render any payment or performance required under the Franchise Agreement upon demand if Franchisee fails or refuses punctually to do so;

(7) this Guaranty shall apply to any claims Franchisor may have due to return of any payments or property Franchisor may have received from Franchisee as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(8) such liability shall not be contingent or conditioned upon pursuit by

Franchisor of any remedies against Franchisee or any other person; and

(9)     such liability shall not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during and after the terms of the Franchise Documents, as the same may be amended or renewed, until Franchisee's duties and obligations to Franchisor are fully discharged and satisfied.

All capitalized terms when used shall have the meanings ascribed to them in the Franchise Agreement.

This Guaranty shall be governed, construed and interpreted in accordance with the substantive laws of the state where Franchisor has its principal place of business at the time a dispute arises, without giving effect to its conflicts of law principles.

IN WITNESS WHEREOF, each of the undersigned has affixed his signature on the 14th day of June, 2013.

WITNESS:                                    GUARANTOR:


_____                    _____
Signature                                   **Evel L. Zubiate**

__Rocio Aguirre__
Print or Type Name



Please sign and date to acknowledge acceptance for BF0085:

X: [signature] Date: 6/14/13

Evel L. Zubiate

7/19/13 [signature]

**Mark Baker**

**President - OHACF, LLC**



Please sign and date to acknowledge acceptance for BF0085:

X: ______________________ Date: ______________

Evel L. Zubiate

7/19/13 [signature]

**Mark Baker**
**President - OHACF, LLC**



*ATTENTION FRANCHISEES*

- You have been approved to participate in the UWIN Customer Complaint Resolution Program; attached is your UWIN Agreement, which includes terms and conditions of participation.
- Fill out page 11 & A-1 with your Company Name, Type of Contractor, and Address, as applicable.
- Sign page 11 (left side only) & A-2.
- PLEASE RETURN ORIGINAL AGREEMENT (DO NOT FAX OR SEND A COPY) TO UWIN at the address listed on page 11.
- Once UWIN receives your original, signed agreement you will be sent the UWIN Seal on disk for use. You will also be added as a contractor on the UWIN website.

## UWIN AGREEMENT FOR FRANCHISEES

THIS UWIN AGREEMENT FOR FRANCHISEES, dated as of the date on the signature page (the "**Agreement**"), is made by and between UWIN, LLC, a Florida limited liability company ("**UWIN**"), and the home services contractor identified on the signature page ("**Contractor**") who, in consideration of the promises set forth below, agree as follows:

*ARTICLE 1  NATURE AND SCOPE OF AGREEMENT*

    1.1    **UWIN.**  UWIN is a customer service resource that provides customers information and assistance with, resolution and reparations concerning their transactions with participating home services contractors (the "**Customer Complaint Resolution Program**"). Participants in the Customer Complaint Resolution Program display UWIN's distinctive seal of approval and its associated marks, logos, and designs (collectively, the "**Seal**").

    1.2    **Contractor.**  Contractor is a franchisee of one of UWIN's affiliates (each, a "**Franchisor**") and, pursuant to its franchise agreement, has obtained the right to use the Franchisor's system in conjunction with the operation of its residential home repair services business ("**Contractor's Business**").  In connection with the operation of the Contractor's Business, Contractor desires to participate in the Customer Complaint Resolution Program.

    1.3    **Representations and Warranties.**  Contractor represents and warrants to UWIN as follows:

    A.    Contractor has independently investigated the business risks involved in participating in the Customer Complaint Resolution Program and such other matters as Contractor deems important.;

    B.    All information Contractor has provided to UWIN to induce UWIN to grant Contractor the right to participate in the Customer Complaint Resolution Program was true, correct, complete and accurate as of the date made, and, as of the date of this Agreement, no material change has occurred in such information;

    C.    Contractor's execution, delivery and performance of this Agreement does not violate or constitute a breach under any agreement or commitment made by Contractor;

    D.    If Contractor is a business entity, Contractor is duly organized and validly existing, is qualified to do business in each state where Contractor is or will conduct business, and is duly authorized to execute and deliver this Agreement and perform Contractor's obligations pursuant to this Agreement; and

    E.    This Agreement represents a valid, binding obligation of Contractor.

    1.4    **Owner's Guaranty.**  If Contractor is a business entity, each individual with an ownership interest in Contractor (each, an "**Owner**") is required to execute an Owner's Guaranty in favor of UWIN (the form of which is attached as **Exhibit A**) and deliver the executed copy to UWIN with this signed Agreement, or if such ownership interest is acquired later, within 10 days after becoming an Owner.

*ARTICLE 2  SCOPE OF PARTICIPATION*

      2.1    **Participation in the Customer Complaint Resolution Program**.  UWIN grants Contractor the non-exclusive right to participate in the Customer Complaint Resolution Program, pursuant to the terms of this Agreement and its requirements as established by UWIN from time to time.  Contractor agrees to comply with the Customer Complaint Resolution Program and the requirements provided by UWIN from time to time.

      2.2    **Grant of License**.  Subject to the terms and conditions of this Agreement, UWIN grants Contractor a non-exclusive, revocable license to use the Seal in connection with the Customer Complaint Resolution Program and Contractor's Business. Contractor accepts such grant and agrees to display the Seal on its business materials, website, advertising and marketing only in the form and manner, and only with appropriate legends and proprietary notices, as may be prescribed by UWIN from time to time and to comply with UWIN's "**Graphics Manual**", a current copy of which Contractor hereby acknowledges having received.  UWIN has the right (but not the obligation) to review and approve all labeling, advertising, displays and other items on which the Seal appears prior to the use of such items by Contractor. Contractor agrees to permit UWIN to inspect any materials bearing the Seal and to comply in a timely fashion with any instruction from UWIN as to the proper use of the Seal or any request to modify or discontinue any use of the Seal.

      2.3    **Term**.  Unless terminated earlier pursuant to **Article 9**, the term of this Agreement will be from the date of this Agreement until the expiration or termination of the Franchise Agreement ("**Term**").  During the term if requested by UWIN, Contractor agrees to execute UWIN's then current form of agreement and all other agreements then customarily used by UWIN in granting rights to use the Customer Complaint Resolution Program, which agreements may contain terms and conditions that are materially different from the terms and conditions in this Agreement.

      2.4    **Reserved Rights**.  UWIN reserves all rights not specifically granted to Contractor herein.  This Agreement does not limit the right of UWIN to use or authorize others to participate in the Customer Complaint Resolution Program, use the Seal, or to engage in or license any business activity, including, without limitation, the operation or franchising of residential home repair services businesses under the Seal at any location, and/or under any other trade name, trademark or service mark now or hereafter owned by or licensed to UWIN or its affiliates at any location.

      2.5    **Modification of the Customer Complaint Resolution Program and/or Seal**. The parties agree that UWIN, in its sole discretion, may change or modify the Customer Complaint Resolution Program, including the Graphics Manual and/or the Seal, from time to time. Contractor agrees to modify its operations, including any display of the Seal, to comply with the new standards established by UWIN within a reasonable time after UWIN notifies Contractor of any such change.  If such change is made, reference in this Agreement to the Customer Complaint Resolution Program and/or Seal will be deemed to refer to such new program, mark or seal.

      2.6    **Goodwill**.  All improvements and additions to or associated with the Customer Complaint Resolution Program, whenever and by whomever made, and all service mark and trademark registrations and goodwill at any time associated with the Customer Complaint Resolution Program, including the Seal, are the property of UWIN.  All goodwill established by Contractor's use of the Seal and Customer Complaint Resolution Program will

inure to the sole and exclusive benefit of UWIN.   Upon expiration or termination of this Agreement, no monetary amount will be assigned or attributed to any goodwill associated with Contractor's participation in the Customer Complaint Resolution Program or use of the Seal.

2.7     **Ownership of Customer Complaint Resolution Program**.   Contractor acknowledges and agrees that it will not acquire any proprietary rights in the Customer Complaint Resolution Program or the Seal by virtue of its participation in the Customer Complaint Resolution Program.  Contractor agrees not to contest (A) UWIN's unrestricted and exclusive ownership of the Customer Complaint Resolution Program and Seal or (B) UWIN's right to grant licenses to use the Seal.  Contractor acknowledges that it does not have any right to authorize others to participate in any part of the Customer Complaint Resolution Program, including any use of the Seal, and that all materials relating to the Customer Complaint Resolution Program will at all times remain the sole property of UWIN.

*ARTICLE 3  CUSTOMER COMPLAINT RESOLUTION*

3.1     **Resolution of Complaints**.  Contractor agrees to follow, and authorizes UWIN to follow, the resolution provisions described in this Article 3 for any and all disputes which may arise between Contractor and its customers during the Term.

3.2     **Contractor's Resolution**.   Contractor will use good faith efforts to resolve any and all disputes that Contractor may have with its customers and former customers regarding the material used by Contractor, the labor performed or the craftsmanship displayed by Contractor with respect to work for which it has charged or intends to charge its customers.

3.3     **UWIN's Intervention**.  If a customer of Contractor notifies UWIN that a dispute exists between such customer and Contractor regarding the material used by Contractor, labor performed or the craftsmanship displayed by Contractor with respect to work for which Contractor has charged, or intends to charge, that customer (a "**Customer Complaint**"), UWIN will advise the customer that UWIN will promptly notify Contractor of the Customer Complaint and that Contractor will have 48 hours to resolve the Customer Complaint to customer's satisfaction.

3.4     **Remedial Actions**.  If Contractor fails to resolve a Customer Complaint to the customer's satisfaction within 48 hours after receiving notice of the Customer Complaint from UWIN, UWIN, in its sole discretion and without notice to Contractor, has the right to either:

A.     pay customer the dollar amount that UWIN determines to be in dispute;

B.     pay customer the dollar amount that UWIN determines is required to complete the work, if unfinished; or

C.     pay an independent third party contractor to complete the work, if unfinished (each of these, a "**Remedial Payment**").

Contractor authorizes and directs UWIN to make any of the foregoing Remedial Payments and take such other related actions required to resolve the Customer Complaint as UWIN, in its sole discretion, deems appropriate. Nothing herein is intended to be deemed to cause UWIN to be a guarantor or third party to Contractor's obligation to its customers and Contractor shall not represent anything to the contrary to its customers. **Contractor agrees to reimburse UWIN for the full amount of any Remedial Payment made under this Section 3.4 within 15 days after UWIN notifies Contractor of such Remedial Payment.** If Contractor does not reimburse UWIN for the full amount of any Remedial Payment within the 15-day period, UWIN has the right to assess and collect a past due service charge equal to the lesser of 1.5% per month or the maximum interest rate permitted by law on such past due amounts beginning from the date UWIN made the Remedial Payment. Contractor's obligations under this **Article 3** will continue after the termination or expiration of this Agreement with regard to (i) any work performed by Contractor prior to the date of termination or expiration of this Agreement and (ii) any work performed by Contractor while it is displaying the Seal, regardless of whether such work was performed prior to or after the date of termination or expiration of this Agreement.

3.5     ***Records and Reports.***  To assist with UWIN's intervention under this **Article 3** and assistance with Customer Complaints, Contractor agrees to maintain accurate books and records and to provide UWIN with information, within 5 days after UWIN's request, in a format specified by UWIN, regarding (A) the number of service calls made by Contractor, (B) the number and description of each complaint made by a customer of Contractor, (C) the status of each complaint and the steps taken by Contractor to resolve the complaint, and (D) the amount of money, if any paid by Contractor's customer or by Contractor to resolve the complaint.

## ARTICLE 4  TRANSFER

4.1     ***Transfer by UWIN.***  UWIN has the right, directly or indirectly, to sell, assign, transfer or otherwise dispose of this Agreement, or any or all of its rights and obligations under this Agreement, to any individual, firm, partnership, association, bank, lending institution, corporation, affiliate, limited liability company or other third party as UWIN may in its sole discretion deem appropriate. In the event of any such sale, assignment, transfer, or other disposition, UWIN will be released from any liability under this Agreement for the obligations transferred.

4.2     ***Transfer by Contractor.***  Contractor acknowledges that the granting of the rights hereunder is based on UWIN's investigation of Contractor's qualifications and that such rights are personal to Contractor and therefore Contractor will not sell, divide, encumber, assign, hypothecate, mortgage, sub-license, or otherwise transfer through any means any part of this Agreement or its rights or obligations hereunder. Any actual, attempted or purported transfer occurring without UWIN's prior written consent will constitute a default of this Agreement and will be null and void.

## ARTICLE 5  TERMINATION AND EXPIRATION

5.1     ***Mutual Agreement.***  The parties may terminate this Agreement at any time upon mutual agreement.

5.2     ***Termination by UWIN.***  UWIN may terminate this Agreement, in its sole discretion upon 60 days notice to Contractor.

5.3     **Termination by UWIN Without Opportunity to Cure**.  Contractor will be deemed to be in default under this Agreement, and UWIN may, at its option, terminate this Agreement and all rights granted herein effective immediately, without giving Contractor notice of, or the opportunity to cure, the default, if Contractor either:

A.     makes (or is deemed to have made) a general assignment for the benefit of creditors, or if a petition is filed against Contractor under the Bankruptcy Code and not dismissed within 60 days of filing, or if a petition is filed by Contractor under the Bankruptcy Code, or if Contractor is declared or adjudicated bankrupt, or if a liquidator, trustee in bankruptcy, custodian, receiver, receiver and manager, moderator, or any other officer with similar powers is appointed of or for Contractor, or if Contractor commits any act of bankruptcy or institutes proceedings to be adjudged bankrupt or insolvent or consents to the institution of such appointment or proceedings, or if Contractor admits in writing an inability to pay debts generally as they become due;

B.     has any of the products or chattels of Contractor's Business at any time seized or taken in execution or in attachment by a creditor of Contractor, or a writ of execution is issued against such products or chattels;

C.     has willfully or fraudulently misrepresented any fact, condition or report made in any application given to UWIN or required to be made by this Agreement; or

D.     by its actions, or its failure to take an action that it is required to take, adversely affects the goodwill associated with the Customer Complaint Resolution Program or the Seal.

5.4     **Termination by UWIN After Opportunity to Cure**.  Contractor will be deemed to be in default of this Agreement, and UWIN, at its option, may terminate this Agreement and all rights granted herein effective as of the time noted, if Contractor either:

A.     fails to pay when due any monies owed to UWIN and such default is not cured within 10 days after receiving Notice thereof from UWIN;

B.     fails to resolve one or more disputes with its customers to the satisfaction of UWIN in accordance with the Customer Complaint Resolution Program and this Agreement; or

C.     is in default of any of Contractor's other obligations contained in this Agreement or in any other agreement or instrument entered into or made between Contractor and UWIN (or one of its affiliates) relating to Contractor's Business and fails to cure such default to UWIN's satisfaction within 30 days after receiving Notice from UWIN or its affiliate to cure the same.

5.5     **Other Relief**.  Any termination under **Sections 5.1**, **5.2**, **5.3** and **5.4** of this Agreement will be without prejudice to any other rights (including any right of indemnity), remedy or relief vested in or to which UWIN may otherwise be entitled against Contractor.  All moneys paid by Contractor to UWIN under this Agreement or otherwise will be retained by UWIN as consideration for the rights and benefits previously conferred on Contractor hereunder. The foregoing remedy does not exclude any of the remedies which UWIN may have at law or in

equity by reason of the default, breach or non-observance by Contractor of any provision of this Agreement.

      5.6    **Contractor's Obligations on Termination or Expiration**.  Upon the termination or expiration of this Agreement for any reason whatsoever, Contractor will forthwith cease to be enrolled in the Customer Complaint Resolution Program and must immediately:

      A.    pay UWIN all outstanding and unpaid amounts and charges that have or will thereafter become due hereunder or under any other agreement between Contractor and UWIN, including but not limited to the amount of any Remedial Payments and/or interest on past due Remedial Payments (as described in **Section 3.4** above);

      B.    thereafter not, directly or indirectly, represent to the public that Contractor's Business is operated in association with UWIN or the Customer Complaint Resolution Program, or hold itself out as a present or former participant in the Customer Complaint Resolution Program;

      C.    cease to use, directly or indirectly, in advertising or in any other manner whatever, the Seal, any mark similar to the Seal, or any other identifying characteristics or indicia of operation of the Customer Complaint Resolution Program;

      D.    notify the telephone company and all listing agencies of the termination or expiration of Contractor's right to use the Seal;

      E.    permit UWIN, at Contractor's expense, to enter the location from which Contractor's Business is conducted in order to remove any and all personal property of Contractor which displays the Seal or any distinctive feature or device associated with the Customer Complaint Resolution Program, including any and all equipment, signs, advertising materials, fixtures, furnishings, inventory, invoices, supplies or forms; and

      F.    delete any references to UWIN or the Seal from any website used by Contractor.

*ARTICLE 6  DISPUTES AMONG PARTIES AND WITH THIRD PARTIES*

      6.1    **Complaints**.  Contractor must immediately provide UWIN with copies of any correspondence, notices or other complaints relating to the operation or activities of Contractor's Business that Contractor receives from any of its customers, any Better Business Bureau or any federal, state or local regulatory or governmental agency

      6.2    **Infringements**.  Contractor must give Notice to UWIN immediately upon learning of any alleged infringement or a challenge to Contractor's use of the Customer Complaint Resolution Program or the Seal, or any claim by any third party of any rights in the Customer Complaint Resolution Program, the Seal or any other mark.  Contractor agrees not to communicate with any person other than UWIN or UWIN's attorneys and Contractor's attorneys in connection with any alleged infringement, challenge or claim.

6.3  **Disputes Concerning Customer Complaint Resolution Program.** UWIN has the sole right and responsibility to handle and resolve litigation, trademark office proceedings or other administrative proceedings, or other disputes with third parties (including imitators and infringers) concerning the Customer Complaint Resolution Program and/or the use of all or any part of the Seal. UWIN does not have any obligation to initiate suit against imitators or infringers, and may settle any dispute by grant of a license or otherwise. Contractor will sign all instruments and documents, provide assistance and take any action that, in the opinion of UWIN's attorneys, may be necessary or advisable to protect and maintain UWIN's interests in any litigation, trademark office proceeding or other administrative proceeding or to otherwise protect and maintain UWIN's interest in the Customer Complaint Resolution Program and/or the Seal.

**6.4**  NO PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES. *EXCEPT WITH RESPECT TO CONTRACTOR'S OBLIGATION TO INDEMNIFY THE INDEMNIFIED PARTIES PURSUANT TO SECTION 7.3 AND CLAIMS UWIN BRINGS AGAINST CONTRACTOR FOR CONTRACTOR'S UNAUTHORIZED USE OF THE CUSTOMER COMPLAINT RESOLUTION PROCESS OR SEAL, UWIN AND CONTRACTOR AND CONTRACTOR'S RESPECTIVE OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER AND WILL BE LIMITED TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.*

6.5  **No Jury Trial.** UWIN AND CONTRACTOR IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY.

6.6  **Attorneys' Fees.** The prevailing party in any litigation arising out of or relating to this Agreement will be entitled to recover from the other party all damages, costs and expenses, including court costs and reasonable attorneys' fees, incurred by the prevailing party in successfully enforcing any provision of this Agreement.

6.7  **Applicable Law.** This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state in which UWIN has its principal place of business at the time a dispute arises, without giving effect to its conflicts of law principles.

**6.8**  VENUE. *UWIN AND CONTRACTOR AGREE THAT (A) ANY STATE COURT OF GENERAL JURISDICTION SITTING IN THE COUNTY AND STATE WHERE UWIN HAS ITS PRINCIPAL PLACE OF BUSINESS AT THE TIME THE ACTION IS COMMENCED OR (B) THE UNITED STATES DISTRICT COURT FOR THE COUNTY AND STATE WHERE UWIN HAS ITS PRINCIPAL PLACE OF BUSINESS AT THE TIME THE ACTION IS COMMENCED WILL BE THE VENUE AND EXCLUSIVE FORUM IN WHICH TO ADJUDICATE ANY CASE OR CONTROVERSY ARISING FROM OR RELATING TO THIS AGREEMENT, AND UWIN AND CONTRACTOR IRREVOCABLY SUBMIT TO THE JURISDICTION OF SUCH COURT AND WAIVES ANY OBJECTION IT MAY HAVE TO EITHER THE JURISDICTION OR VENUE OF SUCH COURT.*

*ARTICLE 7  RELATIONSHIP AND INDEMNIFICATION*

   7.1   ***Independent Parties.***   Contractor is and will at all times remain an independent contractor and is not and will not represent itself to be the agent, joint venturer, partner or employee of UWIN, or to be related to UWIN other than as a participant in the Customer Complaint Resolution Program. Contractor will not make any representations or take any acts which could establish any apparent relationship of agency, joint venture, partnership or employment with UWIN, and UWIN will not be bound in any manner whatsoever by any agreements, warranties, representations or undertakings made by Contractor to any other person nor with respect to any other action of Contractor. No acts of assistance given by UWIN to Contractor will be construed so as to alter this relationship.

   7.2   ***Non-Liability.***   UWIN is not obligated or liable for any injury or death of any person or damage to any property caused by Contractor's acts, failure to act, negligence or willful conduct, or for any other liability of Contractor.

   7.3   ***Contractor Indemnity.***   Contractor hereby agrees to indemnify, hold harmless and, upon request, defend UWIN, its affiliates, and their respective members, owners, shareholders, directors, officers, employees and agents (the "**Indemnified Parties**"), from and against all suits, proceedings, assessments, losses, claims, liabilities, demands or actions of any nature or kind whatsoever ("**Claims**"), directly or indirectly arising out of, or in any manner whatsoever associated or connected with:

   A.   the failure of Contractor to pay when due any levies, taxes or assessments that Contractor may be required by applicable law to pay;

   B.   Contractor's operation of Contractor's Business;

   C.   Contractor's acts, failure to act, or negligence or willful conduct; or

   D.   any failure to comply with the obligations described under this Agreement, including but not limited to Remedial Payments made under **Section 3.4** and any related actions taken in connection therewith; and against any and all damages, costs, expenses and fees (including, without limitation, reasonable legal expenses and fees), losses, fines or penalties incurred by or on behalf of any of the Indemnified Parties in the investigation or defense of any and all Claims.

*ARTICLE 8  GENERAL*

   8.1   ***Inquiry by UWIN.***   Contractor, by its execution of this Agreement, authorizes UWIN and its agents and representatives to make credit and background checks, including, without limitation, reasonable inquiries of Contractor's bankers, suppliers and other trade creditors regarding their dealings with Contractor in relation to Contractor's Business, to discuss the affairs, finances and accounts of Contractor's Business with Contractor's bankers; and Contractor, by its execution of this Agreement, authorizes and directs such bankers, suppliers and trade creditors to discuss with UWIN and its authorized agents and representatives the affairs, finances and accounts of Contractor's Business. If requested, Contractor agrees to execute and deliver such directions and other documents as UWIN may require in order to authorize such bankers, suppliers and trade creditors to release or disclose any such information and documents to UWIN.

8.2     **Notices.**  All notices, consents and approvals permitted or required to be given under this Agreement must be in writing and will be deemed to be sufficiently and duly given if set forth in writing and, in the case of Contractor, left with an adult person working at Contractor's Business, or, in the case of either party, if sent by a prepaid certified letter or by overnight courier service or transmitted by facsimile, electronic mail  or other form of recorded communication tested prior to transmission (with a confirming copy mailed to the addresses shown on the signature page) or such other address or facsimile number provided by one party to the other party for notices.  Any notice so given or made will be deemed to have been given or made and received on the earlier of (A) the day of delivery or (B) one business day after transmission by facsimile or other form of recorded communication service of the same or by overnight courier service, as the case may be, or (C) on the third business day following the day of mailing of the same by certified mail.

8.3     **Approvals or Consents.**   Requests by Contractor for approvals or consents must be in writing and timely made.  Approvals and consents by UWIN will not be effective unless in writing and duly executed by UWIN.  Except as expressly provided to the contrary herein, UWIN may grant or withhold such approvals or consents, and may make any determinations permitted hereunder, in its sole discretion and will not be required to show "reasonableness" or to comply with any other standard in connection herewith.

8.4     **Non Waiver.** The failure of either party to exercise any right, power or option given under this Agreement, or to insist upon strict compliance with the terms and conditions of this Agreement by the other party, will not constitute a waiver of the terms and conditions of this Agreement with respect to any other or subsequent breach of this Agreement or default under this Agreement, nor a waiver by the first party of its right at any time thereafter to require strict compliance with all terms and conditions of this Agreement. UWIN's acceptance of payments due under this Agreement will not constitute a waiver of any breaches by Contractor that precede the acceptance of such payments.

8.5     **Effect of Standards.** UWIN's specifications of the Customer Complaint Resolution Program will not constitute a warranty or representation, express or implied, as to quality, safety, suitability, fitness for a particular purpose or any matter.  UWIN will not be liable to Contractor or others on account of the specifications of the Customer Complaint Resolution Program.

8.6     **Further Assurances.**  The parties agree to diligently do or cause to be done all acts or things and to execute all documents and instruments necessary to implement and carry into effect this Agreement to its fullest extent.

8.7     **Successors and Assigns.**  This Agreement will inure to the benefit of and be binding upon UWIN, Contractor and their respective heirs, legal representatives, successors and permitted assigns.

8.8     **No Third Party Beneficiaries.** Except as otherwise expressly provided herein, this Agreement is exclusively for the benefit of the parties hereto and does not confer a benefit on, or give rise to liability to, a third party.  No agreement between UWIN and a third party is for the benefit of Contractor.

8.9     **Construction.** Contractor acknowledges that it had the opportunity to be represented by an attorney in connection with the execution of this Agreement, and to review and understand the terms hereof and to consider the advisability of entering into this

Agreement.  This Agreement will be construed according to its plain meaning and neither for nor against either party hereof regardless of which party's counsel drafted the provision.

8.10   ***Entire Agreement/Amendments***.   UWIN   and   Contractor   each acknowledge   and   warrant   to   each   other   that   they   wish   to   have   all   terms   of   the   business relationship   defined   in   this   Agreement.   Neither   UWIN   nor   Contractor   wishes   to   enter   into   a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different   from   or   supplementary   to   the   rights   and   obligations   set   forth   herein.   Accordingly, UWIN   and   Contractor   agree   that   this   Agreement,   together   with   any   other   documents   or agreements executed by the parties contemporaneously hereto, supersede and cancel any prior and/or   contemporaneous   discussions   (whether   described   as   representations,   inducements, promises,   agreements   or   any   other   term)   between   UWIN   or   anyone   acting   on   its   behalf   and Contractor   or   anyone   acting   on   its   behalf,   which   might   be   taken   to   constitute   agreements, representations,   inducements,   promises   or   understandings   (or   any   equivalent   to   such   terms) with respect to the relationship between the parties, and UWIN and Contractor each agree that they have placed, and will place, no reliance on any such discussion.  This Agreement, together with any other documents or agreements executed by the parties contemporaneously hereto or incorporated   herein   by   reference,   constitutes   the   entire   agreement   between   the   parties   and contains   all   of   the   terms,   conditions,   rights   and   obligations   of   the   parties   with   respect   to   any aspect   of   the   relationship   between   the   parties.   No   further   rights   or   offer   of   rights   have   been promised to Contractor and no such rights or offer of rights will come into existence, except by means of a separate writing, executed by an officer of UWIN or such other entity granting the rights   and   specifically   identified   as   a   modification   of   this   Agreement.   No   change,   modification, amendment   or   waiver   of   any   of   the   provisions   hereof   will   be   effective   and   binding   upon   either party unless it is in writing, specifically identified as an amendment hereto and signed by the party to be charged.

8.11   ***Survival***.  All obligations of UWIN and Contractor which expressly or by their nature survive termination or expiration or transfer of this Agreement, including but not limited   to   the   Remedial   Payment   obligations   in   **Article 3,**   the   dispute   resolution   provision   in **Article 6** the Relationship and Indemnification provisions of **Article 7**, will continue in full force and effect subsequent to and notwithstanding such termination or expiration or transfer and until they are satisfied or by their nature expire.

8.12   ***Severability of Provisions***.  Every part of this Agreement is severable and the invalidity or unenforceability of any part of this Agreement will not affect the validity or enforceability of any other part of this Agreement.

8.13   ***Counterparts***.  This Agreement may be executed in counterparts, and each counterpart when so executed and delivered will be deemed an original.

*ARTICLE 9.  ACKNOWLEDGEMENTS*

9.1   ***Control of Contractor's Business***.   Contractor   understands   and acknowledges that UWIN will not be exercising any control over its method of operations or give Contractor any significant assistance in the day-to-day operations of its residential home repair services   business.   Specifically,   UWIN   has   no   control   over   and   no   obligation   to   provide   any assistance with respect to any of the following activities: site approval or selection; site design or appearance;   hours   of   operation;   service   techniques;   account   or   management   policies   and

practices; personal policies or practices; promotional campaigns; service or marketing territories; and training programs.

9.2 **Contractor Business Trademark.** Contractor acknowledges that, notwithstanding the license of the Seal under this Agreement, the Contractor's Business will primarily be associated with Contractor's name, trademarks, and logos and not substantially associated with the Seal. Contractor's display and use of the Seal will be in connection with its participation in the Customer Complaint Resolution Program and not the overall operation of its residential home repair services business. Contractor's Business will not be operated under a marketing plan or system prescribed in substantial part by UWIN.

9.3 **Contractor's Business Operation.** Contractor acknowledges that it is not relying on UWIN to furnish any advice, guidance, or assistance with respect to the established or continuing operation of its residential home repair services business in the form of marketing assistance or advice or any other business assistance, although UWIN may give Contractor assistance from time to time.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of **June 14, 2013**.

**ZUBIE AIR INC:**

UWIN:

UWIN, LLC

_____

_____

**Evel L. Zubiate**
**President**

Mark Baker
President

**Check One:**
      an Electrical Contractor
    **X an HVAC Contractor**
    **X a Plumbing Contractor**

UWIN, LLC
50 Central Avenue
Suite 920
Sarasota, Florida 34236
Attention: Membership Services

**Located at:**
**13111 Look Out Ridge**
**San Antonio, TX 78233**

<u>EXHIBIT A</u>

**OWNER'S GUARANTY**

In consideration of, and as an inducement to, the grant of a license to use the Seal and the execution of the UWIN Agreement for Franchisees, dated, _____ , 20__ (the "**Agreement**") by and between UWIN, LLC, a Florida limited liability company ("**UWIN**"), and _____, ("**Contractor**"), the undersigned owner of Contractor ("**Owner**") hereby personally and unconditionally: (1) guaranties to UWIN and its successors and assigns, for the Term and thereafter, including any renewal, as provided in the Agreement, that Contractor will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and any documents, agreements, instruments and promissory notes executed pursuant to or in connection with the Agreement (collectively, the "**Documents**"); and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Documents applicable to Owners of Contractor.

**The undersigned waives:**

(1)     acceptance and notice of acceptance by UWIN of the foregoing undertakings;

(2)     notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

(3)     protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

(4)     any right the undersigned may have to require that an action be brought against Contractor or any other person as a condition of liability; and

(5)     any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

**The undersigned consents and agrees that:**

(1)     the undersigned's direct and immediate liability under this Guaranty will be joint and several with all signatories to this and similar guaranties of Contractor's obligations;

(2)     the undersigned agrees to render any payment or performance required under the Agreement upon demand if Contractor fails or refuses punctually to do so;

(3)     this Guaranty applies to any claims UWIN may have due to return of any payments or property UWIN may have received from Contractor as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(4)     such liability is not contingent or conditioned upon pursuit by UWIN of any remedies against Contractor or any other person; and

(5)     such liability will not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which UWIN may from time to time grant to Contractor or to any other person, including without limitation, the acceptance of any

partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during and after the terms of the Documents, as the same may be amended or renewed, until Contractor's duties and obligations to UWIN are fully discharged and satisfied.

All capitalized terms used in this Guaranty and not otherwise defined will have the meanings ascribed to them in the Agreement.

This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state where UWIN has its principal place of business at the time the dispute arises, without giving effect to its conflicts of law principles.  Owner agrees that (A) any state court of general jurisdiction sitting in the county and state where UWIN has its principal place of business at the time the action is commenced or (B) the United States District Court for the county and state where UWIN has its principal place of business at the time the action is commenced will be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Guaranty, and Owner irrevocably submits to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court.

      IN WITNESS WHEREOF, each of the undersigned has affixed his or her signature on _____, 2 0___.

**WITNESS(ES):**                      **GUARANTOR(S):**

_____            _____
Signature                         Signature

_____            _____
Print or Type Name                  Print or Type Name


_____            _____
Signature                         Signature

_____            _____
Print or Type Name                  Print or Type Name

**OWNER'S GUARANTY**

In consideration of, and as an inducement to, the grant of a license to use the Seal and the execution of the UWIN Agreement for Franchisees, dated, **June 14, 2013** (the "**Agreement**") by and between UWIN, LLC, a Florida limited liability company ("**UWIN**"), and **ZUBIE AIR INC**, a Texas Corporation, ("**Contractor**"), the undersigned owner of Contractor ("**Owner**") hereby personally and unconditionally: (1) guaranties to UWIN and its successors and assigns, for the Term and thereafter, including any renewal, as provided in the Agreement, that Contractor will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and any documents, agreements, instruments and promissory notes executed pursuant to or in connection with the Agreement (collectively, the "**Documents**"); and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Documents applicable to Owners of Contractor.

**The undersigned waives:**

(1)     acceptance and notice of acceptance by UWIN of the foregoing undertakings;

(2)     notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

(3)     protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

(4)     any right the undersigned may have to require that an action be brought against Contractor or any other person as a condition of liability; and

(5)     any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

**The undersigned consents and agrees that:**

(1)     the undersigned's direct and immediate liability under this Guaranty will be joint and several with all signatories to this and similar guaranties of Contractor's obligations;

(2)     the undersigned agrees to render any payment or performance required under the Agreement upon demand if Contractor fails or refuses punctually to do so;

(3)     this Guaranty applies to any claims UWIN may have due to return of any payments or property UWIN may have received from Contractor as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

(4)     such liability is not contingent or conditioned upon pursuit by UWIN of any remedies against Contractor or any other person; and

(5)     such liability will not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which UWIN may from time to time grant to Contractor or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and

1

irrevocable during and after the terms of the Documents, as the same may be amended or renewed, until Contractor's duties and obligations to UWIN are fully discharged and satisfied.

All capitalized terms used in this Guaranty and not otherwise defined will have the meanings ascribed to them in the Agreement.

This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state where UWIN has its principal place of business at the time the dispute arises, without giving effect to its conflicts of law principles.  Owner agrees that (A) any state court of general jurisdiction sitting in the county and state where UWIN has its principal place of business at the time the action is commenced or (B) the United States District Court for the county and state where UWIN has its principal place of business at the time the action is commenced will be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Guaranty, and Owner irrevocably submits to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court.

IN WITNESS WHEREOF, each of the undersigned has affixed his or her signature on **June 14, 2013.**

WITNESS:                                          **GUARANTOR:**

_____          _____
Signature                                               **Evel L. Zubiate**

_____
Print or Type Name